IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| JESSYCA REDLER and<br>BRYAN REDLER, | ) <br>) <br>) | |
| Plaintiffs, | ) <br>) | CIVIL NO.: 3:14-CV-017 |
| | ) | JURY TRIAL DEMANDED |
| MARRIOTT OWNERSHIP RESORTS<br>(ST. THOMAS), INC. d/b/a<br>MARRIOTT FRENCHMAN'S COVE, | ) <br>) <br>) <br>) | |
| Defendant. | ) <br>) | |

**DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND
REPORTS OF PLAINTIFFS' SAFETY EXPERT CARL J. ABRAHAM
WITH INCORPORATED MEMORANDUM OF LAW**

Defendant, Marriot Ownership Resorts (St. Thomas), Inc. d/b/a Marriott

Frenchman's Cove ("Marriott"), by and through undersigned counsel, and pursuant

to the applicable Federal Rules of Civil Procedure, Federal Rules of Evidence, Local

Rules of the United States District Court for the Virgin Islands, Division of St.

Thomas and St. John, and the principles set forth in *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), moves the Court to enter an order

precluding Plaintiffs Jessyca Redler and Bryan Redler ("Plaintiffs") from

presenting, at trial or otherwise, the testimony or the reports of Plaintiffs' safety

expert Carl J. Abraham ("Dr. Abraham") in this action.  In support thereof, Marriott

states:

## I.     PRELIMINARY STATEMENT

Plaintiff Jessyca Redler ("Mrs. Redler") initiated this action to recover damages for personal injuries allegedly sustained on April 15, 2012 when an umbrella in the pool area at the Frenchman's Cove on St. Thomas (the "Frenchman's Cove") overturned onto Mrs. Redler.  Her husband, Bryan Redler ("Mr. Redler"), alleges a loss of consortium.  According to Plaintiffs, "the failure to secure the deck umbrella in a stanchion that held it securely or otherwise secure the deck umbrella constituted a known and obvious dangerous condition . . . ."  Compl. ¶ 38.

Plaintiffs have proffered Dr. Abraham, an engineer, as their "Safety Expert" in this matter. "Carl Abraham is expected to provide testimony that the state of the umbrella that hit Ms. Redler made it unsafe and that allowing the umbrella to exist in the condition it was in was a breach of duty of care on the part of the Defendant."[1] Plaintiffs have filed reports by Dr. Abraham dated August 12, 2013 and December 22, 2014.[2]  Dr. Abraham was deposed on April 23, 2015.[3]  Dr. Abraham has never met Plaintiffs nor does he recall ever speaking with them.  The first report was based on conversations with opposing counsel and photographs

---

[1] *See* Plaintiffs' Expert Witness Disclosure dated December 22, 2014 attached as Exhibit A.

[2] A copy of the December 22, 2014 report is attached as Exhibit B; a copy of the August 12, 2013 report is attached as Exhibit C.  The August 12, 2013 report was attached to Plaintiffs' Disclosure of Expert Witness and Report dated November 3, 2014; a copy of that disclosure is attached as Exhibit D.

[3] A copy of the transcript of Dr. Abraham's deposition is attached as Exhibit E.

2

taken by Mr. Redler. The second report was completed following his on-site inspection of the Frenchman's Cove property and exemplars of the umbrella involved in the incident.

The testimony and reports of Dr. Abraham as to safety should be excluded primarily because his conclusions are based upon speculation and conjecture and do not demonstrate any failure of Marriott or the umbrellas and stanchions in use at the Frenchman's Cove to comply with any law, ordinance, code, or standard of reasonable care.

Moreover, the methodology, if any, employed by Dr. Abraham is not sufficiently reliable and it will not assist the trier of fact through the application of scientific, technical or specialized expertise to understand the evidence or to determine a fact in issue.

Further, the testimony and reports of Dr. Abraham as to medical issues should be rejected outright. Dr. Abraham is a "licensed Professional Engineer with a specialization in Safety, Safety Engineering and Design." (Exhibit B at p. 1, ¶ 2; Exhibit C at p. 1.)   He is not qualified to opine on the medical injuries alleged in this case.

Finally, Plaintiffs have failed to submit a list of all publications Dr. Abraham himself has authored in the previous 10 years or a list of all other cases in which, during the previous four years, he has testified as an expert at trial or by deposition. Similarly, Plaintiffs have failed to submit the photographs and

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

videotape conducted on the inspection which occurred and which is referenced in his expert report.

Accordingly, both under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure and Rule 702 of the Federal Rules of Evidence, Dr. Abraham may not testify.

## II.    LEGAL PRINCIPLES

District courts have a "gatekeeping" function in connection with expert testimony. *ZF Meritor, LLC v. Eaton Corp.*, 695 F.3d 254, 290 (3d Cir. 2012); *Barnes v. Century Aluminum Co.*, 2013 U.S. Dist. LEXIS 42311, *13 (D.V.I. Mar. 26, 2013) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997), and *Daubert*, 509 U.S. at 589). Federal Rule of Evidence 702, as amended in 2000 to incorporate the standards set forth by the Supreme Court in *Daubert*, requires district courts to ensure that expert testimony is not only relevant, but reliable. *ZF Meritor*, 696 F. 3d at 291 (citations omitted).

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods

4

to the facts of the cases.

Fed. R. Evid. 702.

As the Third Circuit has explained, Rule 702 "embodies a trilogy of restrictions on expert testimony:  qualification, reliability and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ("Rule 702 has three major requirements:  (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact.").

Importantly, the proponent of challenged expert testimony has the burden of establishing, by a preponderance of proof, that the testimony is admissible.  *See, e.g.*, Daubert, 509 U.S. at 592 n. 10; *Mercedes-Benz USA, Inc. v. Coast Auto. Group, Ltd.*, 362 F. App'x 332, 335 (3d Cir. 2010) (citations omitted); *Virgin Islands v. Jacobs*, 2001U.S. Dist. LEXIS 22511, *12-13 (D.V.I. Dec. 28, 2001) (citations omitted).

## III.   ARGUMENT

Dr. Abraham gives the following opinions:

1.     It would have been impossible for Mrs. Redler to open the umbrella. (Exhibit B at p. 2, ¶ 7.)

2.      "The stability of the umbrellas was a problem that the Marriott Hotel was aware of and they were solving the problem by securing the umbrellas with new cement bases."  (Exhibit B at p. 2, ¶ 6; Exhibit C at p. 2.)

5

3. A gust of wind could tip the umbrella over without anyone touching the pole or the umbrella; it takes less than 10 pounds of force to push the umbrella and stanchion to the ground; and the umbrella and pole fell to the ground with more than enough force to produce Mrs. Redler's concussion. (Exhibit B at p. 3, ¶ 13.)

4. By using stanchions, Marriott deviated from the standard of care known in the industry for decades. (Exhibit B at p. 3, ¶ 14(b); Exhibit C at pp. 3, 4.)

5. Guests are unable to close the umbrellas. (Exhibit B at p. 3, ¶ 14(c).)

6. Marriott didn't follow established protocol in providing medical assistance to Mrs. Redler. (Exhibit B at p. 3, ¶ 14(d), p. 4, ¶¶ 14(e), 14(f); Exhibit C at p. 2, ¶ (c).)

7. Marriott deviated from the standard of care followed by all hotels that umbrellas must be closed when there is a strong wind. (Exhibit B at p. 4, ¶ 14(j).)

8. The umbrella and stanchion were not fit for their intended purpose and foreseeable exposure to wind gusts. (Exhibit B at p. 4, ¶ 14(l).)

9. The warnings and instructions associated with the hazard were defective. (Exhibit B at p. 5, ¶ 15; Exhibit C at p. 3.))

10. The impact was extreme because of the design of the pole. (Exhibit B at p. 5, ¶ 16.)

11. "The force produced by the steel pole was more than enough to produce a severe concussion, a subdural hematoma and actually kill a young child." (Exhibit B at p. 5, ¶ 17.)

**HAMILTON, MILLER & BIRTHISEL, VI P.C.**
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

12.     Both the umbrella and the stanchion that it was placed in were defective.  (Exhibit B at p. 6, ¶ 18; Exhibit C at p. 3.)

13.     "It is a known fact that restaurants with chairs, tables, and umbrellas outside; resorts throughout the world; spas; and hotels fold and tie up their umbrellas whenever there is a danger of the umbrella being thrown overdue to gusts of wind, even with a substantial stanchion holding the umbrella.  From a risk benefit standpoint, no hotel will gamble on the integrity of any stanchion if it is foreseeable that gusts of winds may blow the umbrella over onto the guests."  (Exhibit C at p. 3, ¶ j.)

Dr. Abraham also gives opinions on medical issues that are clearly outside the scope of his expertise and testimony as a safety expert and are otherwise inadmissible.  His medical opinions are as follows:

1.     Mrs. Redler's current and permanent symptoms were caused "by the single trauma of the steel pole hitting her brain on April 15, 2012."  (Exhibit B at p. 3, ¶ 12; *see also* Exhibit C at p. 4.)

2.     The Marriott management knew, or should have known, "that any delay in the medical management of a concussion will exacerbate the pre-existing injury resulting in additional damage to the brain with residual after effects and a longer recuperation period."  (Exhibit B at p. 4, ¶ 14(f); Exhibit C at p. 2, ¶ d.)

3.     There is no such thing as a mild concussion; a concussion is a concussion.  (Exhibit B at p. 4, ¶¶ 14(g), 14(i); Exhibit C at p. 2, ¶ g.)

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA  33131 • 305-379-3686 • FAX 305-379-3690

4.      Mrs. Redler's injury "can also manifest itself resulting in visual perception disorders, difficulty attending to auditory and visual stimuli problems organizing an categorizing verbal materials and changes in sexual behavior.  In addition, damage to the right temporal lobe could also result in a lack on (sic) inhibition when talking."  (Exhibit B at p. 5, ¶ 16.)

5.      "The fact that [Mrs. Redler's] brain injuries have continued for over 2 years is indicative that the brain will deteriorate prematurely resulting in additional neurological deficits at an early age."  (Exhibit B at p. 6, ¶ 19.)  "In fact, based upon the severe injury she experienced, she may experience Alzheimer's neurological deficits, Parkinson's and other problems at an early age well before she reaches the geriatric part of her life."  (Exhibit C at p. 3, ¶ i.)

## A.      Dr. Abraham Is Not Qualified to Provide Medical Testimony.

As a threshold matter, Dr. Abraham is clearly incompetent to provide any medical testimony as he is not a medical doctor.  "The qualification of a witness to testify is a preliminary question of law." *United States v. Moses*, 137 F.3d 894, 899 (6th Cir. 1998).  To answer this question, this Court must be satisfied not only that the witness has specialized training or experience, but also that the witness' expertise is of a kind that qualifies him to opine on the particular issues at hand. *See, e.g., Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) (expert witness must have "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case").

**HAMILTON, MILLER & BIRTHISEL, VI P.C.**
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

Dr. Abraham was proffered as a safety expert.  (Exhibit A at p. 1.)  At deposition, however, Dr. Abraham testified that he was retained by Plaintiffs' counsel "To determine the liability in the subject matter, how the brain injuries were caused, how they were caused (sic), and to render an opinion based upon [his] experience and knowledge of valuating cases involving impacts to the brain." (Exhibit E at 16:17-23.)  No explanation as to how he misapprehended the scope of his retention in this matter has been provided.

At deposition, Dr. Abraham conceded that he is not: a medical doctor, a neurologist, a radiologist, a neuropsychologist, ophthalmologist, physical therapist, psychologist, psychiatrist, an orthopaedist, or an orthopaedic surgeon. (Exhibit E at 8:16-25, 9:1-23, 11:14-16.).  Dr. Abraham has a Ph.D. in chemistry, but in the course of obtaining that degree, he did not take any premed or medical courses. (Exhibit E at 169:16-21.)  He claims to have been "qualified in court [as a biomechanical engineer]" (Exhibit E at 10:9-11) in "fifty thousand cases," but he cannot recall the names of any such cases.  (*Id.* at 11:3-13.)  In this regard, it's notable that he failed to provide a list of all other cases in which, during the previous four years, he has testified as an expert at trial or by deposition.  Such list was not attached to either of Plaintiffs' Expert Witness Disclosures.  (*See* Exhibits A and B.)

In sum, Dr. Abraham has no formal medical training.  (*Id.* at 16:1-2.)  He considers himself qualified to determine how the alleged brain injuries in this case were caused, and to render a medical diagnosis and prognosis (*id.* at 16:6-23), based on his "background in personal injury cases from 1970 to the present time" (*id.* at

9

17:1-8), presentation of papers, (*id.* 17:4-5, 15-16), and the fact that he reads "voluminously on appellate decisions relating to cases [he's] involved in." (*Id.* at 9-10.) Again, Dr. Abraham does not recall the names of any cases he's been involved in (*see id.* at 11:3-13), and he has not complied with Rule 26 in this regard. He has likewise failed to submit a list of the publications he has authored in the past 10 years. And, of course, Dr. Abraham cannot make himself an expert by reading articles or decisions. In *TMI Litigation*, the Third Circuit held that because an expert's "only knowledge of the health effects of radiation was obtained from literature he reviewed in connection with his retention as an expert in this litigation . . . [h]e plainly does not meet Rule 702's 'Qualifications' requirement." *In re TMI Litigation*, 193 F.3d 613, 680 (3d Cir. 1999).

Dr. Abraham was not proffered as a medical expert for good reason. He does not possess the specialized expertise. The first requirement of Rule 702, qualification, is not met. *See Schneider*, 320 F.3d at 404 ("Qualification refers to the requirement that the witness possess specialized expertise.")

**B.   Dr. Abraham's Medical Testimony Is Not Reliable.**

Even if Dr. Abraham were qualified to present medical testimony, which clearly he is not, the methodology he used, or more aptly put, did not use, in formulating his medical opinions is not reliable. At deposition, Dr. Abraham was

10

unable to identify a single theory or technique that he used and that can and has been tested or that has been subjected to peer review and publication.[4]

The second requirement of Rule 702, reliability, also is not met.   Dr. Abraham's testimony is based on subjective belief and unsupported speculation. *See Schneider*, 320 F.3d at 404 (To establish reliability, the testimony must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his o[r] her belief." *Id.* (citations and internal quotation marks omitted); *see also Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (noting that district courts must ensure that "the expert's opinion [is] based on the methods and procedures of science rather than on subjective belief or unsupported speculation" (citations and internal quotation marks omitted).

**D.    Dr. Abraham is Not Qualified to Testify as to Whether, by Using Stanchions, Marriott "Deviated from the Standard of Care Known in the Industry for Decades" or as to Other Related Issues.**

As a threshold matter, Marriott recognizes that Dr. Abraham is an engineer,

---

[4] At deposition, Dr. Abraham named 16 articles (*see* Exhibit E at 41-47), none of which he authored, and many of which he "extracted" – "copied and pasted."  (*Id.* at 44:24, 45:1-10, 46:16-21.)  Dr. Abraham then proceeded to testify that he did not rely on any of these documents in rendering his opinions in this case. (*Id.* at 47:25, 48:1-9.)  (These articles were attached as Exhibits 3–18 to his deposition.)  Nor did he rely on an article attached as Exhibit 19 to his deposition, titled "Focal (Nonepileptic) Abnormalities on EEG."  (*Id.* at 70:11-22.)

Dr. Abraham further testified that the opinions in his reports were not based on any conclusions reached by Alan Ashare, M.D., Plaintiffs' radiology expert, because his conversations with Dr. Ashare took place after Dr. Abraham's reports were rendered.  (*Id.* at 90:6-9.)

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

and that he professes to have used his background and experience "in handling similar cases" (Exhibit E at 26:4-5) in reaching his conclusions as to Marriott's purported failure to meet the standards of care in the hospitality industry. The problem is, however, that Dr. Abraham cannot point to any similar cases he's been involved in or any peer reviewed articles he's published on the subject at issue. At deposition, Dr. Abraham was asked: "Have you ever been qualified as an expert in court to testify about the force of an umbrella falling over and injuring anyone? (Exhibit E at 183:16-18.) He answered: 'I have never been disqualified, but I've never had a case that I've had to go to trial on similar to this one with an umbrella." (*Id.* at 184:7-9.)

The Court must examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). In other words, "[d]istrict courts must ensure that expert opinion testimony is in fact expert opinion, not merely opinion given by an expert." *United States v. Lundy*, 809 F.2d 392, 396 (7th Cir. 1987).

These legal standards make clear that Dr. Abraham is not an expert on the specific subject matter of his proffered testimony/opinions. Ultimately, Dr. Abraham opines that by using stanchions, Marriott deviated from the standard of care known in the industry for decades. (Exhibit B at p. 3, ¶ 14(b); Exhibit C at pp. 3, 4.)

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

There is no specialized knowledge that Dr. Abraham possesses which would assist the trier of fact in reaching the same or, indeed, a different, conclusion based on the facts and documentary evidence which may be presented at trial. *See Wilson v. Woods*, 163 F.3 935, 938 (5th Cir. 1999) (excluding witness who "had never taught [relevant] courses, never experimented or conducted studies in the field, and never published anything on the subject"). These principles were applied to exclude a professor with no relevant professional experience from offering expert testimony on a particular subject within his field. *Shreve v. Sears, Roebuck & Co.*, 166 F.Supp. 2d 378 (D. Md. 2001). "The fact that a proposed witness is an expert in one area does not *ipso facto* qualify him to testify as an expert in all related areas." *Id.* at 393. *See also Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723-24 (7th Cir. 1999) (error to admit expert testimony where witness' expertise was in an area other than that at issue).

**E.    Dr. Abraham's Testimony and Reports as to "State" of the Umbrella and Marriott's Duty of Care Lack Reliability.**

The second prong of the expert admissibility test focuses on methodology and the *Daubert* factors. 509 U.S. at 592-94. Under a *Daubert* analysis, a court *may* consider several factors in determining whether expert testimony is admissible: (1) whether the theory or technique can and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether in respect to a particular technique there is a high known or potential rate of error and whether there are standards controlling that technique's operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id.*

13

Not only are there are no convincing factors which operate in favor of admitting Dr. Abraham's testimony, there is no way his manner of drawing conclusions could, at the least, be compared with others in the field.

### 1.   Dr. Abraham's Opinion that Mrs. Redler Could Not Have Opened the Umbrella is Based on "Common Sense," Not Methodology.

It appears from the facts developed thus far that due to the windy conditions on the day of the incident, the umbrella next to Mrs. Redler was in the closed position until she opened it.   Dr. Abraham opines that it would have been impossible for Mrs. Redler to have opened the umbrella because one must be able to lift over 60 pounds in order to lift the umbrella, (Exhibit B at p. 2, ¶ 7; Exhibit E at 104:18-22).   That conclusion is not based on any scientific principles or standards, or even on what Mrs. Redler's abilities are.   It's based on Dr. Abraham's "experience through a lifetime, and working out – and knowing what [his] wife, for example, who works out all the time, can lift, and she's strong, versus what [he] can lift." (Exhibit E at 106:8-10, 16-25, 107:1.)[5]   According to Dr. Abraham, it's just "common sense."   (*Id.* at 109:17-18, 20.)[6]

The standard jury instructions as to common sense will therefore suffice: "You should use your common sense in weighing the evidence.   Consider it in light

[5] His opinion that "guests are unable to close the umbrellas" (Exhibit B at p. 3, ¶ 14(c)) is likewise unfounded.   At deposition, Dr. Abraham was asked what facts or authority he relied in reaching this opinion.   He responded "Oh, I never said close.   I never said that."   (Exhibit E at 16:24-25, 163:1-3.)

[6] In any event, Dr. Abraham contradicted himself by testifying that there were guests who were reopening umbrellas.   (*See* Exhibit E at 151:13-15.)

14

of your everyday experience with people and events, and give it whatever weight you believe it deserves.   If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion."  Model Civ. Jury Instr. 3rd Cir. 1.5 (2011).

**2.      No "Methodology" Was Utilized by Dr. Abraham to Conclude that Marriott Deviated From the Standard of Care Followed by "All Hotels" and "Known in the Industry for Decades."**

When asked to explain how he determined that Marriott deviated from the standard of care followed by "all hotels" and "known in the industry for decades" (*see supra* p. 6, ¶¶ 4, 7;   p. 7, ¶ 13), and what, exactly, that standard is, Dr. Abraham answered that "he's stayed in [Marriott] hotels all over the world." (Exhibit E at 64:12-13.)  According to Dr. Abraham, the standard of care that's used throughout the world is a non-delegable duty to eliminate all the inherent risks. (*Id.* at 121:20-25, 122:1.)  He maintains that Marriott was on notice as to the risk the stanchions/umbrellas purportedly posed because "it's a known fact that wind can blow over umbrellas, that's no secret."  (*Id.* at 160:12-15.)[7]

In other words, here, again, expert testimony would serve no purpose.

**3.      The Testing Performed by Dr. Abraham as to the Umbrella/Pole Was Not Representative of the Conditions of the Incident as Reported and the Analyses and Conclusions by Dr. Abraham Are Not Based Upon Accepted Principles or Methods in the Scientific Community.**

---

[7] Dr. Abraham's opinion that Marriot didn't follow established protocol in providing medical assistance to Mrs. Redler (*see supra* p. 6, ¶ 6) is also untenable.  This opinion is based on the fact that "It was open and obvious to [Dr. Abraham] that there was no one there that would recognize the problem that existed at the time she was injured, and that she needed immediate medical attention."  (Exhibit E at 66:11-14.)

15

Dr. Abraham determined that "the umbrella could be easily blown over by a gust of wind without anyone touching the pole or the umbrella" (*see supra* p. 6, ¶ 3) by pushing the pole of the umbrella with his hand!  (*See* Report of Findings by Rimkus Consulting Group, Inc., attached as Exhibit F, at p. 3, and photograph 5 thereto.)  Dr. Abraham's testing was not applicable to the conditions of the subject incident because a gust of wind would apply distributed forces onto the canopy, whereas the test performed by Dr. Abraham applied a concentrated load onto the pole of the umbrella.  (*See* Exhibit F at p. 3.)

Dr. Abraham's determination that "it takes less than 10 pounds of force to push the umbrella and stanchion over to the point where it fell to the ground" (*see supra* p. 6, ¶ 3)  was made without using any measuring device, such as a force gauge.  (*See* Exhibit E at 96:13-17.)   Due to the aforementioned reasons, the force reported by Dr. Abraham was not the same type of force involved in the subject incident.  (*See* Exhibit F at p. 3.)

Dr. Abraham's determination that "the umbrella and pole fell to the ground with more than enough force to produce Mrs. Redler's concussion" (*see supra* p. 6, ¶ 3); that the impact was extreme because of the design of the pole (*see supra* p. 7, ¶ 10);[8] and that "the force produced by the steel pole was more than enough to produce a severe concussion, a subdural hematoma and actually kill a young child" [9]

---

[8] Dr. Abraham blithely asserts that "the pole was round, and the impact was extremely narrow, in the temple area." (Exhibit E at 75:16-19.)

[9] Dr. Abraham acknowledged that Mrs. Redler did not suffer a "subdural hematoma," (Exhibit E at 76:6-7), and that she is not a young child.  (*Id.* at 91:16-

16

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

(*see id., ¶ 11)* is unscientific, to say the least.  Dr. Abraham tipped over a *closed* umbrella onto a piece of ceramic tile placed on the armrest of two chairs.  (*See* Exhibit F, photograph 6.)  Dr. Abraham initially performed the testing using an open umbrella but failed to make the shaft contact the tile due to the support from the canopy.  (*See id.*, photograph 7.)  His testing suggested that when the canopy was open, contact from the shaft of the umbrella would be different compared to that when the canopy was closed.  As such, his testing of tipping over a closed umbrella onto a piece of tile did not apply to the facts of this case.  (*See* Exhibit F at p. 4.)

Moreover, Dr. Abraham did not reference any peer-reviewed literature to support the conclusion that there was enough force to produce "a severe concussion, a subdural hematoma and actually kill a young child."  "The relationship between mechanical force and the failure of biological tissues is the subject and purview of biomechanics or biomechanical engineering."  (*See id.*)  Dr. Abraham has failed to establish his qualifications as a biomechanical engineer. (*See* Exhibit E at 10:16-21.)

### 4.   Dr. Abraham's Opinion that the "Warnings Were Defective" is Based on Inadmissible Hearsay and Unspecified "Voluntary" Standards.

In opining that "The warnings and instructions associated with the hazard were defective," (s*ee supra* p. 7, ¶ 9), Dr. Abraham principally relies on an unnamed Marriott bellboy who stated that he spoke with Mrs. Redler and "warned her." (Exhibit E at 65:5-11.)  In Dr. Abraham's view, the warnings were defective because

18.)

17

the bellboy "never stated that there was a possibility of any danger that she would be hit in the head." (*Id.* at 65:17-19.)   The bellboy never told her what the consequences would be "with reference to opening it up or leaving it open." (*Id.* at 65:19-21.)  The statements upon which Dr. Abraham relies are clearly inadmissible hearsay. *See* Fed. R. Evid. 801. Rule 703 makes clear, ""[f]acts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference . .. ." Fed. R. Evid. 703.

Dr. Abraham then asserts that there are "voluntary" and "statutory" warnings that have a "signal word, what the risk is, and what the consequence is. They didn't have any of that." (Exhibit E at 73:12-18.)  In his opinion, warnings should have been posted on the stanchions to advise guests of the risk of permanent injury or death because the steel pole was heavy. (*Id.* at 5-12.)  At deposition, Dr. Abraham  mentioned the American Society for Testing and Materials (ASTM), American National Standards Institute (ANSI), and the Consumer Product Safety Commission (CPSA) (Exhibit E at 73:15-16, 24-25, 74:2-3), but he hasn't produced any standards published by these organizations or even extracted any relevant data.  The Federal Rules of Evidence permit an expert to rely on documents only if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703.  Dr. Abraham fails to demonstrate how Marriott is bound by these purported standards or how these standards fit the facts of the case, much less how he formulated his opinion on data that would ordinarily be relied on by other experts in the field.

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

5.      **There is No Analytic Support for Dr. Abraham's Pre-Determined Conclusion that the Umbrellas/Stanchions Were Unstable/Defective.**

Dr. Abraham's "analysis" of the umbrella and stanchion *starts* with its conclusion - the umbrella overturned onto Mrs. Redler because the pole of the umbrella was not permanently embedded in the cement, which is based on his "understanding" that at the time of the incident, Marriott was in the process of securing the umbrellas in new cement bases. (Exhibit E at 72:10-16, 142:7-9, 148:24-25, 149:1-3, 173:23-25, 174:1-2.) The purpose of his field investigation, then, was to find evidence that supported this conclusion and not to assess independently what had occurred. For example, when asked what tests he did to determine that the subject umbrella and stanchion were not fit for their intended purpose and foreseeable exposure to wind gusts, Dr. Abraham testified: "I found out that when the wind blows in St. Thomas, the sun doesn't go away. I stay [sic] there, and watched the sun. It stayed, continued to – it continued to come down on the people." (*Id.* at 154:17-25, 155:1.) (This nonsensical answer is but one of many!) On cross-examination, Dr. Abraham ended where he started: "The stanchion should have been in the ground, so it could withstand the changes in the velocity of the wind." (*Id.* at 177:14-16.) No scientific, technical or specialized expertise was employed.

F.    **Dr. Abraham's Testimony and Reports Will Not Assist the Trier of Fact.**

The third restriction on expert testimony is whether the expert's testimony assists the trier of fact to understand the evidence or to determine a fact in issue,

19

through the application of scientific, technical or specialized expertise.   Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592.   Because Dr. Abraham's opinions are unsupported, they offer no expert assistance to the jury, and fail to satisfy the Third Circuit's fit requirement.   *See Schneider*, 320 F.3d at 404 (To satisfy the fit requirement, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.")   Furthermore, expert testimony without "reliable support may render it more prejudicial than probative, making it inadmissible under Fed. R. Evid. 403."   *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987); *see also Allison v. McGhan Medical Corp.*, 184 F.3d 13300, 1310 (11th Cir. 1999) (noting the "intricate role of Rule 403  in an expert testimony admissibility analysis").

Additionally, where, as is often the case here, the proposed testimony is the sort that is self-evident without the necessity of an expert explanation, or if the testimony is not germane to the underlying question, the expert should be excluded. *Montgomery v. Noga*, 168 F.3d 1282, 1303 (11th Cir. 1999)

## IV.   CONCLUSION

The deficiencies and shortcomings in Dr. Abraham's work are overwhelming. This is exactly the kind of "expert" testimony that this Court should exclude under Rule 702.   Otherwise, the label "expert" may mislead the jury and give these opinions credence to which they are clearly not entitled.

**[*Signatures on following page*]**

20

Respectfully submitted,

/s/ *Schuyler A. Smith*

_____

Jennifer Quildon Miller, Esq.
V.I. Bar No. 1109
Schuyler A. Smith, Esq.
V.I. Bar No. 1271
Hamilton, Miller & Birthisel, VI P.C.
Counsel for Defendant
150 Southeast Second Ave., Suite 1200
Miami, Florida 33131
Telephone 305-379-3686
Telefax 305-379-3690

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on **June 1, 2015**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of Electronic Filing.

/s/ *Schuyler A. Smith*
Schuyler A. Smith, Esq.

## SERVICE LIST

Karin A. Bentz, Esq.,
Gregory Adam Thorp, Esq.,
Karin A. Bentz P.C.
5332 Raadets Gade, Suite 3
St. Thomas, VI 00802-6309
Telephone: 340-774-2669
Facsimile: 340-774-2665
Email: kbentz@virginlaw.com

21