**In the Matter of:**

REDLER

vs.

MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)

**C.J. ABRAHAM**

*April 23, 2015*



www.OrangeLegal.com

800-275-7991

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 2 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                 1

```
 1              IN THE DISTRICT COURT OF THE VIRGIN ISLAND
                   DIVISION OF ST. THOMAS AND ST. JOHN
 2

 3                            CASE NO.:  3:14-CV-017

 4    JESSYCA REDLER and
      BRYAN REDLER,
 5
            Plaintiffs,
 6

 7    vs.

 8
      MARRIOTT OWNERSHIP RESORTS
 9    (ST. THOMAS), INC., d/b/a
      MARRIOTT FRENCHMAN'S COVE
10
            Defendant.
11    _____/

12

13    DEPOSITION OF:        C.J. ABRAHAM

14    DATE TAKEN:           Thursday, April 23, 2015

15    TIME:                 10:58 a.m. - 4:28 p.m.

16    PLACE:                Law Offices of S. Marks, P.A.
                            1900 Glades Road, Suite 102
17                          Boca Raton, Florida 33431

18    TAKEN BY:             The Defendant

19    REPORTED BY:          Barbara L. Kent, RMR, RPR, FPR,  CSR
                            Court Reporter and Notary Public
20

21

22

23

24

25
```



```
 1                  A P P E A R A N C E S

 2    KARIN A. BENTZ, ESQUIRE
      OF:    Law Offices of Karin A. Bentz, P.C.
 3           5332 Raadets Gade
             Suite 3
 4           St. Thomas, Virgin Island 00802
             kbentz@virginlaw.com
 5           (349) 774-2669

 6           APPEARING ON BEHALF OF THE PLAINTIFF,

 7    KELLY CHARLES-COLLINS, ESQUIRE
      OF:    Hamilton, Miller & Birthisel
 8           150 Southeast Second Avenue
             Suite 1200
 9           Miami, Florida 33131
             kcharlescollins@hamiltonmillerlaw.com
10           (305) 379-3686

11           APPEARING ON BEHALF OF THE DEFENDANT.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 4 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          3

1                     C O N T E N T S

2   TESTIMONY OF C.J. ABRAHAM

3        Direct Examination by Ms. Charles-Collins........   5

4        Cross-Examination by Ms. Bentz.................. 169

5        Redirect Examination by Ms. Charles-Collins...... 180

6   CERTIFICATE OF OATH................................. 188

7   CERTIFICATE OF REPORTER............................. 189

8

9                     E X H I B I T S

10  DEFENDANT EXHIBITS

11  Number  1 (Report - 8/12/13)........................... 22
    Number  2 (report - 12/22/14).......................... 22
12  Number  3 (Article - Ways the Brain is Injured)........ 41
    Number  4 (Article - This is what Happens)............. 42
13  Number  5 (Article - Football Physics)................. 42
    Number  6 (Article - Subconcussive Head Impacts)....... 42
14  Number  7 (Article - First On-Field Soccer Impact)......42
    Number  8 (Article - The Motor Cortex)................. 43
15  Number  9 (Article - The Brain from Top to Bottom)..... 43
    Number 10 (Article - Recommendations for Diagnosing)... 44
16  Number 11 (Article - Concussion)....................... 44
    Number 12 (Article - The Invisible War)................ 44
17  Number 13 (Article - Dynamics of Falls)............... 45
    Number 14 (Article - Biomechanics of Sport Concussion.. 45
18  Number 15 (Article - Data analysis).................... 46
    Number 16 (Article - G Force).......................... 46
19  Number 17 (Article - Concussion Facts)................. 46
    Number 18 (Article - An Analysis of Maximum G Forces).. 47
20  Number 19 (Article - Focal Abnormalities on EMG)....... 70

21

22                  S T I P U L A T I O N S

23      It is hereby stipulated by and between counsel for the

24  respective parties that the reading and signing of the

25  deposition be Reserved.



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                            4

```
 1                  P R O C E E D I N G S

 2                       * * * *

 3          THE VIDEOGRAPHER:  Here begins the videotaped

 4    deposition of Carl J. Abraham, taken in the matter

 5    of case number 3:14-CV-017.  Jessyca Redler and

 6    Bryan Redler versus Marriott Ownership Resorts,

 7    St. Thomas, Inc., doing business as Marriott,

 8    Frenchman's Cove.  To be heard in the United States

 9    District Court of the Virgin Islands, Division of

10    St. Thomas and St. Johns.

11          The deposition is being held at the law

12    offices of Jeffrey Marks, located at 1900 Glades

13    Road, Suite 102, Boca Raton, Florida.

14          Today's date is April 23rd, 2015 and the time

15    on the video monitor is 11:10 a.m.

16          The Court Reporter is Barbara Kent, and the

17    Video Specialist is Paul Smith on behalf of Orange

18    Legal.

19          Would Counsel please introduce yourself,

20    after which the Court Reporter will swear in the

21    witness.

22          MS. BENTZ:  Karin Bentz, Law Office of Karin

23    A. Bentz, PC, on behalf the Plaintiffs, Jessyca and

24    Bryan Redler.

25          MS. CHARLES-COLLINS:  Kelly Charles-Collins
```

http://www.yeslaw.net/help



**Orange Legal**
**800-275-7991**

```
 1           of Hamilton, Miller & Birthisel on behalf of the

 2           Defendant, Marriott Ownership Resorts, St. Thomas.

 3                THE COURT REPORTER:  Would you raise your

 4           right hand, sir.

 5                Do you solemnly swear or affirm the testimony

 6           you're about to give will be the truth, the whole

 7           truth, and nothing but the truth, so help you God.

 8                MR. C.J. ABRAHAM:  I do.

 9                        C.J. ABRAHAM,

10      Having been first duly sworn by the court reporter, was

11      examined and testified as follows:

12                     DIRECT EXAMINATION

13      BY MS. CHARLES-COLLINS:

14           Q.   Would you please state your name for the

15      record.

16           A.   Carl Abraham.

17           Q.   Would you like me to call you Dr. Abraham?

18           A.   Carl, Carl Abraham.

19           Q.   Okay.

20           A.   It doesn't matter.

21           Q.   All right.

22                Dr. Abraham, my name is Kelly

23      Charles-Collins, I'm the attorney who will be taking your

24      deposition today on behalf of the Marriott.  I know that

25      you've been through a deposition before, but I'm going to
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 7 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          6

1    just ask you to indulge me in going through a couple of

2    things.

3             One is to please allow me to finish my

4    question before you begin your answer, and I will do the

5    same, allow you to finish your answer before I ask you

6    another question.

7             Also, if you would make sure to answer all of

8    my questions and words, so that the court reporter can

9    take them down, and that we not speak over each other so

10   that the court reporter can take down everything that is

11   being said.

12            If you need a break at any time, please let

13   me know that you need a break, and we will take one.

14   However, if there's a question pending, I just ask that

15   you answer the question before you take the break.

16            What's your address?

17   A.    In New York, is 3 Baker Hill Road, Great

18   Neck, New York; and down here is 5232-A, Lake Catalina

19   Drive North, in Boca Raton.

20   Q.    Say that street name, again.  I'm sorry?

21   A.    Lake Catalina Drive North, in Boca Raton.

22   Q.    And do you reside in both places throughout

23   the year.

24   A.    Six months in New York, in the -- from May to

25   the first week of November; and I work down here, and



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    7

```
 1    from November to the first week of May.

 2         Q.    Okay.  And you own your own company; correct?

 3         A.    Yes.

 4         Q.    What's the name of the company?

 5         A.    Scientific Advisory Services.

 6         Q.    And how long have you had that company?

 7         A.    Since September, 1998.

 8         Q.    And has anyone else -- do you have employees,

 9    or does anyone work with you in that company?

10         A.    Yes, I have -- all my staff is in New York,

11    and I -- I own a couple other companies, also.

12         Q.    Okay.  As it relates to engineering, your job

13    as a safety expert, is that all done under Scientific

14    Advisory Services?

15         A.    Yes.

16         Q.    Now, I know that you have quite a few

17    initials after your name.

18         A.    What -- I have to qualify that.  It's also

19    done under another name.

20         Q.    Okay.

21         A.    Another company.

22         Q.    What's the other name?

23         A.    Company called ForceField FF, LTD.

24         Q.    FF?

25         A.    It's ForceField FF, (NA), LTD.
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                           8

```
 1        Q.    Okay.  And for this case, the Plaintiff --
 2   the Plaintiffs Counsel retained you; right?  To be their
 3   safety expert; correct?
 4           MS. BENTZ:  Object to form.
 5   BY MS. CHARLES-COLLINS:
 6        Q.    Were you retained by Plaintiffs Counsel?
 7        A.    That's one of the areas, yes.
 8        Q.    Okay.  So were you retained under Scientific
 9   Advisory Services, or under ForcedField, NA?
10        A.    Well, they used my background on the
11   ForceField, in conjunction with Scientific.
12        Q.    What do you mean by that?
13        A.    Well, I deal with brain injuries in sports,
14   in ForceField, on almost a daily basis.  And I've been
15   involved in that field, from 1980 to the present time.
16        Q.    Okay.  All right.  So let's go through a
17   couple of things; just to establish, you are not a
18   medical doctor; correct?
19        A.    No.
20        Q.    You're not a neurologist?
21        A.    Well, a neurologist is not a -- in some --
22   yes, I'm not -- I am not a neurologist, correct.
23        Q.    Okay.  You're not a radiologist?
24        A.    No, I am not.
25        Q.    You are not a neuropsychologist?
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    9

```
 1        A.    Psycho -- neuropsychologist is not a medical
 2    doctor.
 3        Q.    I didn't ask you if it was a medical doctor.
 4        A.    Well, you're asking me about doctors.
 5        Q.    No.  What I asked you?
 6        A.    They're not a doctor.
 7        Q.    Mr. Abraham, one of the things that will make
 8    this deposition go faster is, if you listen to the
 9    specific questions I'm asking you, and answer that
10    question.
11              I am asking you a separate question.  The
12    question is:  You are not a neuropsychologist; correct?
13        A.    Okay.  Like a neuropsychologist we're both
14    not medical doctors.
15        Q.    You are not a neuropsychologist; correct?
16        A.    Correct.
17        Q.    You are not an ophthalmologist?
18        A.    No.
19        Q.    You are not a physical therapist?
20        A.    No.
21        Q.    You are not a psychologist?
22        A.    Nope.
23        Q.    You are not a psychiatrist?
24        A.    No.
25        Q.    You are not a biomechanical engineer?
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          10

```
 1        A.    I handle -- I have a background in

 2   biomechanical engineering.

 3        Q.    What does that mean?

 4        A.    For about -- well, I handle -- in sports, I

 5   handle the biomechanical aspects of injuries.

 6        Q.    But are you a --

 7        A.    From the -- from concussions to other

 8   injuries to the body.

 9        Q.    Okay.  But are you a biomechanical engineer?

10        A.    I have been qualified in court in those

11   areas.

12        Q.    When?

13        A.    You want a specific date?

14        Q.    Yes.

15        A.    I have been in this business 45 years.

16        Q.    When have you been qualified as a

17   biomechanical engineer?

18        A.    In the past.

19        Q.    When in the past?

20        A.    That's as general as I can give you, and as

21   specific as I can give you.

22        Q.    Is there anything that would allow you to

23   give me a more specific answer?

24        A.    I would have to look up a few cases --

25        Q.    Okay.
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                              11

```
 1        A.     -- and -- that I testified on, and from those

 2   cases, I can render a more exact opinion -- reply.

 3        Q.     Okay.  And do you know off-hand the name of

 4   any of those cases that you would look at?

 5        A.     Fifty thousand cases, you would like me to

 6   remember those names?

 7        Q.     I asked you --

 8        A.     I don't.

 9        Q.     -- specifically as to biomechanical engineer,

10   where you said that you were qualified as an expert, do

11   you recall the names of any of the cases?

12        A.     The only way I can do that is, look up, if I

13   can recall the cases in my office.

14        Q.     Okay.  You are not an orthopaedist, or an

15   orthopaedic surgeon; correct?

16        A.     No.

17        Q.     I noticed that you have a J.D. behind your

18   name.  Are you a licensed attorney?

19        A.     No.

20               MS. BENTZ:  Object to form on that last one.

21   BY MS. CHARLES-COLLINS:

22        Q.     You would agree with me that you're not

23   qualified to make any type of medical diagnosis?

24               MS. BENTZ:  Object to form.

25               THE WITNESS:  With reference to what?
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                     12

```
 1    BY MS. CHARLES-COLLINS:

 2         Q.    To anything?  Any type of medical diagnosis?

 3         A.    Well, with reference to concussions, I speak

 4    on -- in that whole -- in that area on concussions at

 5    major conventions in the United States, Canada, and

 6    Europe.

 7         Q.    I understand that but --

 8         A.    And -- well, if you understand that, then, I

 9    speak in those areas, the only way I could speak in those

10    areas, if I'm -- if -- only if I'm respected as an expert

11    in those areas.

12         Q.    That's not my question.  I don't care if

13    you're an expert in those areas.  My question is:  That

14    you are not qualified to render a medical diagnosis?

15         A.    I am.

16         Q.    How is that?

17         A.    Because --

18         Q.    What are your specific qualifications that

19    allow you to render a medical diagnosis?

20         A.    Because I've been involved with hundreds of

21    brain injury cases in -- in sports.  I have presented

22    many talks, and I have also published peer review

23    articles in those areas.

24               And just for your own edification,

25    concussions is not a subject that is studied and
```



**Orange Legal**
**800-275-7991**

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                13

```
 1   specialized in in medical school.  It's learned

 2   afterwards.  I learned the same way the doctors did after

 3   I got out of school.

 4        Q.    You have no medical training, do you?

 5        A.    In what area?  I've been involved in being

 6   taught anatomy by the assistant medical examiner of

 7   Nassau County.  I have been through, with him, over fifty

 8   autopsies, going to every part of the body, from the

 9   brain to the ankle.  And I am self-taught.

10           So, when you say, I am self-taught, like a

11   lot of doctors that are rendering opinion, like your

12   psychologists in this particular --

13        Q.    We're not talking about the psychologist.

14        A.    I am.  Because she's rendering an opinion

15   that's totally --

16        Q.    I'm asking you about your --

17        A.    -- that's totally.

18        Q.    -- medical training.

19        A.    I am not finished with my reply, when I'm

20   finished with my reply, you may reply.  That is our

21   agreement.  It is --

22        Q.    Right.

23        A.    I want to --

24        Q.    But this is my deposition, and I'm going to

25   ask you to answer the questions that I have asked.
```



```
 1          MS. BENTZ:  Yes, but Dr. Abraham has the

 2    right to answer the question.

 3          MS. CHARLES-COLLINS:  But he is not answering

 4    the question.

 5          THE WITNESS:  Whether I -- whether I am or

 6    not, you have to give me the courtesy, as -- the

 7    same courtesy that I'm giving you to finish your

 8    questions.

 9          MS. BENTZ:  I suggest you let him finish his

10    question because he might actually, you know,

11    conclude his answer, and then we could not have to

12    keep asking it over and over.

13          MS. CHARLES-COLLINS:  Okay.

14          MS. BENTZ:  Okay.

15          MS. CHARLES-COLLINS:  Uh-huh.

16          THE WITNESS:  I mean, you are allowed a

17    individual, unnamed, Karen Postal.

18          MS. CHARLES-COLLINS:  I'm going to move to

19    strike -- now I'm not going to --

20          THE WITNESS:  You can move to strike after I

21    get through.

22          MS. CHARLES-COLLINS:  Karin, can we go off on

23    the report for a second?

24          MS. BENTZ:  Yeah.

25          THE VIDEOGRAPHER:  Going off video record at
```

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 16 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    15

```
 1      11:21 a.m.
 2             (At about 11:21 a.m. recess.)
 3             (At about 11:22 a.m. proceedings reconvened.)
 4             THE VIDEOGRAPHER:  Back on record at
 5      11:22 a.m.
 6             THE WITNESS:  My medical training relates to
 7      real life situations, involving going through
 8      autopsies, over fifty of them, with being taught by
 9      the assistant medical pathologist in Nassau County.
10             Handling over several hundred cases involving
11      brain injuries over the last 45 years.  Going
12      through the medicals, discussing the medical
13      diagnosis, and evaluation with medical specialists;
14      and it's something that I've learned, not only
15      learned, but I've written peer review articles in
16      that subject, and have presented papers nationally,
17      and internationally in that area.
18             So when you say that I'm not medically
19      trained, I'm not medically trained as an
20      orthopedist.  I'm medically trained in what I
21      valuate cases in, specifically, this is one of
22      them.
23   BY MS. CHARLES-COLLINS:
24      Q.   All right.  Are you done?
25      A.   Yes.
```



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 17 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    16

1       Q.      You have no formal medical training?

2       A.      I stated that.

3               MS. BENTZ:  I don't think it was on the

4       record.  So --

5   BY MS. CHARLES-COLLINS:

6       Q.      And just like you're not qualified to render

7   a medical diagnosis, you're not qualified to render any

8   type of prognosis; correct?

9       A.      That's not correct.

10      Q.      And you're not qualified to make any type of

11  the medical causation determinations; correct?

12      A.      Totally incorrect.

13      Q.      Okay.

14      A.      I deal with impacts and resulting brain

15  injuries on a weekly basis.  Not on -- not on a -- a

16  semi-annual basis.

17      Q.      What's your understanding of what you were

18  retained by Plaintiffs Counsel to do in this case?

19      A.      To determine the liability in the subject

20  matter, how the brain injuries were caused, how they were

21  caused, and to render an opinion based upon my

22  experience, and knowledge of valuating cases involving

23  impacts to the brain.

24      Q.      You weren't retained to render legal

25  opinions?



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 18 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                17

1    A.    When I determine liability, the liability

2    relates to the legal aspects of the case, and based upon

3    my background in personal injury cases from 1970 to the

4    present time, and the fact that I have presented many

5    papers before the Bar Association in the area of law, and

6    how it -- and the interaction of the technical aspects of

7    cases, and the law, I do have a background in that area,

8    that I can render an opinion.

9          I do read voluminously on appellate decisions

10   relating to cases I'm involved in.

11   **Q.    So is it your opinion that if somebody reads**

12   **a lot of cases, or talks to people about a lot of cases,**

13   **that they're somehow qualified to be an expert in that**

14   **area?**

15   A.    I have done more than talk to people.  I've

16   presented papers, and made presentations to the legal

17   profession on both coasts.

18   **Q.    Have you ever practiced law?**

19   A.    No.

20   **Q.    Okay.**

21         MS. BENTZ:  I'm just going to state for the

22         record that Dr. Abraham does hold a JD degree.

23         MS. CHARLES-COLLINS:  We already know that.

24         MS. BENTZ:  Okay.

25         MS. CHARLES-COLLINS:  I'm going to move to



```
 1        strike.  But we already know that, but he's not

 2        licensed to practice law anywhere, so --

 3   BY MS. CHARLES-COLLINS:

 4        Q.    Have you ever met the Plaintiffs?

 5        A.    No.

 6        Q.    Have you ever spoken to them?

 7        A.    I don't recall.

 8        Q.    Did you have an opportunity to conduct an

 9   inspection at the location where the Redlers allege that

10   they were injured, or that Mrs. Redler was injured?

11        A.    What do you mean by alleged?  She was

12   injured.

13        Q.    I didn't ask you that.  I said, did you

14   have --

15        A.    You mentioned, alleged.

16        Q.    Listen, I'm not here to fight with you about

17   what the allegations in this case are --

18        A.    But you --

19        Q.    -- I'm here to take your deposition.  That's

20   the question that I asked you.  So, my question is, were

21   you able to take --

22        A.    Can I go back?

23        Q.    -- did you do --

24        A.    Excuse me.

25        Q.    -- an inspection at the location where
```

http://www.yxslaw.net/help



**Orange Legal**
**800-275-7991**

```
 1    Mrs. Redler alleged that she was injured?  That's my
 2    question.
 3         A.    The use of the word alleged is not -- is
 4    incorrect.
 5         Q.    That is not --
 6         A.    It's stated that you used the word, allege.
 7    She was injured, and there were witnesses to this.
 8         Q.    I didn't ask you that.  My question is:  Did
 9    you have the opportunity to do an inspection at the
10    location where Mrs. Redler alleged that she was injured?
11         A.    I --
12         Q.    That's my question.
13         A.    -- I did perform an inspection at the area,
14    and the location where Ms. Redler was injured, not
15    alleged to be injured.
16         Q.    And where is that?  Where was that location?
17         A.    At the Marriott Frenchman's Cove.
18         Q.    And where is that?
19         A.    St. Thomas.
20         Q.    And when did you do that inspection?
21               Can I ask you what you're referring to?
22         A.    My report.
23         Q.    Which report is that?
24         A.    My report rendered on December 22nd.
25         Q.    What year?
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    20

```
 1        A.     2014.

 2        Q.     Thank you.

 3               Is that the date that you did the inspection?

 4        A.     I don't recall.  I don't recall what the date

 5    was.

 6        Q.     Okay.  Do you know if you performed more than

 7    one?

 8        A.     Oh, I -- on December 12th, 2014.

 9        Q.     Okay.

10        A.     I inspected the area.

11        Q.     Okay.  And that's from your report?

12        A.     Yes.

13        Q.     Okay.  Did you inspect the area more than

14    once, or just once?

15               (Interruption by iPad.  SIRI:  I'm not sure

16        what you said.)

17               MS. BENTZ:  Sorry.  Siri decided to chime in

18        on our deposition, I was trying to turn it off.

19        That was funny.

20    BY MS. CHARLES-COLLINS:

21        Q.     Did you inspect the location once, or more

22    than once?

23        A.     I might have seen it more than once.

24        Q.     Okay.  So other than December 12th of 2014,

25    when do you think you might have seen it?
```

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                        21

```
 1        A.    I don't -- I don't recall, but I've seen it
 2   more than once.
 3        Q.    And was that for the purpose of conducting an
 4   inspection, or was -- what was the purpose of you seeing
 5   it, other than on December 12th?
 6        A.    As a member of the Marriott Frequent Flier,
 7   and the fact that I've stayed at Marriott Hotels, I
 8   wanted to see their facilities, and I had access to the
 9   hotel as an invitee.
10        Q.    Okay.  And was this prior to you being
11   retained by Plaintiffs Counsel, or subsequent to your
12   retention?
13        A.    Subsequent.
14        Q.    So do you know when you went there?
15        A.    No.
16        Q.    What did you do when you got there?
17        A.    Just looked around.
18        Q.    Did you advise Plaintiffs Counsel that you
19   would be there to look around?
20        A.    No.
21        Q.    Tell me what you meant by -- mean by, you
22   looked around?
23        A.    I'd look around.  I went to a number of
24   hotels while I was there.  Just visiting them.
25        Q.    Is there anything that would allow you to
```



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 23 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                        22

 1    narrow down the time frame when you went to just look

 2    around?

 3         A.    No.

 4               MS. BENTZ:  Can we go off the record?

 5               MS. CHARLES-COLLINGS:  Yeah.

 6               THE VIDEOGRAPHER:  Going off record at

 7         11:31 a.m.

 8               (At about 11:31 a.m. recess.)

 9               (At about 11:32 a.m. proceedings reconvened.)

10               THE VIDEOGRAPHER:  Back on record at

11         11:32 a.m.

12               (Deposition Exhibit 2 marked.)

13    BY MS. CHARLES-COLLINS:

14         Q.    So, Dr. Abraham, you are looking at the

15    report that's dated December 22nd, 2014, which we have

16    marked as Defendants Exhibit Number 2.  I'm going to show

17    you the copy that I have as Exhibit Number 2.

18               Can you look through this, and just let me

19    know if this is a full copy of the report?

20         A.    Yes.

21         Q.    Okay.  And then you also did another report

22    in August of 2013; is that correct?

23         A.    Yes.

24               (Deposition Exhibit 1 marked.)

25    BY MS. CHARLES-COLLINS:



```
 1       Q.    Would you look at Defendant's Exhibit 1 and

 2   tell me if that is a complete copy of your report?

 3             MS. BENTZ:  Do you have another copy?

 4             MS. CHARLES-COLLINS:  Yeah, do you want one?

 5             MS. BENTZ:  Yeah.  I don't bring paper, you

 6       know that.

 7             MS. CHARLES-COLLINS:  Oh, here.  I'm sorry.

 8             MS. BENTZ:  Thank you.

 9             MS. CHARLES-COLLINS:  You're welcome.

10             That one, let me give you the pictures, here.

11             MS. BENTZ:  Thank you.

12             MS. CHARLES-COLLINS:  That's for the December

13       report.

14             MS. BENTZ:  Okay.

15             THE WITNESS:  Got it.

16   BY MS. CHARLES-COLLINS:

17       Q.    Okay.  Besides those two reports, did

18   you -- have you done any other reports in this case

19   besides the August one, and the December report, any

20   written reports?

21       A.    I just have notes that I have.

22       Q.    Okay.  And where are those notes kept?

23       A.    Right here.  I kept them right here.

24       Q.    Okay.  So those are your handwritten notes?

25       A.    Those are my handwritten notes.
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                              24

```
 1        Q.     Okay.  And what are those handwritten notes

 2   from?

 3        A.     The mediation hearing.

 4        Q.     Besides the mediation hearing, do you have

 5   any other handwritten notes?

 6        A.     I have notes on my report, here, and some

 7   legal.

 8        Q.     Not notes that you take, like, for yourself

 9   to --

10        A.     Yes.

11        Q.     But beyond that, so do you have draft notes?

12        A.     No.

13        Q.     Do you have notes from the inspection?

14        A.     No.

15        Q.     Okay.  Of the two reports, which would you

16   consider to be the operative report in this case?

17        A.     They're both good.

18        Q.     What was the circumstances under which you

19   did the August 2013 report, what was that done for?

20        A.     That was done with the thought that I

21   wouldn't have to go down to St. Thomas, and perform an

22   inspection.

23        Q.     So tell me what you reviewed in order to

24   draft that August 2013 report?  What did you consider?

25               MS. BENTZ:  Just going to state for the
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                 25

```
1          record, that that report is not admissible as it

2          was offered for purposes of settlement, pursuant to

3          Rule 408.  It's also considered work product.

4               MS. CHARLES-COLLINS:  But it was filed as

5          part of your disclosures with the Court.

6               MS. BENTZ:  Still, for purposes of

7          settlement.

8               MS. CHARLES-COLLINS:  But it was filed with

9          the Court, and he said it's an operative report.

10              MS. BENTZ:  Well, it's still --

11              THE WITNESS:  There's nothing wrong with it.

12              MS. BENTZ:  Okay.

13              THE WITNESS:  Nothing at all.

14    BY MS. CHARLES-COLLINS:

15         Q.   Can you tell me for the August 2013 report,

16    what you reviewed?

17         A.   I had an oral conversation with Ms. Bentz, as

18    to the facts of the case.  And I think those are the

19    only -- that's the only thing I had, and a few

20    photographs.

21         Q.   Okay.

22         A.   And she might have given me medicals, I don't

23    recall what -- what she gave me, but whatever I have, the

24    whole thing -- everything that I have on the case is

25    here.
```

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                26

1       Q.    Okay.

2       A.    And I worked from that.

3       Q.    Okay.

4       A.    And I used my background and experience in

5    handling similar cases.

6       Q.    **Did you look at the complaint in this case in**

7    **order to draft this report?**

8       A.    It depends if I had -- when was the complaint

9    originally done?

10          Yeah.  There was an original complaint, and

11   amended complaint.  If that complaint -- let's see.

12   There was a verified complaint.

13          Nope, let me just get the original complaint.

14      Q.    Okay.

15      A.    See the date on that.

16          MS. BENTZ:  Do you want to go off the record?

17          THE WITNESS:  No, I just can't find -- I

18   don't think I had a complaint to even go by.

19   BY MS. CHARLES-COLLINS:

20      Q.    Okay.

21      A.    Let's leave it at that.

22      Q.    **And photos that are attached to your report**

23   **so we're looking --**

24      A.    They were --

25      Q.    **Hold on for a second.**

```
 1              We're looking at the August 2013 report, so
 2    the ones that are attached at pages 11 and 12.
 3      A.    Yeah.
 4      Q.    Did you take those photographs?
 5      A.    No.
 6      Q.    Okay.
 7      A.    I didn't go down to St. Thomas.
 8      Q.    So where are those photographs from?
 9      A.    They were sent to me by the -- their office.
10    I requested them.
11      Q.    Okay.  By the Plaintiff's attorney?
12      A.    Someone in their office sent it to me.
13      Q.    Okay.  And what are those photographs of?
14      A.    Umbrellas in cement.
15      Q.    Okay.  And do you know when those photos were
16    taken?
17      A.    Before my report.
18      Q.    Okay.  But do you know when?  Did anyone tell
19    you when they were taken?
20      A.    No.
21      Q.    Do you know if they were taken on the day of
22    the incident, as alleged in the complaint?
23      A.    If that's what it alleges, then, it was taken
24    at -- on the day of the accident.
25      Q.    No.  I think I confused you with my question.
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                28

```
 1              My question is:  Do you know whether these

 2   photos were taken on that day?  I'm not saying that they

 3   were, I'm just saying on the date alleged in the

 4   complaint?

 5       A.    If -- if -- well, they stated that it was

 6   alleged in the complaint, so --

 7       Q.    No.  I'm saying on the date alleged in the

 8   complaint.  So were these pictures -- do you know if

 9   these pictures were taken on the date they're saying the

10   incident occurred?

11              Maybe that's clearer.

12              MS. BENTZ:  Okay.  Just for the record, these

13         photos were offered as Exhibits, and I believe they

14         were taken by Plaintiff's husband on the day of the

15         incident.

16              MS. CHARLES-COLLINS:  Okay.

17              THE WITNESS:  Thank you.

18              MS. CHARLES-COLLINS:  I'm going to ask Karin

19         not to testify for you anymore.

20              THE WITNESS:  That was excellent, though.

21              MS. CHARLES-COLLINS:  Yeah.  But she can't

22         testify for you.

23              THE WITNESS:  Together we're terrific.

24              MS. BENTZ:  You know, but --

25              THE WITNESS:  No, that's good to know.
```



Orange Legal
800-275-7991

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                              29

```
 1              MS. BENTZ:  She's talking about these photos.

 2       It's really unclear what photos you're talking

 3       about.

 4              THE WITNESS:  Yes.

 5              MS. CHARLES-COLLINS:  I know I specifically

 6       said photos on pages 11 and 12 of his August 2013

 7       report.

 8              THE WITNESS:  Okay.  Right.

 9              MS. BENTZ:  Okay.  So that would be Bates

10       Numbers 142, and 143.

11              THE WITNESS:  Right.  Okay.  Now --

12              MS. CHARLES-COLLINS:  Yeah.

13       BY MS. CHARLES-COLLINS:

14          Q.    Do you -- do you -- okay.  Let me make it

15       clear.  Do you know what date those photos were taken?

16       Do you know personally?

17          A.    Now I recall, because they were presented to

18       me, because at the time of the accident or incident,

19       Mr. Redler took some photographs.

20          Q.    Okay.  And do you recall that now because

21       Karin just refreshed your memory?

22          A.    Yes.

23          Q.    Okay.

24          A.    Thank you.

25          Q.    Do you know if Mr. Redler took any other
```

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                30

```
 1    photographs, other than the ones that are attached and

 2    have Bate stamp numbers 142 and 143?

 3         A.    I'm sure he did not stop at two photographs.

 4         Q.    Do you know for sure if he took any others?

 5         A.    There are others.

 6         Q.    Were you provided with other photographs

 7    besides the ones that you attached to your report?

 8         A.    I think I recall seeing photographs of the

 9    umbrella down.

10         Q.    Do you know where those photos are now?

11         A.    I think they're part of -- let me see if I

12    can find them.

13               Can I see that --

14               MS. BENTZ:  What?

15               THE WITNESS:  That report by the --

16               MS. BENTZ:  The August one?

17               THE WITNESS:  No, not that -- the other one

18        from -- but there's -- there's -- you got it?

19    BY MS. CHARLES-COLLINS:

20         Q.    And what are you referring to?

21               Dr. Abraham, what report is that?

22         A.    This is the report by Rimkus Consulting

23    Group.

24               Nope, he didn't have them, either.  I did see

25    them somewhere.
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                 31

1        Q.      Okay.

2        A.      I don't recall.

3        Q.      Okay.  And for your December 22nd report,

4    tell me what you relied on?  What documents you reviewed

5    on in order to render your opinions in that report?

6        A.      I had the medicals -- medical evaluation from

7    the doctor in St. Thomas.

8        Q.      Do you remember what doctor that was?

9        A.      Yeah, I have it here.

10               Like the ones I didn't know -- as of last

11   night, I thought everything was in order.

12       Q.      Okay.

13       A.      But I know it's here.

14       Q.      Okay.

15       A.      Dr. Weisher.

16               THE COURT REPORTER:  Can you spell it for me,

17       please?

18               THE WITNESS:  Sure, I can.  W-E-I-S-H-E-R.

19               THE COURT REPORTER:  Thank you.

20               THE WITNESS:  David D. Weisher.

21   BY MS. CHARLES-COLLINS:

22       Q.      Okay.  Any other medical records that you

23   reviewed?

24       A.      Let's see.  Dr. James Nelson.

25       Q.      Anyone else?

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    32

```
 1       A.    For that report?

 2       Q.    Uh-huh.

 3       A.    That was -- I think that was enough.  That's

 4  all I need.

 5       Q.    Is that all you reviewed?

 6       A.    For the report?

 7       Q.    Yeah.

 8             I'm just trying to make -- I know you said

 9  that that was enough, but I'm just saying, I need you to

10  tell me whether or not any other medical records, besides

11  Dr. Weisher and Dr. Nelson, did you review any others for

12  this December report?

13       A.    Oh, I -- did I -- this is December 22nd --

14  that was it.

15       Q.    Okay.

16       A.    That's all I had.

17       Q.    All right.  Any other documents that you

18  reviewed for that report for the December 2014 report?

19       A.    Well, I have cases of prior studies of

20  concussive incidents.  Now, when I say cases, I have,

21  maybe 12, if I can describe the size, milk box sizes of

22  cases in my files.

23       Q.    Okay.

24       A.    Both --

25       Q.    Go ahead.
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                33

```
 1        A.    Both here and in New York.

 2        Q.    Okay.  But specifically as to this case, and

 3   this December 22nd, 2000 (sic) report, what -- what

 4   cases, what studies did you rely on in order to render

 5   your opinions in this report?

 6        A.    I've had another case where an umbrella went

 7   over, and I think it was in St. Thomas, and injured an

 8   invitee, a guest.

 9        Q.    Is that something that you relied on in

10   drafting this December 22nd report?

11        A.    I only rely on my background and experience.

12   I really don't need much, too many references, because

13   I've handled many similar cases.

14        Q.    Okay.  So when you -- when I asked you what

15   you relied on, and you talked about the 12 milk box sizes

16   of prior studies, did you rely on any of those prior

17   studies in rendering the opinions in your report dated

18   December 22nd, 2014?

19        A.    Well, I relied on the fact that it gave me

20   more documentation that the Marriott was on notice from

21   prior -- prior incidents on the island, where individuals

22   were injured.

23        Q.    Which Marriott?

24        A.    I don't recall.

25        Q.    Okay.  And tell me, specifically, what
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 35 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                34

 1    documents you relied on that gave you more information

 2    that the Marriott, when it was on notice of these -- of

 3    similar incidents?

 4        A.    It's just that I handled prior cases where

 5    this type of incident has occurred, not just with brain

 6    injuries, but injuries, bodily injuries.

 7        Q.    Okay.  I understand that.  But you rendered

 8    opinions in a report in this case, and I'm asking you

 9    specifically what you relied on.  And if you relied on

10    information from case studies, or you said you have

11    documentation.  I need to know what that is?

12        A.    Well, let me tell you what I do rely on.  Not

13    only on the papers that I've published and the

14    presentations that I have made through -- throughout the

15    United States, Canada, and England, I relied on the

16    studies I made in testing every type of protective head

17    gear in the world, from 1980 to the present time.

18            I relied on my independent testing of my own

19    products, that are now the leading provider of head gear

20    in the United States, in the sport of soccer, and

21    basketball, and other sports.

22            There's just so much that -- that I have

23    available, and within my background, that it doesn't take

24    much for me to evaluate a case like this.  I can do a lot

25    of it if you just give me the facts, I could actually



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 36 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          35

1   write a report without looking at any documents.

2       Q.    **This case does not involve any type of head**

3   **gear; correct?**

4       A.    No.  It involves, though, an impact to the

5   brain, which I've been dealing with hundreds, if not

6   thousands of incidences of -- from 1980 to the present

7   time.

8       Q.    **And this case does not involve any type of**

9   **sports injury from basketball, soccer, any other kind of**

10  **sport; correct?**

11      A.    Doesn't matter.

12      Q.    **That's not my question.**

13      A.    I know it doesn't.

14      Q.    **Okay.  I know it doesn't matter.**

15      A.    No.  It has nothing to do with the sport.  It

16  just has to do with an impact to the brain, which is

17  similar, identical to sports injuries.

18      Q.    **Okay.**

19      A.    So when you asked me those other extraneous

20  questions, they're all interrelated.  So, one cannot

21  be -- the injury in this case cannot be isolated from the

22  injuries that cause the -- cause -- causation of a

23  concussive, or subconcussive brain injuries.

24      Q.    **And what authority do you have to make that?**

25  **What are you relying on to make that statement?**



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    36

```
 1       A.    I -- it's hard to answer your questions,

 2   because it -- it just tells me that you have not done

 3   your homework with reference to concussive blows to the

 4   brain.

 5       Q.    I have not asked you a question about

 6   concussive blows to the brain.

 7       A.    And what is -- and what is available.

 8       Q.    What I've asked you --

 9             MS. BENTZ:  What --

10             MS. CHARLES-COLLINS:  -- is based on the

11       statement that you've made -- Karin, don't

12       interrupt.

13             Based on the statement that you have just

14       made, I'm asking you what authority, what treatise,

15       what standard, what medical literature, what have

16       you --

17             THE WITNESS:  Oh.

18   BY MS. CHARLES-COLLINS:

19       Q.    What are you relying on to make those

20   statements?

21             MS. BENTZ:  Okay.

22             MS. CHARLES-COLLINS:  My understanding of --

23       has nothing to do with my question.

24             THE WITNESS:  I will tell you.  I will tell

25       you --
```



```
 1          MS. CHARLES-COLLINS:  So can you answer my

 2    questions.

 3          MS. BENTZ:  Hold on, hold on.  I am objecting

 4    to the form of the question; it's compound,

 5    argumentative, now you need to --

 6          MS. CHARLES-COLLINS:  What is the

 7    authority --

 8          MS. BENTZ:  -- you need to allow the Witness

 9    to finish his answer.

10          MS. CHARLES-COLLINS:  That's an -- is there

11    objection to form?

12          MS. BENTZ:  No.  You're not allowing the

13    Witness to finish his answer.

14          MS. CHARLES-COLLINS:  Because he's not

15    answering my question.

16          MS. BENTZ:  He did answer.  He -- you said,

17    what did he rely on?  And he relies on his 44 years

18    of experience, and he's trying to explain that to

19    you.

20          MS. CHARLES-COLLINS:  That's not the question

21    I asked.  I said what specific authority, not your

22    experience, not what you know, not what's in --

23    what specific written authority, peer-reviewed, or

24    otherwise authority.

25          THE WITNESS:  There you go.
```

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                 38

```
 1          MS. BENTZ:  Well, I didn't understand the

 2     question.

 3          MS. CHARLES-COLLINS:  I'm not going to look

 4     through those.

 5          THE WITNESS:  You don't have to.  I'm giving

 6     it to you.

 7          MS. CHARLES-COLLINS:  No.

 8          THE WITNESS:  Those are the authorities.

 9          MS. CHARLES-COLLINS:  You are in a

10     deposition.

11          THE WITNESS:  I'm giving you the authority.

12          MS. CHARLES-COLLINS:  Karin --

13          THE WITNESS:  You have access to everything

14     that I have.

15          MS. CHARLES-COLLINS:  Karin, please instruct

16     your Witness to answer the questions that are being

17     asked at this deposition.  I am not here to look

18     through his documents.

19          MS. BENTZ:  Well, that's kind of what you

20     asked him.  You want to know what he relied on.

21     He's handed you what he's relying on as part of his

22     file.  You asked him to produce his file; I don't

23     know what else to say, so --

24          MS. CHARLES-COLLINS:  I need him to answer my

25     question.  My question is not to provide me
```

http://www.yeslaw.net/help



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 40 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    39

```
 1    documents; my questions require a verbal answer.

 2    So my question is, Dr. Abraham, if you have things

 3    in there that you're saying that you relied on,

 4    tell me what it is that you relied on.

 5         MS. BENTZ:  Here, you can go through

 6    everything specifically that you relied on,

 7    that's -- now the question -- just so I understand

 8    it, because I didn't understand your first

 9    question, Attorney Charles.

10         MS. CHARLES-COLLINS:  Okay.

11         MS. BENTZ:  Was -- what written authority did

12    he rely on in forming his expert opinion --

13         MS. CHARLES-COLLINS:  Uh-huh.

14         MS. BENTZ:  -- of December, whatever.

15         MS. CHARLES-COLLINS:  Well, that was the

16    original question.  My question now, was, he went

17    back to talking about -- when I asked about sports,

18    that a sport's injury is similar or identical to

19    the injuries alleged in this complaint.  And I want

20    to know what authority he's relying on for making

21    that opinion.

22         MS. BENTZ:  The sports injury, or this

23    injury?

24         MS. CHARLES-COLLINS:  The opinion he just

25    made that they are similar, or identical.
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 41 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                  40

```
1              MS. BENTZ:  Okay.

2              MS. CHARLES-COLLINS:  A sports injury is

3       similar or identical to the injuries alleged in

4       this complaint.

5              MS. BENTZ:  Can we take a time out, so I

6       can --

7              THE WITNESS:  No, I can answer the question.

8              MS. BENTZ:  No, I want to go use the ladies

9       room, then, you can look through all this stuff.

10             THE WITNESS:  I got it, take me five minutes

11      to go through.

12             MS. BENTZ:  Okay.

13             THE WITNESS:  What do we do?

14             MS. BENTZ:  Then, I will be right back.  Can

15      we go off the record, please.

16             THE WITNESS:  Oh, you're going to be right

17      back?

18             MS. CHARLES-COLLINS:  We can.

19             THE VIDEOGRAPHER:  Going off record at 11:54

20      a.m.

21             (At about 11:54 a.m. recess.)

22             (At about 12:01 p.m. proceedings reconvened.)

23             THE VIDEOGRAPHER:  Back on the record at

24      12:01 p.m.

25   BY MS. CHARLES-COLLINS:
```



```
 1        Q.    Dr. Abraham, when we took a break, you were

 2   going to identify for me what authorities you relied on

 3   to make this statement that concussive injuries in sports

 4   are similar or identical to the injuries alleged in this

 5   lawsuit?

 6        A.    Sure.

 7              So, okay.  You want me to just bring them out

 8   one at a time?

 9        Q.    Yeah.  You can just name them?

10        A.    All right.  Here's one, the "Ways the Brain

11   is Injured."

12        Q.    And who is that written by?

13        A.    It's published by braininjury.com.

14        Q.    Okay.  Can we take that from you?  Can we

15   keep that?

16        A.    Sure you can.

17        Q.    Okay.

18        A.    Do you want that?

19        Q.    Can you please mark that as Exhibit 3.

20              (Deposition Exhibit 3 marked.)

21              THE WITNESS:  Here's another one.  Here's

22        from Mother Jones.  Soccer -- what -- "This is What

23        Happens to Your Brain When You Get Kicked in the

24        Head."

25   BY MS. CHARLES-COLLINS:
```



```
 1        Q.    Okay.  We'll mark that as 4.

 2              (Deposition Exhibit 4 marked.)

 3              THE WITNESS:  "Football Physics:  The Anatomy

 4        of the Hit."

 5              MS. CHARLES-COLLINS:  We'll mark that as 5.

 6              (Deposition Exhibit 5 marked.)

 7              THE WITNESS:  There's one, a "Subconcussive

 8        Head Impacts and a Method for Significantly

 9        Absorbing, Reducing and Dissipating Those Forces."

10              MS. CHARLES-COLLINS:  Okay.  And we'll mark

11        that as Exhibit 6.

12              (Deposition Exhibit 6 marked.)

13              THE WITNESS:  Here's one,

14        "sportsconcussions.org."

15   BY MS. CHARLES-COLLINS:

16        Q.    We'll mark that as 7.  What's the name of the

17   article?

18        A.    "First On-Field Soccer Impact Study."

19        Q.    We'll mark that as 7.

20              (Deposition Exhibit 7 marked.)

21   BY MS. CHARLES-COLLINS:

22        Q.    Are there any others?

23        A.    I should have brought all of them.  My -- my

24   other cases, here's -- okay.  Don't need that.

25              Here's, "The Brain from Top to Bottom."  You
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 44 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          43

```
 1   want that?

 2              MS. CHARLES-COLLINS:  I will mark that as 8.

 3              (Deposition Exhibit 8 marked.)

 4              THE WITNESS:  These are my only copies, so --

 5              MS. CHARLES-COLLINS:  Okay.

 6              THE WITNESS:  I don't want them left here.

 7              MS. BENTZ:  And I don't have copies, so

 8       we'll --

 9              MS. CHARLES-COLLINS:  We'll figure it out.

10              MS. BENTZ:  Let's just get them with the

11       transcript.

12              THE WITNESS:  Here's some more of -- "The

13       Brain From Top to Bottom," is the --

14              (Deposition Exhibit 9 marked.)

15   BY MS. CHARLES-COLLINS:

16       Q.    Okay.  I will just put a 9 on here.

17       A.    This is --

18       Q.    This will be 9, this is "Symptoms, Treatments

19   and Causes of Depression."

20       A.    So here's one publication:  "Recommendation

21   for Diagnosing a Mild Traumatic Brain Injury:  A National

22   Academy of Neuropsychology Education Paper."  Okay.

23       Q.    This is Number 10.

24       A.    Did I give you one on concussion by

25   Wikipedia?  Did I give you that one, yet?
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    44

```
 1       Q.      No.

 2       A.      If you don't have it, I will give you one.

 3               (Deposition Exhibits 10 and 11 marked.)

 4   BY MS. CHARLES-COLLINS:

 5       Q.      And that would be Number 11.

 6       A.      Another one, my only copy, so I'm not even

 7   going to give you this.  This is the War -- "The

 8   Invisible War on the Brain."  Published in National

 9   Geographic, February 2015.

10       Q.      Okay.  We'll make a copy of that article, so

11   that you can keep the magazine.

12       A.      When are you making them?

13       Q.      I'm sure they have a copy machine right here

14   to make a copy of that.

15       A.      I will ask her to do that for me.

16               (Deposition Exhibit 12 marked.)

17   BY MS. CHARLES-COLLINS:

18       Q.      Okay.  All right.  And we'll make that Number

19   12.  So -- I'm sorry.

20       A.      My next, is:  "Dynamics of Falls and Blows,"

21   it's just an expert from a paper.

22       Q.      And who wrote that paper?

23       A.      I don't know.  You can get the --

24       Q.      Where did you -- where did you get this from?

25       A.      I do a lot of research, and certain parts of
```



 1   papers I extract.

 2        Q.    So this actual document that's titled

 3   "Dynamics of Falls and Blows," this is something that you

 4   typed?

 5        A.    No, I didn't type -- I extracted that from

 6   another paper.

 7        Q.    Copied and paste it?

 8        A.    Yes.

 9        Q.    Okay.  So these are not your words?

10        A.    Nope.

11        Q.    Do you know where you got this information

12   from?

13        A.    No.  From some of the research I do.

14              This is -- or papers that I review, and

15   certain parts of papers are important to me.

16              Here's "Biomechanics of Sport Concussion:  A

17   Quest for the Elusive Injury Threshold."  This guy is

18   very -- the author's -- very well-known on this, so --

19        Q.    And that will be Exhibit 14.  Exhibit 13 was

20   "Dynamics of Falls and Blows", and Exhibit 14 is

21   "Biomechanics of sports concussion:  Quest for the

22   Elusive Injury Threshold."

23              (Deposition Exhibits 13 and 14 marked.)

24              THE WITNESS:  Here's some Data Analysis from

25        a paper -- oh, here, "Forced Induced on the Brain

Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 47 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                        46

 1          by Hitting Soccer Balls."

 2               Here's another one.

 3     BY MS. CHARLES-COLLINS:

 4          Q.    Okay.

 5          A.    Okay.

 6          Q.    And that will be Number 15.

 7          A.    Okay.

 8          Q.    Anything else?

 9          A.    Here's one on G-forces.

10          Q.    That will be number 16.

11               (Deposition Exhibits 15 and 16 marked.)

12               THE WITNESS:   Here's one on Concussion Facts.

13               MS. CHARLES-COLLINS:   That will be number 17.

14               (Deposition Exhibit 17 marked.)

15     BY MS. CHARLES-COLLINS:

16          Q.    And do you know where this one came from,

17     Concussion Facts, it doesn't have any type of header or

18     footer.

19          A.    No.  No.

20          Q.    Did you put this together?

21          A.    Yeah.  It's extracted.

22               Here's another one, "An Analysis of Maximum

23     Vehicle G Forces and Brain Injury in Motorsports

24     Crashes."

25          Q.    And that will be number 18.



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 48 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    47

```
 1              (Deposition Exhibit 18 marked.)

 2              MS. BENTZ:  You made the mistake of asking

 3         him that question.

 4              MS. CHARLES-COLLINS:  Okay.  I'm okay.

 5              MS. BENTZ:  Okay.  Good.

 6              MS. CHARLES-COLLINS:  I'm fine.

 7    BY MS. CHARLES-COLLINS:

 8         Q.    Is that it?

 9         A.    I also discussed the case with Dr. Share.  He

10    did a medical evaluation of Ms. Redler.

11         Q.    Okay.  In relation to your December 22nd,

12    2014 report?

13         A.    Yes.

14         Q.    Okay.  Dr. Share?

15         A.    Yes.  I -- I -- he's a someone I've known for

16    many years.

17         Q.    Did he treat Ms. Redler?

18         A.    I know he evaluated her, and then he

19    recommended that she see certain medical specialists for

20    further treatment.

21         Q.    And how did you get in touch with Dr. Share

22    to be discussing Mrs. Redler's medical condition?

23         A.    We're close friends, and we're on the same

24    case.

25         Q.    Okay.  Now, of all the Exhibits that we just
```



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 49 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                            48

1    marked, which start at 3, and end at Number 18, these

2    different articles or excerpts that you have pulled from

3    things that you've read, did you rely on any of these

4    particular documents in rendering your opinions in this

5    case?

6        A.    No.

7        Q.    Okay.  Are there any particular articles, or

8    pieces of articles that you relied on in rendering your

9    opinions on -- in this case?

10       A.    There were thousands of articles that I've

11   reviewed over the last -- 1980 to now, is 35 years, that

12   I have reviewed.  So as a whole, I take everything that I

13   have reviewed.

14       Q.    Uh-huh.

15       A.    Rather than rely on one specific article in

16   rendering an opinion.  Plus, my own personal experience

17   in -- in discussing cases with doctors, medical doctors,

18   and with actually injured individuals who have

19   experienced and are in the middle of -- the treating -- a

20   treatment for their concussions.

21       Q.    And I realize that over the years you've read

22   all these things, but I'm just asking, specifically, as

23   to this December 22nd report, and the opinions that you

24   rendered herein, did you rely on any specific literature,

25   articles, treatises, anything for this particular case,



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 50 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          49

 1   and this particular report?

 2       A.    I rely on the thousands of documents that I

 3   have reviewed.  Not one specific one.

 4       Q.    When you did your inspection, did you have an

 5   opportunity to inspect any of the umbrellas by the pool

 6   side at the Frenchman's Cove?

 7       A.    You wouldn't let me.

 8       Q.    Okay.

 9       A.    You don't recall that?

10       Q.    Is it your opinion that you were not allowed

11   to, or your testimony that you were not allowed to

12   inspect any of the umbrellas at the pool side?

13       A.    At the time of my inspection, you wouldn't

14   allow me to do that.

15       Q.    Okay.

16       A.    And, however, as an invitee, I can do

17   anything.  At another -- at another time.

18       Q.    Okay.  So is it your testimony that on

19   December 12th, on or about December 12th when there was

20   an inspection, where you were present, Attorney Bentz was

21   present, I was present, and Marriott employees were

22   present, that you were not allowed to conduct any type of

23   inspection on umbrellas?

24            MS. BENTZ:  I've got an objection to the

25       form, because I don't understand it.



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 51 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                      50

```
 1              Are you talking about the umbrellas by the

 2         pool?  Or the umbrella where we were?

 3              MS. CHARLES-COLLINS:  I asked him if he did

 4         an inspection on any of the umbrellas, he said he

 5         wasn't able to.

 6              MS. BENTZ:  Well, your first question

 7    was about the --

 8              THE WITNESS:  No, I never -- I never said --

 9              MS. BENTZ:  Pool side.

10              THE WITNESS:  Don't put words in my mouth.

11    You're putting words in my mouth.  That's not good.

12              MS. CHARLES-COLLINS:  Okay.  So, go ahead.

13              THE WITNESS:  Because I have total recall.

14              MS. CHARLES-COLLINS:  Good.  So do I.  So,

15         great.

16              THE WITNESS:  So if you have total recall,

17         don't put words in my mouth.

18    BY MS. CHARLES-COLLINS:

19         Q.    Okay.  So we're going to make this very

20    clear.

21         A.    No, you're not making it clear.

22         Q.    I said we are going to make this very clear.

23         A.    Now we're making it clear.  That's good.

24         Q.    Did you inspect any umbrellas in relation to

25    your December 22nd, 2014 report?  Did you do a formal
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 52 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                      51

 1   inspection of umbrellas?

 2        A.    A formal inspection?  I was presented with

 3   two exemplar umbrellas that were not the actual umbrella

 4   that was involved in the subject accident.

 5        **Q.    Were any of them, the two umbrellas, the two**

 6   **exemplar umbrellas, were any of those umbrellas similar**

 7   **or were the same as the umbrella that was alleged to have**

 8   **caused the injuries in this -- in this case?**

 9        A.    They were not.

10        **Q.    Okay.  What was different from the umbrellas**

11   **that you saw in December 2014, than the umbrella on the**

12   **day of the incident?**

13        A.    That's a very good question.  I'm going to

14   answer it in full.

15        **Q.    Great.**

16        A.    First of all, you're alleging in your replies

17   to interrogatories --

18        **Q.    No, that's not my question.**

19        A.    I'm going to -- I'm giving you a background

20   as to why they weren't --

21        **Q.    Okay.**

22        A.    -- the same.

23        **Q.    Okay.**

24        A.    And I didn't interrupt you.

25        **Q.    Okay.**



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 53 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          52

1      A.    It was stated at the mediation hearing that

2    Ms. Redler --

3      **Q.    We don't want to talk about what's at the**

4    **mediation.**

5      A.    It was --

6      **Q.    Mediations are confidential.**

7      A.    Oh, it's alleged -- it was alleged that

8    Ms. Redler, in spite of the employee taking the umbrella

9    down, that she put it up, again.

10     **Q.    Okay.  My question --**

11     A.    I am going to give you the answer why it

12   couldn't be the same umbrella.

13     **Q.    Okay.**

14     A.    Okay.

15            I attempted at the inspection, to open the

16   umbrella, and I could lift over 50 pounds.  I could not

17   lift that umbrella up, and open it without the aid of an

18   employee from the Marriott.

19            So it wouldn't be impossible for her, if

20   that, if that ques -- if that statement is true by the

21   Defendant, to -- for her to put up, open the umbrella,

22   number one.  And if that's the case, it would be im --

23   the exemplar umbrellas that you presented to me, were not

24   even close to the umbrella that was blown over, and hit

25   her, causing her permanent brain injuries.



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 54 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          53

```
 1        Q.    Okay.  So that's my question.  You saw the --
 2   you said that you saw photographs of the umbrella from
 3   the date of the incident; correct?
 4        A.    Yes.
 5        Q.    And those -- that was from the pictures that
 6   Mr. Redler took?
 7        A.    Yes.
 8        Q.    Okay.  Describe for me how that umbrella, in
 9   the photos that Redler -- Mr. Redler took, are different
10   from the umbrellas that you saw in December 2014?
11        A.    The photograph --
12        Q.    Physical characteristics?
13        A.    Okay.  Well, we know that it -- it looks like
14   an umbrella, and acts like an umbrella.  The only
15   difference is, that if Mr. -- Miss Redler was able to,
16   and she would have to, because her husband had a back
17   injury, if she was able to open it, it couldn't be the
18   same umbrella.
19        Q.    My question is not that.  We're not talking
20   about opening the umbrella, my question is:  How do they
21   look different?
22        A.    Well, most of the umbrellas look a similar,
23   not identical, because I had two different umbrellas at
24   the time of my inspection, that you said were exemplars,
25   even though they were different from each other.
```



**Orange Legal**
**800-275-7991**

Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 55 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    54

1            They looked alike.  They were different.

2    They were different in the diameter of the pole, they

3    were different in the base, one took a little more force

4    to raise the umbrella than the other, they're not

5    similar.  They look similar --

6        **Q.    Describe the two umbrellas that you saw on --**

7    **in December, 2014.  Describe them.**

8        A.    They were two umbrellas that were at the

9    Marriott Hotel, that were alleged to be exemplars because

10   you people stated that you could not find the actual

11   umbrella.  It was never produced for me to inspect.

12       **Q.    Dr. Abraham, we'll get through this a lot**

13   **faster if you answer the questions I'm asking you.**

14           **Describe for me the -- what the two umbrellas**

15   **that you looked at in December, looked like.  I want to**

16   **know what they looked like?**

17       A.    Oh, I have a schematic of them, I think, here

18   somewhere.

19           (Discussion held off the record.)

20           THE WITNESS:  Here's another one you can use,

21       "Dynamics of Falls and Blows."

22   BY MS. CHARLES-COLLINS:

23       **Q.    We'll mark that as Number 19.  We have this**

24   **one.**

25       A.    Oh, you have that one?



```
 1        Q.    Yeah.  We have this one.

 2        A.    Okay.

 3        Q.    So it's not Number 19.

 4        A.    I know I have it, it's at the -- I downloaded

 5   it from the company itself.  The manufacturer of it, a

 6   distributor of the company.

 7              MS. BENTZ:  What are you looking for?

 8              THE WITNESS:  The Tropicana --

 9              MS. BENTZ:  That was an Exhibit at a prior

10        deposition; do you want me to pull it up?

11              THE WITNESS:  Yeah.  That's the one that I

12        have.

13   BY MS. CHARLES-COLLINS:

14        Q.    Okay.  But what I'm asking you is, to

15   describe for me the umbrellas that you saw in December at

16   the inspection?

17        A.    It was in a stanchion.  It was an umbrella

18   that had a -- that you open by raising the center portion

19   that controlled all of the arms, and a locking mechanism

20   of -- for once the umbrella was opened.  And that's --

21   that's the only thing that was similar to the umbrella in

22   question, because of the allegation that she was able to

23   open up the umbrella.

24        Q.    Okay.

25        A.    I say it wasn't possible for her to open up
```

```
 1     the umbrella.
 2          Q.     Okay.  We'll get there.
 3          A.     And I'm saying that, that the allegation --
 4          Q.     We'll get there.
 5                 THE WITNESS:  Let me finish.
 6                 MS. BENTZ:  Let him finish his answer.
 7                 THE WITNESS:  The allegation is totally
 8     false.
 9     BY MS. CHARLES-COLLINS:
10          Q.     Okay.  We will get there but my -- what --
11     did the umbrellas -- you saw the two umbrellas in
12     December?
13          A.     Yes.
14          Q.     Did the umbrellas have a canopy?
15                 MS. BENTZ:  What was -- I don't understand
16     what the canopy is.
17     BY MS. CHARLES-COLLINS:
18          Q.     Did the -- did the -- I mean the -- did the
19     stand have a canopy for the umbrella?  A covering?
20          A.     A covering?  You mean, when the umbrella's
21     opened?
22          Q.     An umbrella has a canopy, so what --
23          A.     Right.  Right.  When you open it --
24          Q.     Right.
25          A.     -- the canopy's there.
```

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                57

```
 1        Q.    Yes.

 2        A.    Yes.

 3        Q.    Okay.  So were both canopies the same?

 4              MS. BENTZ:  As what?

 5              MS. CHARLES-COLLINS:  Each other.

 6              THE WITNESS:  I -- each other?  No.

 7   BY MS. CHARLES-COLLINS:

 8        Q.    Okay.  Describe them for me.

 9        A.    Because, one, they both had canopies.

10        Q.    Yes.

11        A.    But one -- they both were very difficult to

12   raise.

13        Q.    Okay.  Describe the canopies for me.

14              MS. BENTZ:  Okay.  Just so I'm clear, and for

15        the record --

16              THE WITNESS:  Excuse me.

17              MS. BENTZ:  -- we're talking only about the

18        umbrellas now that Dr. Abraham inspected in

19        December.

20              MS. CHARLES-COLLINS:  Yep.

21              MS. BENTZ:  Okay.  Because, just for the

22        record, we never were able to actually evaluate the

23        umbrella that actually fell on the Plaintiff.

24              MS. CHARLES-COLLINS:  Never asked him a

25        question about that.
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    58

```
 1                THE WITNESS:  No, I --

 2                MS. BENTZ:  I just want to make it clear for

 3        the record, because this is a deposition

 4        transcript, and --

 5                MS. CHARLES-COLLINS:  Okay.

 6                MS. BENTZ:  -- and things --

 7                MS. CHARLES-COLLINS:  I made it very clear.

 8        I'm talking about the umbrellas that you looked at

 9        on -- in December at the Frenchman's Cove, 2014.

10  BY MS. CHARLES-COLLINS:

11        Q.    Describe the canopies of the two separate

12  umbrellas that you looked at.

13        A.    They were -- as you stated, canopies, we'll

14  call them canopies, that were only to block the sun from

15  coming through them.

16        Q.    Did they have color?

17        A.    Yeah.  They had colors.  They were in my

18  photographs.  Whatever colors they had.

19        Q.    Okay.  What photographs would those be?  The

20  ones to your report?

21        A.    The ones I took.

22        Q.    Okay.

23        A.    They would describe the colors.  I think they

24  were vomitatious something or other.

25        Q.    Vomitatious?
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    59

```
 1      A.    Yeah.  I don't think they were colorful.

 2      Q.    All right.  So the photographs, you're saying

 3   in your report, that's marked as Exhibit 2, is this what

 4   you've -- you identified Exhibit 2 as your complete

 5   report.  Are those the umbrellas?

 6      A.    No.  I was -- there was also a videotape

 7   that --

 8      Q.    Okay.  But I'm asking just about the

 9   photographs that are attached to Exhibit 2 of your

10   December 21, 2014 report.  Are those pictures of the

11   umbrellas that you inspected in December 2014 at

12   Frenchman's Cove?

13      A.    I don't recall the colors.

14      Q.    My question is:  Are those pictures that are

15   attached to your report, December 22nd, 2014, pictures of

16   the umbrellas that you inspected at Frenchman's Cove?

17      A.    No.

18            MS. BENTZ:  Can we have the Bates Numbers,

19      please, just for the record.

20            MS. CHARLES-COLLINS:  Bates Stamp Number.

21            THE WITNESS:  Yes, okay.

22            MS. CHARLES-COLLINS:  Three -- hold on for a

23      second, Dr. Abraham, let me just clarify the

24      record.  Bates Stamp Numbers 360, 361, 362, 364.

25            THE WITNESS:  Oh.
```

```
 1    BY MS. CHARLES-COLLINS:

 2         Q.    Are those pictures of the photos -- I mean

 3    are those pictures of the umbrellas that you inspected at

 4    Frenchman's Cove on -- in December of 2014?

 5         A.    They look like them, but I don't recall the

 6    colors.

 7         Q.    Okay.  All right.  Karin, do you want to take

 8    a break?

 9              MS. BENTZ:  Yeah.

10              MS. CHARLES-COLLINS:  We will take a break

11    just so --

12              THE VIDEOGRAPHER:  Going off record at

13    12:28 p.m.

14              (At about 12:28 p.m. recess.)

15              (At about 12:45 p.m. proceedings reconvened.)

16              THE VIDEOGRAPHER:  Back on record at

17    12:45 p.m.

18    BY MS. CHARLES-COLLINS:

19         Q.    Okay.  Dr. Abraham, in this case you were

20    retained to -- you were retained to -- to review the

21    facts and allegations in this case, and asked to render

22    certain opinions; correct?

23         A.    Yes.

24         Q.    Okay.  What I'm going to ask you to do is, to

25    list for me all of your opinions in this case, and then
```

```
 1    we will go back and talk about each one.

 2         A.    Uh-huh.

 3         Q.    So can you do that for me?

 4         A.    Sure.

 5         Q.    Okay.

 6         A.    Can I have the report from the other expert?

 7               MS. BENTZ:  You have it right here.  Is that

 8         it?

 9               THE WITNESS:  No, the other expert there.

10               MS. BENTZ:  Okay.  Here you go.

11               THE WITNESS:  Okay.  Thank you.  Just bear

12         with me; I'm just trying to find my report.

13               MS. CHARLES-COLLINS:  Okay.  Which one?  The

14         December 2014?

15               Here you go.

16               THE WITNESS:  Yeah.  Yeah.

17               May I borrow it?

18               MS. CHARLES-COLLINS:  Yeah.

19               THE WITNESS:  Thank you.

20               I'm having a problem with this report, and

21         one of the reasons is, that the photographs that we

22         have here are usually listed in my report, and I

23         don't have a page of photographs listing these --

24         as a schedule, listing these photographs.  So I

25         don't know where these photographs came from.
```

 1    BY MS. CHARLES-COLLINS:

 2        **Q.    That was the report as it was provided to us.**

 3        A.    Okay.  But that's not the umbrellas that I

 4    inspected.

 5        **Q.    But that was the report that was provided to**

 6    **us with those photos?**

 7        A.    I'm just saying to you, that--

 8        **Q.    Okay.**

 9        A.    -- that's not the umbrellas that I inspected.

10    The umbrellas that I inspected, have copies of those

11    photographs with me on my iPad.  So, I just want to put

12    that on the record.

13        **Q.    Okay.**

14        A.    All right.  Let's go --

15        **Q.    So do you know where those photos came from?**

16        A.    I have no idea right now.  Right now, I

17    don't.

18        **Q.    Okay.**

19        A.    I can't recall.

20        **Q.    All right.**

21        A.    Of course I took a lot of photographs when I

22    was down there --

23        **Q.    Okay.**

24        A.    -- for a number of things.

25              Okay.  Let's go over my report.



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 64 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                63

```
 1                 Okay.  On page three of my report, it says --
 2       Q.    Let me just clarify something for the record,
 3   Dr. Abraham, we're talking about your December 22nd, 2014
 4   report; correct?
 5       A.    Yes.
 6       Q.    Okay.  Go ahead.
 7       A.    A, the management and loss prevention
 8   individuals at the Marriott, they were on notice that the
 9   steel pole of the umbrella struck Ms. Redler's head.
10       Q.    Okay.  What other opinions do you have?
11       A.    Okay.  My opinion, also, is that she was
12   knocked unconscious, and she received a concussion
13   without any question.
14                 There's no question as to the fact that she
15   received a concussion; okay.
16       Q.    Uh-huh.  And can you do me a favor,
17   Dr. Abraham, if, what you're telling me is contained in
18   your report in one of the --
19       A.    You want to just skip over?
20       Q.    -- numbered paragraphs -- no, no, no.  No,
21   no.  I just -- so that I can make reference to it.
22   Because -- so if you're talk -- I know that when you just
23   said about management --
24       A.    Right.
25       Q.    -- should have known that was 14 a --
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                64

1       A.      Correct.

**2       Q.      -- correct?**

3       A.      Now I'm going to 14 b.

**4       Q.      Okay.**

5       A.      Okay.  They have known for decades, that the

6  stanchions that they were using, were not sufficient to

7  maintain, as I stated in my report, the integrity of an

8  open umbrella when strong breezes, or when wind was

9  occurring, which they knew in this specific instance

10  prior to the accident.

11          But knowing that they -- the question is, as

12  a hotel, on an international basis, and I've stayed in

13  their hotels all over the world, are -- knowing that, why

14  would they order the umbrellas with stanchions when they

15  knew, or should have known that there are alternatives

16  safer methods of securing the umbrellas, so that the

17  inherent risk of anything being blown over would have

18  been reduced, or eliminated.

19          At the same time, since they knew that this

20  could occur -- while I'm on this subject, they could have

21  easily closed the umbrellas, and wrapped a tie around it,

22  so it would remain shut.  These ties cost, I guess, a few

23  cents.  You can get them in -- I get them in Home Depot,

24  a large plastic ties, that you need a special tool to

25  open it up.  And they could have gone around, and just

**Orange Legal**
**800-275-7991**

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 66 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          65

 1   put these ties around all the closed umbrellas so no one

 2   would open them.

 3            Next, while I'm on this, they had an

 4   individual go around, and these -- a witness in this

 5   case, and it was brought up, previously.  The witness

 6   states that he spoke with Ms. Redler and told her that

 7   the -- warned her.

 8            Now, who was this witness?  The employee of a

 9   Marriott.  He was formerly a head of housekeeping, and

10   now he became a bellboy.  So now he has the position of a

11   bellboy.  I don't know what the requirements were, or

12   what his training was, but he -- what it does demonstrate

13   is, that the management of the Marriott Hotel at that

14   facility, were not properly trained in safety warnings,

15   and instructions.  Because the so-called alleged warning

16   that he stated he gave the -- Ms. Redler and the family,

17   was not a proper warning.  He never stated that there was

18   a possibility of any danger that she would be hit in the

19   head.  She -- they never gave her what the consequences

20   would be with reference to opening it up or leaving it

21   open.  And there's no evidence that she raised the

22   umbrella by herself.

23            And I'm stating to you, with safety

24   engineering and scientific certainty, that it would have

25   been impossible for her to raise the so-called exemplar

http://www.yeslaw.net/help

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 67 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                        66

 1    umbrellas that you stated were similar, or identical to

 2    the one that fell over, which had a steel, or a big round

 3    steel pole, supporting the umbrella.

 4            Okay.  By the way, I describe that in 14 c,

 5    that she wouldn't be able to lift it up.

 6            D, the -- knowing that injuries do occur to

 7    guests at hotels from simple strain -- a strained ankle,

 8    strained ligament, slip and fall cases.  There was no one

 9    that, based upon the -- this specific incident, that was

10    trained in handling injuries to the head, or brain.

11            It was open and obvious to me that there was

12    no one there that would recognize the problem that

13    existed at the time she was injured, and that she needed

14    immediate medical attention.

15            You people are calling the injury that she

16    received as a mild concussion.  What you're not privy to

17    is the fact that, in my opinion, and the opinion of

18    experts in the field, there's no such designation as a

19    mild concussion.

20            A concussion is a concussion is a concussion,

21    and that's what it is.  And it varies from person to

22    person, based upon the extent -- based upon one as the

23    impact they receive.  Their DNA, and other associated

24    characteristics relating to their physiology.

25            The Marriott Hotel, up to j, on page four,



**Orange Legal**
**800-275-7991**

1    14 j.  Failed to follow the standard of care throughout

2    the Caribbean and the Islands, and throughout the United

3    States.  When there is a strong breeze or wind by the

4    pool or on the beach, all umbrellas must be closed and

5    stay closed.  The fact that they're even inferring that

6    Ms. Redler raised the umbrella as a number of other

7    people did, other invitees did, is really not an excuse

8    for them to have bellboys, individual employees working

9    around the pool, to make sure and verify that no one open

10   up their umbrella, and if they did they would be

11   immediately closed, with a warning.

12           And at the same time, in addition to being

13   closed, they could have been removed from their

14   stanchions and stored somewhere until the danger of these

15   breezes blowing over the umbrellas ceased.

16           The choice of the umbrella, the original

17   purchase of the umbrella and stanchion, also demonstrated

18   the inability, and in-ept training of the management at

19   the hotel, of the areas involving the safety and welfare

20   of the invited guests.

21           The -- it was open and obvious that the

22   stanchions and umbrellas would not be a safe

23   instrumentality to be used for guests, because breezes

24   and gusts can occur at any time.  Sometimes without

25   notice.



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                68

```
 1              The fact that an individual was injured --

 2   and I've handled plenty of cases against the Marriott,

 3   and in Europe and throughout the United States; okay?

 4   Management of Marriott knows, or should have known, knew

 5   or should have known that if an individual is injured by

 6   an instrumentality, the evidence is extracted and saved,

 7   and placed in an area not available to anyone else, and

 8   preserved.  It wasn't done in this case.  And as a

 9   result, I was presented with two umbrellas that were not

10   similar, or identical to the umbrella that severely

11   injured Ms. Redler.

12              And on top of it, was not given an

13   opportunity to fully evaluate the severity of her injury,

14   based upon what did result from the impact of the

15   umbrella to the side of her head.  And it also injured a

16   part of her body, at the same time.

17              Knowing that, I did want to give you one

18   other fact.  Yeah, this is something I did rely on, by

19   the way.

20      Q.    Okay.

21      A.    Based upon what is alleged, here.  I don't

22   have a staple, but you can put this together.  There's an

23   author to this, as well.  The author is, Selim Benbadis,

24   MD, he's the chief editor, and this is a medical -- I

25   didn't copy the whole article.  What I did was copy what
```

http://www.yoslaw.net/help



Case: 3:14-cv-00017-CVG-RM Document #: 166 Filed: 05/29/15 Page 70 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    69

1    related to the allegation, here, if I might just put

2    it -- read it.

3            That the findings -- they ran a brain MRI,

4    and a CT scan, and we'll go over that in the middle, and

5    they found abnormal findings.  It's called a focal

6    dysrhythmia.  And what I would like to do is present this

7    as something that I did rely on.  Because this -- what

8    they're claiming here, and as a finding, is clearly, has

9    not been clinically useful in the modern era medicine.

10       Q.    When you say they did a finding, who are you

11   talking about, they?

12       A.    The defense in this case.  It's stated

13   that -- there was a fall on her head, a head trauma in

14   2009, and they ran a CT scan.

15       Q.    Who ran a CT scan?

16       A.    The medical people when she did have a --

17   that injury, and they ran an MRI.

18       Q.    Right.  But these are her doctors?

19       A.    Her doctors.

20       Q.    Okay.

21       A.    But just to present what -- a CT scan and an

22   MRI, can only determine structural changes, and not

23   concussions.  Then, you have to use, for example, a

24   functional NMR to determine the condition of the

25   chemistry of the brain, and from that, you can determine



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                      70

 1    the concussive level.

 2            And the EEG, when they found abnormal

 3    findings of focal dysrhythmia, it's meaningless.  But

 4    they're making a big deal of it, and it's clearly not

 5    clinically useful in the modern era, and it should be

 6    considered a pathological finding only when associated

 7    with more definite abnormalities.  And this is

 8    documentation of what I did rely on.

 9        Q.    Okay.

10        A.    And I verified that, also, with Dr. Asher.

11        Q.    Okay.  So we'll mark that as Exhibit 19.

12            (Deposition Exhibit 19 marked.)

13    BY MS. CHARLES-COLLINS:

14        Q.    And does -- Dr. Abraham, does this article

15    that we just talked about, or a portion of the article,

16    relate to a specific numbered paragraph in your report

17    or --

18        A.    No, because this was present --

19        Q.    Okay.

20        A.    -- this was --

21        Q.    Just to the doctor.

22        A.    -- presented to me well after the fact.

23        Q.    Okay.  All right.

24            Go ahead with the rest of your opinions.

25        A.    Okay.  Well, m speaks for itself.  Because I



```
 1   was told by Ms. Bentz, okay, the attorney for Ms. Redler,

 2   that the Marriott was going to produce the actual

 3   stanchion and umbrella for tests to be conducted by the

 4   other side.  And the -- that Defense failed to produce

 5   the actual umbrella and stanchion.  For whatever reason,

 6   I don't know.

 7        Q.    When did she tell you?  When did

 8   Attorney Bentz tell you that?

 9        A.    Prior to my flying down.  And also, oh, when

10   I was down there, she stated I was going to see the

11   actual one, and that -- actually, you were flying down

12   and going to present that to me.

13        Q.    Were you told by Attorney Bentz that she was

14   advised that before that inspection, that, in fact, what

15   you would be inspecting were exemplars?

16        A.    No.

17        Q.    Okay.

18        A.    I thought I was going to -- I finally, just

19   prior to going there, I was told that you couldn't find

20   it.

21        Q.    Okay.  All right.  Do you have any -- any

22   other opinions?

23        A.    Yes.

24        Q.    Okay.

25        A.    Okay.  I state in n, like Nancy.
```



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 73 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                72

```
 1        Q.      Uh-huh.

 2        A.      On page five that it is foreseeable from a

 3   risk benefit standpoint, that if it's foreseeable doing

 4   a -- performing a risk analysis, that an umbrella and

 5   stanchion do not have the -- are not designed to

 6   withstand breezes that are known throughout the area, and

 7   wind gusts, they should not be used.

 8               And there's a standard of care that is

 9   followed throughout the United States and throughout the

10   islands.  And the standard of care was finally followed

11   during, and after the incident.  During the incident they

12   were installing, from what I understand, the

13   stanchions -- they were installing the poles in cement,

14   and they have finally removed all of the umbrellas that

15   were on stanchions, and made them -- the poles

16   permanently embedded in the cement.

17        Q.      Okay.  Anything else?

18        A.      Okay.  Yes.  That there were no written or

19   oral warnings regarding -- and when I say warnings,

20   regard -- warnings that follow the voluntary -- do you

21   want to go off the record?

22               We're being presented with, I think, dinner.

23               MS. CHARLES-COLLINS:  We can go off.

24               Wait.  Hold on one second.  Finish that

25          thought, though.
```



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 74 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                73

1           MS. BENTZ:  Why don't you finish that portion

2      of the opinion, and then we'll eat.

3           MS. CHARLES-COLLINS:  Okay.  Okay.

4           THE WITNESS:  You're stating that I'm not

5      going to recall what I stated, and started; right?

6           MS. BENTZ:  No, but you're almost done with

7      your opinions; right?

8           THE WITNESS:  No.  This goes another three

9      hours of this.

10          MS. CHARLES-COLLINS:  Okay.  Yeah, we have.

11     BY MS. CHARLES-COLLINS:

12     **Q.    So no written or oral warnings, and you were**

13     **going to explain to me what you mean by warnings.**

14     A.    Right, right, right.  That follows voluntary

15     ASTM, ANSI, ISO, or statutory warnings, Municipal

16     Consumer Product Safety Commission, those types of

17     warnings that have a signal word, what the risk is, and

18     what the consequence is.  They didn't have any of that.

19          So, most of all alleging defective warnings

20     and instructions, which I also state outwardly in my

21     report.

22     **Q.    Can I ask you one question?  You said ASTM,**

23     **then you said another word?**

24     A.    ANSI.  American National Standards Institute.

25     ISO, which is the International Standards Organization.



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                            74

1          Q.     Okay.

2          A.     And then the Consumer Product Safety

3     Commission, which is the CPSA.

4          Q.     Okay.   Thank you.

5          A.     They have warnings that anybody can copy, and

6     that should have been posted.   When they had this

7     problem, they could be placed on stanchions throughout

8     the area where individuals are seated.   And they could

9     have placed Ms. Redler, and her family on notice that no

10    way, should she be exposed to open umbrella, because of

11    the risks.   The risk can result in permanent injury, and

12    possible death.   Because the poles were steel, heavy, and

13    the force was extreme.

14              Now can I get my soup?

15         Q.     How much more do you have as far as listing

16    your opinions?

17         A.     Ten more minutes.

18         Q.     Okay.

19         A.     My soup will get cold.

20         Q.     They have a microwave.

21         A.     I don't like anything microwaved.

22         Q.     All right.   We will take a break, so you can

23    eat.

24              MS. BENTZ:   She likes to be in control; can

25    you tell that?



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                          75

```
 1                    That's why she went to law school.
 2                    MS. CHARLES-COLLINS:  We will take a break.
 3                    THE VIDEOGRAPHER:  Going off record at
 4          1:10 p.m.
 5                    (At about 1:10 p.m. recess.)
 6                    (At about 1:30 p.m. proceedings reconvened.)
 7                    THE VIDEOGRAPHER:  Back on record at
 8          1:30 p.m.
 9     BY MS. CHARLES-COLLINS:
10          Q.     Dr. Abraham, when we -- before we took a
11     break, we were going through your opinions in this case,
12     so if I could ask you to continue with --
13          A.     Uh-huh.
14          Q.     -- letting me know what your opinions are.
15          A.     Yes.
16                    Okay.  I'm stating that the impact was
17     extreme because of the design of the pole.  The pole was
18     round, and the impact was extremely narrow, in the temple
19     area.
20                    And I also go on to state in Paragraph 16,
21     what that part of the brain is responsible for.  Okay.
22                    And then 17, I state that the testing that
23     was done, and contrary to the Defendant's allegations
24     against me, which state that my testing was not
25     scientific, peer reviewed, published, et cetera.
```

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 77 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          76

 1            Rather that the testing that was performed by

 2    me was performed to demonstrate that the force produced

 3    by the steel pole was more than enough to produce a

 4    severe concussion.  It was severe enough to also produce

 5    a subdural hematoma, and actually kill a young child,

 6    which didn't happen in this case.  And a subdural

 7    hematoma wasn't produced, just a severe concussion.  But

 8    the force was significance.

 9            And also I wanted to demonstrate that the

10    fall of the pole was similar to that, or what Mrs. --

11    what Ms. Redler experienced when the pole went over.  And

12    she was severely injured.  Okay.

13            I also state that Ms. Redler was exposed to

14    an enhanced risk, and hidden danger on page six, top

15    paragraph.  The enhanced risk, and hidden danger when

16    known, or should have been known by the Defendants, but

17    hidden from Ms. Redler.

18            I also state in 18 that the Defendant's

19    deviated from the standard of care, that is known

20    throughout the hotel chains, and the protection of

21    invited guests from foreseeable risks, and hidden

22    dangers.  And they ignored the safety and welfare of

23    Ms. Redler, which resulted in her injuries.

24            Number 19, I interpreted, if a safety

25    specialist, or an individual experienced in risk



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                              77

```
 1    analysis, observed the stanchion, and the pole, and the

 2    umbrella, they would have informed the Marriott

 3    management that the instrumentality was a -- dangerous,

 4    and should not be used at the hotel when there were

 5    alternative safer methods of a blocking the sun from the

 6    guests.

 7              Furthermore -- I'm sorry, I can give you this

 8    back.

 9              (Discussion held off the record.)

10              THE WITNESS:  I apologize.  I inadvertently

11       put some check marks on the side.

12    BY MS. CHARLES-COLLINS:

13         Q.    Oh.

14         A.    It was --

15         Q.    That's okay.

16         A.    I didn't realize what I was looking at as it

17    was -- I got involved with it.

18         Q.    That's all right.

19         A.    Next, I'd also like to state, that based upon

20    my experience -- is that the report submitted by Paul

21    Marsenison, and cosigned by Amor Camachtcho, Ming Xiao,

22    and Richard Baratta, really, was supposed to be a report

23    that was -- that performed scientific -- scientifically

24    accepted -- a protocol in evaluating the subject

25    umbrella.
```



1          I have reviewed the report that was issued on

2     April 17th, 2015, as sent to the law firm, to Ms. Smith

3     of Hamilton, Miller & Birthisel of Miami, Florida.  Okay.

4          Conclusions.  The overturning of the open

5     umbrella was consistent with the effect from a gust of

6     wind.

7          Okay.  I have to state with certainty

8     that that conclusion is correct, there was no testing of

9     the umbrella to prove that point.

10    Q.    By who?  No testing by who?

11    A.    By the individuals that I -- that co-signed

12    the report with Mr. Marsenisont -- Marsenison.

13         He also concludes that a person sitting in a

14    lounge chair adjacent to the umbrella could be contacted

15    by the umbrella post during overturning.  He never

16    performed any testing that was supposed to be

17    scientifically performed, which was alleged was going to

18    be done by the defense attorneys prior to the issuance of

19    the report.

20    Q.    Can you explain to me what you -- I don't

21    know what you just meant by that.

22    A.    Okay.  He concludes that anyone sitting in a

23    chair adjacent to the umbrella --

24    Q.    Uh-huh.

25    A.    -- could be contacted by the umbrella post.



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                79

```
 1   He didn't call it a pole.  Umbrella post during the

 2   overturning, which is an easy conclusion, but he, in no

 3   way, went through any testing, any type of physical

 4   testing.  Any type of -- any type of testing to prove

 5   that point, but it did happen.

 6       Q.     Yeah.

 7       A.     So that's easy to conclude.  Because in real

 8   life, that's what happened.

 9       Q.     Were you present for his inspection?

10       A.     No.

11       Q.     Okay.

12       A.     Just to reply to that statement, it's usually

13   a courtesy of all the inspections that I go on, that both

14   sides are present.  When I say both sides, the individual

15   alleged experts for both sides are present.

16             Number three, the report prepared by Charles

17   Abraham did not meet ASTM E-620 standard practice for

18   reporting opinions of scientific or technical experts.

19             Well, first of all, it doesn't matter what he

20   calls me.  What's interesting here is, the ASTM E-620, is

21   a committee that I'm a member of, and I'm the only one

22   that objected to having that even created as a standard.

23   Prior to that time, I have been involved with -- I owned,

24   I started Intercity Testing, a consulting corporation in

25   New York.  By the time I sold it in 1988, I had six
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 81 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                            80

 1   offices, over 100 Ph.D.s working for me.  Full

 2   laboratories, we wrote over 15,000 reports in that time.

 3   And all of a sudden, out of the clear blue sky, some guys

 4   that want to be experts, are creating a standard to write

 5   a report.

 6              No one's going to tell me how to write a

 7   report, and I told them that.  And I told them that in

 8   writing.

 9              It's a voluntary standard.  And why he would

10   even bring this up is ridiculous.

11              The testing by Dr. Abraham was not

12   representative of the conditions of the incident as

13   reported.  The analysis and conclusions by him, were not

14   based upon accepted principles or methods in a scientific

15   community.

16              What he hadn't done, if he's going to

17   critique me, which he's done very badly, and to the wrong

18   person, is that if there were alternative methods and

19   principles for testing, what are they?  They were never

20   mentioned here.  So, I don't know what he's talking

21   about, and I -- I know that he doesn't know what he's

22   talking about.

23        Q.    Okay.  Any other opinions that you have?

24        A.    Yes.

25        Q.    Okay.



**Orange Legal**
**800-275-7991**

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 82 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                              81

1      A.     Okay.  On Mar X 075, whatever that stands

2    for.

3      **Q.     It's the Bates Stamp Number for the --**

4      A.     Right.  Okay.  So I said that correctly, I

5    hope.

6            The paragraph at the bottom, he states that

7    the umbrella canopy was approximately ten feet in

8    diameter.  We measured the overturning force for the

9    umbrella by positioning the stand as 12 pounds, which

10   wasn't much.  I estimate it to be about ten pounds.

11           But he says the weight of the entire umbrella

12   was 35 pounds.  The umbrella base weighed 77 pounds.

13   Okay.  And that, therefore, we concluded that because the

14   overturning force was less than the weight of the

15   umbrella alone, the umbrella overturned while it remained

16   in the umbrella stand.  Okay.

17           And I don't know how important that is, but

18   the fact is, he didn't do any testing on the actual

19   umbrella, and he doesn't even mention that in his report.

20           He says -- he says -- what he says, the

21   weight of an identical umbrella and stand.  Totally

22   false.  Totally false.  I stated that.  I stated that

23   because it would be impossible for Ms. Redler to raise

24   the subject umbrella, which was supposed to be similar --

25   similar or exactly the same as the one that was in

Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 83 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                 82

1   question.

2          And then he reviews my report.  Okay.  He

3   states that a gust of wind would apply to distributed

4   forces onto the canopy, whereas a test that I performed,

5   applied a concentrated load on the pole of the umbrella.

6          What was I to do?  I mean, I'd say other

7   things.  Blow on the umbrella so I'd get an implied

8   force?  I couldn't blow that much.  And I could -- and I

9   could -- there weren't enough fans located in the

10  Marriott Hotel to create the gust of wind that came by.

11  And that I failed to address that there was any

12  relationship between the two.  What he fails to see is

13  that it was a qualitative method of demonstrating what

14  occurred, and the forces involved.  Okay.

15         Simply put, a distributed load such as would

16  occur due to wind, would have a different characteristic,

17  in terms of pushing and rotating the pole.  What is the

18  difference whether if you rotate the pole, come straight

19  down, and nothing happens to the pole, it stays in one

20  place and just comes down?  The fact is, the steel pole

21  hit her in the temple, temporal area, and she received a

22  concussion.  Okay?

23         He says, then he comes to conclude

24  Dr. Abraham's testing was not applicable to the

25  conditions of the subject accident.  What he doesn't

http://www.yodaw.net/help



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 84 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    83

 1    understand is the real world, and how we go about

 2    testing, and creating tests to demonstrate what happens

 3    to individuals when they're injured.

 4              I have over 43, maybe 45 patents, 46 patents

 5    now.  I create products, I create testing methods.

 6    Create testing protocol for these products to prove the

 7    integrity of what -- and the capability of what I invent

 8    will do.  There were a lot of products I invent.  There

 9    was no testing available.  What testing is available

10    here?

11              There's nothing written that -- of any

12    protocol that I should follow; and whatever protocol I

13    should follow, if there was anything that was published,

14    it would be voluntary suggestions, and not statutory.

15              I concluded that it took less than ten

16    pounds.  He's saying it took 12 pounds.  It is important?

17    It's not important.  It's insignificant whether it took

18    ten pounds, 12 pounds, the gust of wind would have pushed

19    something over, even if it was more than 12 pounds.

20    Okay?

21              MS. BENTZ:  I'm just going to state for the

22         record that this report, of course, hasn't been

23         allowed by the Court.  So, to the extent that this

24         report is not allowed in evidence pursuant to my

25         motion that's going to be filed --



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                84

```
 1              MS. CHARLES-COLLINS:  Which motion is that?

 2              MS. BENTZ:  These opinions are being -- the

 3         one I have to write --

 4              MS. CHARLES-COLLINS:  Yeah.

 5              MS. BENTZ:  -- are -- did you put my mike

 6         back on?

 7              Okay.  These opinions that he's now rendering

 8         are -- will not be necessary but, go ahead.

 9              THE WITNESS:  Well, they should be more of a

10         reason why a report like this is so nonscientific.

11         I wouldn't admit into the garbage dump.

12              I would never hire an individual like this

13         for my firm, that I ran for 28 years.  This

14         individual is in-ept, in my opinion.  And that's on

15         the record.

16              MS. BENTZ:  It is now.

17              THE WITNESS:  Then -- then, he goes on to

18         have the gall to say at the bottom of X 076.

19    BY MS. CHARLES-COLLINS:

20         Q.   Uh-huh.

21         A.    At the bottom, Dr. Abraham's stated in

22    paragraph 16, that the testing performed by the

23    undersigned Dr. Abraham, did demonstrate that the force

24    produced by the steel pole was more than enough to

25    produce a severe concussion, a subdural hematoma and
```

Case: 3:14-cv-00017-CVG-RM Document #: 166 Filed: 05/29/15 Page 86 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                85

 1    actually kill a young child.

 2            I did that say, and that's the possibility,

 3    because I have experienced individual impact forces that

 4    produced those types of injuries.

 5            I didn't take any measurements with regard to

 6    the location or the magnitude of the force.  Again, it

 7    was demonstrative, more than anything else.

 8            Okay.  And, then, it goes on to my testing,

 9    that the umbrella was open when it came -- came down.

10    And his testing suggested that when the canopy was open,

11    contact with the shaft of the umbrella would be different

12    compared to that of the canopy, when the canopy was

13    closed.  As such, his testing of tipping over the closed

14    umbrella onto a piece of tile, did not comply with the

15    facts of the case.

16            Well, what I didn't get -- and I could have

17    actually created the facts of the case, but I couldn't

18    get a volunteer employee from the Marriott to put their

19    head down in case -- in place of a tile.  So, that didn't

20    work.  So, I couldn't realistically reproduce everything.

21    So I used tile instead of an individual's brain.

22    BY MS. CHARLES-COLLINS:

23      Q.    Could you have used a dummy?

24      A.    What would a dummy do?  A dummy wouldn't

25    fracture.  A dummy --



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 87 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          86

1        Q.      You don't need it to fracture --

2        A.      Well.

3        Q.      -- you just need it to demonstrate a human

4   figure.  If you're doing the testing, why couldn't you

5   have used a dummy?

6        A.      Well, you might be correct, but that's

7   incorrect.

8               I could have drawn a face on the tile.  I

9   could have done that, too, I didn't do that, I'm not an

10  artist.

11              Now he also said that, additionally,

12  Dr. Abraham did not perform any scientific analysis, or

13  reference any peer reviewed literature to establish the

14  amount of force required to produce a severe concussion,

15  a subdural hematoma, or actually kill a young child.  It

16  should be noted that a CT scan of Ms. Redler's head by

17  Dr. Jeffrey Guller at Schneider's General Medical Center

18  on the day of the incident, reported normal results with

19  no evidence of hemorrhage infarct mass effect, or extra,

20  extra axial collections.  There was no subdural hematoma

21  reported.

22              That's all the -- a CAT scan would do.  As I

23  stated previously, as I determined structural changes in

24  the brain are not -- and would not recognize or determine

25  a -- that there was a concussion.  The doctor determined



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 88 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                      87

 1    that it was a concussion without any question.

 2              And then he concludes that I violated in his

 3    last paragraph of 77, I did not meet ASTM 620 which is

 4    the voluntary standard created by mostly industry, and

 5    not individual consultants like myself.

 6         Q.    Any other opinions you have in this case?

 7         A.    He also -- yes, he also states that the

 8    engineering -- biomechanical engineering aspects of the

 9    case were under the responsible charge of Ming Xiao

10    and -- but we don't know what the biomechanical aspects

11    of this case were, because he didn't mention him

12    throughout the report.  So, I don't know what this

13    individual knew or didn't know, and what his opinion and

14    what Dr. Xiao's opinion was.

15              The other happens to be the -- the

16    neurologist, Ph.D., Dr. Spangenberg, Spangenberg, which

17    did 14 more tests on this individual, and if you --

18              MS. BENTZ:  Who is Spangenberg?

19              THE WITNESS:  Spangenberg.

20              MS. CHARLES-COLLINS:  You tell me.

21              THE WITNESS:  Karen Spangenberg-Postal.

22              MS. BENTZ:  Oh, Postal.  Dr. Postal.

23              THE WITNESS:  I said Dr. Postal.

24              MS. BENTZ:  That's how I know her.

25              No, no.  You said Spangenberg.



```
 1              THE WITNESS:  Well, she's keeping her name --
 2              MS. BENTZ:  I was, like -- that if that's a
 3       new expert, you're not getting her in.
 4              THE WITNESS:  She's keeping her name, her
 5       maiden name.
 6              MS. BENTZ:  Oh, okay.  Thanks, Carl.
 7              THE WITNESS:  You got it?  You got that?
 8              MS. BENTZ:  I was on PC there.
 9              THE WITNESS:  When I was sticking up for her.
10       That's the only thing I am spicking -- sticking up
11       for.
12              She says -- con -- concludes -- very
13       interesting, that Ms. Redler didn't have a
14       concussion, because she was not rendered
15       unconscious.  99 percent of individuals that
16       receive a concussion, are not rendered unconscious.
17       I mean, right away, right from the beginning, I'm
18       saying to myself, what is she even involved in this
19       case for, unless she's being paid a lot of money by
20       Defendants to say anything that would make the
21       defense more credible in defending the case.
22  BY MS. CHARLES-COLLINS:
23       Q.    What do you -- what authority do you base
24  your opinion that 99 percent of people who have a
25  concussion, are not rendered unconscious?
```

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 90 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                89

 1      A.    Well, one is the medical -- if you go through

 2   medical literature, you'll see that.  And when you depose

 3   Dr. Asher, he'll state that close to 99 percent or more,

 4   or over 99.

 5      **Q.    I don't want to know what Dr. Asher said; I**

 6   **want to know what -- what authority are you relying on?**

 7   **Is this just your opinion, or is this -- you have medical**

 8   **literature, specific medical literature, specific**

 9   **documents, specific standards that you are relying on,**

10   **that say 99 percent of people who have a concussion are**

11   **not rendered unconscious?**

12      A.    There is medical literature available -- I

13   didn't bring it in.  It's in my cases, in my -- what do

14   you call it?  Milk box cases that I save all my

15   references, but I'll get -- I mean if you need that, I'll

16   get it for you.  But I think that doctors -- Dr. Asher

17   will have all this available.

18           I also discussed that fact with him.

19           He stated, I was also correct in my statement

20   with reference to the fact that she's making that

21   statement, which is so -- well behind times, that it's

22   just that it's more evidence that she really is not the

23   appropriate expert for this particular case.

24      **Q.    When you spoke with Dr. Asher, was that prior**

25   **to your December 2014 report?  Before -- prior to your**



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 91 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    90

 1   writing it.

 2        A.    It's -- no, I -- it was after I received

 3   this, which was December -- well after December 25th.  I

 4   don't recall when I did receive this, but I read it, and

 5   I couldn't believe what I was reading here.

 6        **Q.    So is your answer that your conversation with**

 7   **Dr. Asher was subsequent to you drafting your**

 8   **December 22nd report?**

 9        A.    Yes.  But you asked me what my opinions were.

10        **Q.    Right.  No, but I'm asking you a follow-up**

11   **question.**

12        A.    Yeah, yeah.  It was.  It was.

13        **Q.    Okay.**

14        A.    She now finds there's no valid credible

15   evidence of cognitive impairment, even though she has

16   problems recalling.  She has -- if I recall, she has to

17   jot everything down.  There's a lot that she doesn't

18   remember what she has to do on a daily basis, even though

19   she has her job back.

20        **Q.    And how do you know that?**

21        A.    It was told to me by Dr. Asher.

22        **Q.    So you have no personal knowledge that she**

23   **has the cognitive impairment that -- and when I say she,**

24   **I'm talking about Jessica Redler?**

25        A.    Yeah.  Because I'm the -- I -- I speak to



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 92 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                        91

1   Dr. Asher quite a bit, and so he keeps me posted as to

2   what his findings were.

3           And then she went through all of these tests,

4   when I think, at the beginning somewhere, she was not a

5   candidate to go through all of the testing.  Yet, she

6   continued to test Ms. Redler through 14 or 15 different

7   aspects of her analysis.

8           I mean she even gives her, Ms. Redler

9   gives -- I'll call them Dr. Postal -- indications of

10  problems that she has, as there -- and if you know

11  anything about a concussion, especially, after two years

12  that she still has these problems -- we know it's,

13  essentially, based upon what I know, and what I deal with

14  teenagers and young children who are injured, for an

15  extensive period of time, that the problem is permanent.

**16      Q.    And just so the record is clear, Ms. Redler**

**17  is neither a teenager nor a young child; correct?**

18      A.    No, but she has symptoms -- for example, of

19  that -- of football players.  All the players that have

20  been injured, where the injury has extended, and the

21  injury, the brain deteriorated as a function of time.

22          Okay.  She has headaches, she has sleep

23  issues, all that relates to a concussive problem that

24  persists, and that's why her injury -- and we all

25  understand two things -- one thing.



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 93 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    92

 1           You can have two people side by side, both

 2    identical, different DNAs, both identical in weight, both

 3    get hit by a concussive blow.  One walks away like

 4    nothing happened.  And the other one's unconscious.  We

 5    know this.  People vary.

 6           We -- we -- you -- Ms. Redler was hit and

 7    that's the deal you got.  You got this woman, with her

 8    DNA.  Her DNA may not be as good as somebody else's, but

 9    her injuries, in my opinion, are permanent, and you'll --

10    this can be verified by the doctors that have evaluated

11    her.

12       Q.    Okay.  And is that your personal opinion,

13    that her injuries are permanent?

14       A.    That's my opinion, based upon my background

15    and experience in working with, and evaluating sport

16    injury -- teenagers and adolescents involved in impacts

17    to their brain or body, that resulted in concussions.

18       Q.    Any other opinions that you have in this

19    case?

20       A.    Yes.  My opinion -- and this will be verified

21    by the medical specialist in this case, from my

22    understanding you have a neuropsychiatrist who has

23    extensive experience, unlike Miss Post -- Dr. Postal, in

24    dealing with brain injured people, is a significant

25    difference; and Dr. Share, who has observed and worked



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 94 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          93

1   with several thousands brain injured people.

**2       Q.     So what was your opinion?**

3       A.     My opinion is that I agree with Dr. Share,

4   that there is permanency, here.  And that she'll -- and

5   that will affect her quality of life.  And as a good

6   possibility, it will get worse as a function of time.

7             Now, with reference to other areas, here, I

8   stated that the warnings and instructions were defective.

9   So it doesn't matter, what -- what Ms. Redler did, or

10  didn't do, or what Mr. Redler did or didn't do.  And I

11  gave you alternative, easier, inexpensive methods of

12  securing the umbrellas that could have easily been done,

13  and it wouldn't have cost the Marriott Hotel more than

14  three cents, four cents an umbrella to secure them.

15  Because they were already paying the bellboy to go

16  around, so it wouldn't have cost them any more for the

17  bellboy to just to secure them.

18            Again, there was spoliation of evidence that

19  I never got to see, or examine, or test the actual

20  umbrella.  And I stated that the allegations by the

21  Defense, especially any prior injury from 2009, is

22  ridiculous with their allegations.  They don't even

23  relate to the evaluation of the issues in the subject

24  case.

**25       Q.     Anything else?**



```
 1       A.    Last, but it has to be checked out, your --

 2   she's a psychologist.  Dr. Postal is not licensed in the

 3   state of Massachusetts in the area of the specialty of

 4   treating brain injured patients.  I don't think there's a

 5   license for that, and I don't think --  her license may

 6   be from another state in neuropsychology; that has to be

 7   checked.  I'm not sure.  It's not my responsibility to

 8   check that out.  That's enough.

 9       Q.    Is that it?  Or is that -- you're just saying

10   that's enough because you're tired?

11       A.    No.  I thought that's enough that we can go

12   home, now.

13       Q.    No.  We're going to go through every single

14   one of those.

15            MS. BENTZ:  How much more -- how much more do

16       you have?

17            MS. CHARLES-COLLINS:  Oh, we're going to be

18       here for a while.

19            MS. BENTZ:  Then, I need to take a bathroom

20       break.

21            MS. CHARLES-COLLINS:  Okay.

22            THE VIDEOGRAPHER:  Going off record at

23       2:04 p.m.

24            (At about 2:04 p.m. recess.)

25            (At about 2:15 p.m. proceedings reconvened.)
```

```
 1              THE VIDEOGRAPHER:  Back on record at

 2      2:15 p.m.

 3   BY MS. CHARLES-COLLINS:

 4      Q.    Okay.  Dr. Abraham, let's go over a couple

 5   things before we go through your opinion.

 6              When you did your inspection, describe for me

 7   what tools or materials you used, you brought with you to

 8   do the inspection?

 9      A.    I -- I'm -- I brought Force Gauge with --

10   Force Gauges with me.  It -- when I looked at what I was

11   going to do, I figured I'd just go through a qualitative

12   demonstration of -- of the -- how the umbrella fell, and

13   essentially demonstrate through the breaking of a tile,

14   and the impact that a brain would experience, or had in

15   coming in contact with a small portion of the

16   circumference of the pole, the steel pole.

17              And so I was told that it was an exemplar of

18   the actual one, and I was shown two completely different

19   umbrellas.  And I say completely different, they weren't

20   identical.  So if they're completely different from each

21   other, how can both of them be exemplars?  It was

22   impossible.

23              Then, what happened -- which was interesting,

24   is, I think one of the employees helped me push up --

25   push the umbrella up so, and lock it in place so the
```

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                        96

 1    umbrella would be in the same position that the actual

 2    umbrella was at the time of the incident.

 3            What was interesting is, I couldn't open it

 4    and push it up myself.

 5        Q.    Okay.  We will get to that in a second.

 6    So --

 7        A.    And so what I was able to do with the help

 8    is, get the first one up and, then, I think I released

 9    the umbrella, and then went to the other umbrella, and

10    knocked them both over and determined, approximately,

11    what the force -- the force would be to just start

12    pushing it over.

13        Q.    Okay.  So you brought force gauges, you said

14    with you; correct?

15        A.    Yes.

16        Q.    Did you use those in your testing?

17        A.    No.

18        Q.    Okay.  And then you said that you had a tile.

19    Describe the tile for me?

20        A.    It was a simple ceramic tile that I picked up

21    where I was staying.  I found that in the area where the

22    workers were located, and it was just wide enough to set

23    between two arms of a chair, or table.  I forgot where it

24    fell down to.  And where I direct the pole to hit the --

25    approximately, the center of the tile and fracture them,

http://www.yeslaw.net/help



 1    which took a sufficient force.

 2              How much force?  I don't know.  But it wasn't

 3    important to know the exact force.  First of all, I

 4    wasn't working with the exact umbrellas, and second of

 5    all, it was demonstrative, not for the exactness of the

 6    -- and forces.

 7              Because no one knows -- no one knows what the

 8    actual force was that produced her -- a concussion.  No

 9    one knows.

10        Q.    Can you -- did you have more than one piece

11    of tile?

12        A.    I had another piece, but it was a smaller

13    piece, and the smaller the piece is, it's very difficult

14    to demonstrate that it will fracture, because it takes a

15    real high force for a small piece to fracture.

16              If I knew there were two umbrellas, I would

17    have tried to find another larger piece of tile.

18        Q.    Can you describe for me the dimensions of the

19    piece of tile that you actually used in the testing?

20        A.    It's in the photographs, and I would have to

21    look at it to estimate the approximate size.  I didn't do

22    it for size.  I want -- just wanted it wide enough so

23    the -- it would demonstrate the impact that one

24    experiences.

25        Q.    And you say -- when you say the photographs,



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    98

```
 1    you mean the photographs that you took?

 2         A.    Yes.

 3         Q.    Okay.  And when I say you took that --

 4         A.    I also -- I think I -- did I -- I don't

 5    recall whether I took videotapes or not, but --

 6         Q.    Okay.  At the inspection --

 7         A.    Yes.

 8         Q.    -- in December?

 9               Okay.  And what -- when you look at the facts

10    in this case, or the facts that are alleged in this case,

11    what is the tile supposed to represent, factually?

12         A.    Well, it -- even if I had a dummy there, it

13    wouldn't -- wouldn't represent Ms. Redler.

14               What it does is just demonstrate the impact

15    that takes place, and the fact that we have tile, and it

16    takes a significant amount of force to fracture the tile.

17               And, here, we're dealing with steel.  We're

18    not dealing with a plastic or wood coming down.  So,

19    evidently, the -- the pole is significantly hard.  It's

20    heavier than the 35 pounds, and it just demonstrates what

21    Ms. Redler experienced when she was hit, and nothing

22    more.

23         Q.    Okay.

24         A.    Nothing more.

25         Q.    So you would agree with me, that the tile is
```

1   different, the characteristics of the ceramic tile are

2   different from the characteristics of the human being,

3   and the body tissue of a human being?

4        A.   Oh, I was just thinking of other things,

5   like, there are heads that can be hit that don't even

6   feel it.  We know that.  So --

7        Q.   So your answer is?

8        A.   My mind wanders a little.

9        Q.   That's okay.

10       A.   You got to ask your questions faster so my

11  mind doesn't wander.

12       Q.   All right.  Well, you got to answer my

13  questions faster, so your mind doesn't wander.

14       A.   Okay.  Anyhow, we know a significantly

15  different than the brain, but to me -- it's only a

16  demonstrative test.  It's not an actual test.  And

17  remember I said previously that I couldn't get a

18  volunteer employee from the Marriott Hotel to volunteer,

19  putting their head there.  You recall that?

20            So since I didn't get that volunteer, I just

21  substituted something else.  Perhaps, the ceramic tile

22  was similar to some of the employees heads there.

23       Q.   If you were doing the testing, why didn't you

24  bring a volunteer?

25       A.   Because the people I know are normal.



```
 1        Q.    Okay.  You also -- did you use anything else

 2    besides the tile, your hand?  Did you use any other --

 3    and the umbrella?

 4        A.    Yeah, I think I let part of it come down on

 5    my wrist, but not the total pole, because it could have

 6    fractured my wrist.

 7        Q.    Did you use any chairs in the testing?

 8        A.    I think I put the tile on the arms of two

 9    chairs.

10        Q.    And were those regular, like, seated chairs,

11    or were those lounge chairs?

12        A.    Well, I have to look at the photographs.

13    I -- I have to look at the photographs to be exact.

14        Q.    Okay.  And those would be photographs that

15    you took?

16        A.    Photographs that I took.

17        Q.    Okay.  How much is the -- there were two

18    different umbrellas; right?  There was a tan umbrella; do

19    you remember that?

20        A.    That I --

21        Q.    Uh-huh.

22        A.    It was slightly --

23        Q.    In December.

24        A.    It was like --

25        Q.    Like a khaki color.
```

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                101

```
 1        A.     I described it better than you did.

 2        Q.     Okay.  What is your description?

 3        A.     It was a vomitatious color.  It wasn't really

 4   an attractive color.

 5        Q.     Okay.  And then there was an orange umbrella?

 6        A.     Yeah, also affected by the sun.

 7        Q.     Okay.  All right.  So were the tan color,

 8   khaki colored umbrella, how much did that weigh?

 9        A.     I didn't -- I didn't -- I don't recall

10   whether I weighed it or not.  It was not important to me.

11        Q.     Why wasn't the weight of the umbrella

12   important?

13        A.     Not -- not -- because we have a plaintiff in

14   this case, Ms. Redler, who wound up with a concussion.

15   Does it matter what it weighed?

16               What matters was, to me, was that it wasn't a

17   type of instrumentality that should have been placed

18   anywhere without being placed in the cement.  Because of

19   the foreseeable risk of being exposed to an umbrella

20   coming over.

21        Q.     How do you measure force?  The force of

22   something?

23        A.     Oh, mass times the acceleration -- I come --

24   measure it with a Force Gauge.  I can measure it with an

25   accelerometer.  I can measure them with a number of
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 103 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    102

```
 1    different instruments.  I have them all.

 2        Q.    Okay.  But you didn't have any of those with

 3    you?

 4        A.    Because the conclusion was, in the real

 5    world, she wound up with a concussion.

 6        Q.    Okay.

 7        A.    Does it matter what it weighed?

 8        Q.    I don't know, you tell me.

 9        A.    It doesn't matter what it weighed.

10        Q.    Okay.

11        A.    Because it was a dangerous instrumentality.

12        Q.    How much did the stanchion weigh?

13        A.    I forgot.  I think your -- if I look at

14    your --

15        Q.    No.  From your -- your testing, we're talking

16    about your testing.

17        A.    Oh, I didn't -- I didn't -- I don't think I

18    weighed the stanchion.

19        Q.    Okay.

20        A.    None of that was important, because

21    everything was defectively designed for its foreseeable

22    use, and foreseeable misuse.

23        Q.    Okay.  Do you know -- or what was the wind

24    speed on the day of the incident?

25        A.    No one knows.  It was predicted, it can go
```

http://www.youtaw.net/help



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          103

 1    from eight to 12 miles an hour, to gusts of 51-52 miles

 2    an hour.

 3         Q.    And where did you get that information?

 4         A.    It was presented by the Defense during a

 5    meeting.  It was 18 miles an hour, with gusts up to 51

 6    miles an hour.

 7         Q.    And was -- did you know that prior to doing

 8    your report, or is this something subsequent to?

 9         A.    Subsequent to.

10         Q.    Okay.

11         A.    And it wasn't important.  The fact is, it

12    came over, and it was foreseeable that the wind gusts

13    were going to be there.

14         Q.    Okay.  You are on your tablet, or your iPad.

15    Can you tell me what you're looking at?

16         A.    I am trying to find the photographs from the

17    inspection, so I could actually answer your questions.

18              MS. BENTZ:  Do you have your video with you?

19              THE WITNESS:  No.

20              MS. BENTZ:  Okay.

21    BY MS. CHARLES-COLLINS:

22         Q.    Have you turned those photos over?

23         A.    Yes.

24         Q.    Okay.  You can close that for right now.  We

25    will get back to that.



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 105 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    104

```
 1       A.    Go ahead.

 2       Q.    All right.  But I need you to pay attention

 3    to me --

 4       A.    I do, I'm --

 5       Q.    -- because you said your mind wanders.

 6       A.    I'm multi-tasking.

 7       Q.    No.  What I'm going to ask you to do --

 8       A.    You don't like me when I multi-task?

 9       Q.    No.  I need you to focus on me.

10       A.    You're sounding like my wife.

11       Q.    You should be used to it, then.  Get you in

12    gear.

13             All right.  Let's go through your opinions.

14    Do you have a copy of the -- of your December report in

15    front of you?

16       A.    It's okay.  It's -- hasn't been five minutes,

17    I'll recall what I said.

18       Q.    Okay.  All right.  In your report in

19    Paragraph seven, you say that one must be able to lift

20    over 60 pounds in order to lift the umbrella, and place

21    the pin through the holes to hold the umbrella in the

22    open position.  What is the basis for that opinion?

23       A.    Because I attempted to take your exemplar

24    umbrella and reopen it, and I couldn't do that.  I needed

25    the aid of one of the employees that was there.  And both
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    105

```
 1    of us were able to get together, get it up sufficiently,
 2    to lock it in place.
 3         Q.    Which umbrella was that?
 4         A.    Well, it depends --
 5         Q.    Of the two?
 6         A.    If you faced away from the building where you
 7    were standing, it was on the left.
 8         Q.    So was that the -- the tan one, the one that
 9    you called vomitatious?
10         A.    That's a good description, yes.
11         Q.    Okay.  And where do you get the number?
12    Where do you get the 60 pounds.  You're very specific
13    about that.  Where does that come from?
14         A.    Yeah.  I know what I'm capable of lifting,
15    and I couldn't lift it.
16         Q.    Okay.  So, but what -- did you measure
17    anything with regards to that umbrella for you to come up
18    with 60 pounds?
19         A.    I -- the fact is that -- well, only because I
20    know what my maximum capability is.  There are times that
21    I work out at home and down here, and I know what I can
22    lift.  And when I couldn't lift it -- and we have this
23    Ms. Redler, who was alleged to have lifted and opened the
24    actual umbrella, I -- how anyone can state that with
25    certainty, knowing that it takes this kind of force to
```



Case: 3:14-cv-00017-CVG-RM Document #: 166 Filed: 05/29/15 Page 107 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM     106

1  lift the exemplar umbrellas, it's highly improbable that

2  she did anything.

3     **Q.**     **So, in essence, this is really your opinion,**

4  **based on your limitations, that you need to be able to**

5  **lift over 60 pounds to be able to open that umbrella?**

6     A.     Well, this is a scientifically correct

7  statement relating to whether she opened it or not.

8     **Q.**     **Based on what scientific principles or**

9  **standards do you come to the conclusion that you have to**

10 **be able to lift over 60 pounds?**

11     A.     The fact that I couldn't lift it, and it took

12 two men to raise the umbrella, and you're claiming that

13 she alone was able to reopen the umbrella after the

14 employee closed it.  Someone has to be fabricating this

15 story.

16     **Q.**     **Do you know what Ms. Redler's abilities are**

17 **with regards to lifting?**

18     A.     I -- I will state with certainty not meeting

19 her in person, I'm willing to bet my whole fee on this

20 particular statement, that she wasn't capable of lifting

21 the umbrella that I lifted.

22     **Q.**     **And you based that on what?**

23     A.     Based on my experience through a lifetime,

24 and working out -- and knowing what my wife, for example,

25 who works out all the time, can lift, and she's strong,

http://www.youtube.net/help



```
 1    versus what I can lift.

 2        Q.    Is it your opinion, that because your wife

 3    can't lift over 60 pounds, that Ms. Redler can't lift

 4    over 60 pounds?

 5        A.    I can --

 6            MS. BENTZ:  I am going to object to the form

 7        of that because --

 8            THE WITNESS:  How can you relate the two

 9        people?

10            MS. BENTZ:  Carl, let me finish.

11            MS. CHARLES-COLLINS:  That's what I'm asking

12        you.

13            MS. BENTZ:  I'm objecting -- I'm objecting to

14        the form of that, because you're not talking about

15        lifting it over your head.  Are you talking about

16        lifting it up, or are you talking about lifting

17        60 pounds?

18            MS. CHARLES-COLLINS:  I am talking about what

19        he's talking about.

20            THE WITNESS:  Yeah, I'm --

21            MS. CHARLES-COLLINS:  So I'm asking you -- I

22        have asked you about Mrs. Redler.  This is about

23        Mrs. Redler, and you're saying that Mrs. Redler,

24        with scientific certainty, cannot lift over

25        60 pounds.  And I want to know, what basis do you
```

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 109 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                            108

```
 1        have for that opinion?

 2             MS. BENTZ:  I'm going to object to the form

 3        of that question.

 4             MS. CHARLES-COLLINS:  Okay.

 5             MS. BENTZ:  Are you asking him, can

 6        Ms. Redler lift 60 pounds over her head?  Or can

 7        she just lift 60 pounds?  Is that what you're

 8        asking?

 9             MS. CHARLES-COLLINS:  I am asking him with

10        relation to the opinion that he just made, that she

11        cannot open this umbrella because you have to be

12        able to lift over 60 pounds in order to lift the

13        umbrella.  He doesn't say over your head, behind

14        your back, over your nose, he doesn't say anything.

15             His report says, you have to be able to lift

16        over 60 pounds.  That's what he says.  So I want to

17        know, what basis you have for saying with

18        scientific certainty that Ms. Redler cannot lift

19        over 60 pounds?

20             THE WITNESS:  All right.  That's a good

21        point.

22             The inference is that we're lifting over our

23        head, because that's where the pin was located.

24   BY MS. CHARLES-COLLINS:

25        Q.   Okay.  So what's your scientific basis, or
```



1    whatever basis you have for saying -- for rendering an

2    opinion that Mrs. Redler could not lift over 60 pounds

3    and, therefore, could not open this umbrella?

4         A.    First of all, there was no indication in her

5    background that she worked out, lifted weights, and that

6    she was a smaller person, much smaller than I am.  And

7    doesn't have the arm strength that I have with reference

8    to what I can lift.  And it would be open and obvious to

9    anyone in the real world, to conclude that in no way

10   could she in any way open the umbrella and put the pin in

11   place.

12        Q.    Okay.  So you're just -- that's just your

13   opinion.  You have no scientific basis for that?

14        A.    There is no peer reviewed article on this --

15        Q.    Okay.

16        A.    -- opinion.

17              MS. BENTZ:  He's just saying it's common

18        sense.

19              MS. CHARLES-COLLINS:  Great.

20              THE WITNESS:  Yeah.

21   BY MS. CHARLES-COLLINS:

22        Q.    Is it common sense?

23        A.    It's common sense with -- based on

24   experience.  And -- and there's a scientific certainty

25   associated with it, because of the amount of force that's



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 111 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                110

1    required, and the location where that force has to be

2    exerted to get the pin in place.

3         Q.    How much force is required?

4         A.    Over 60 pounds.

5         Q.    How do you know that?

6         A.    Because I -- I needed help from an employee

7    to complete it.

8         Q.    Okay.

9         A.    And I couldn't lift it.

10        Q.    Okay.  But just because you couldn't lift it,

11   how does that -- how do we know that Ms. Redler couldn't

12   lift it?

13        A.    I said I'm willing to bet my total fee, and I

14   will return everything if she's capable of lifting

15   over -- and putting that --

16        Q.    We're not here to make wagers; we're here to

17   figure out what --

18        A.    But I'm --

19        Q.    -- scientific basis is for your opinion.

20        A.    That's a good scientific offer.

21        Q.    All right.  We can move on.

22        A.    Thank you.

23             MS. BENTZ:  Just let them argue, she can open

24        it, Carl.  It's fine.  The Jury will never believe

25        it.



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 112 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                111

```
 1    BY MS. CHARLES-COLLINS:

 2        Q.    How much does she weigh?

 3        A.    I don't recall.

 4        Q.    How tall is she?

 5        A.    She's well under six feet.

 6        Q.    Okay.  You know she used to take karate all

 7    the time?  Supposedly.  She was a karate person?

 8        A.    Yeah, I was a brown belt.  We don't lift

 9    weights in karate.

10        Q.    I understand that, but you get strength from

11    being in karate?

12        A.    You don't get any strength.

13        Q.    Yes, you do.

14        A.    You learn to move.

15        Q.    And she also was -- she said that she would

16    go to the gym all the time; do you under -- do you know

17    that?

18        A.    Yes.  And the fact is -- but she didn't lift

19    weights.

20        Q.    How do you know that?

21        A.    Because I know.  She's -- no, no woman runs

22    in there like -- short -- she's a short lady.  She's not

23    going to run in there and start lifting weights above her

24    head.

25        Q.    Really?
```



**Orange Legal**
**800-275-7991**

```
 1        A.     No, it doesn't happen.

 2        Q.     Okay.

 3        A.     And I've been member -- I've been a member of

 4   a lot of different gyms.

 5               MS. BENTZ:  No, I object to that, because I

 6        can lift over a certain amount over my mind, but

 7        it's not 60 pounds.

 8               MS. CHARLES-COLLINS:  I can lift more than

 9        that over my head.

10               THE WITNESS:  You can lift over 60 pounds

11        over your head?

12               MS. CHARLES-COLLINS:  I sure can.

13               THE WITNESS:  You might hang from 60 pounds,

14        a bar, but I don't believe you can lift 60 pounds

15        with one hand over your head.

16   BY MS. CHARLES-COLLINS:

17        Q.     Who said she was using one hand?

18        A.     You used, even two hands, you couldn't lift

19   60 -- I was using two hands.

20        Q.     We'll move on from there.

21               MS. BENTZ:  We're never going to agree on

22        that.

23               MS. CHARLES-COLLINS:  No.

24               THE WITNESS:  I'm going to bring a 60-pound

25        weight to Court.
```



```
 1              MS. CHARLES-COLLINS:  Good.

 2              THE WITNESS:  And the first thing I am going

 3         to do is before I get on the stand, I'm going to

 4         ask you to lift it.

 5              MS. BENTZ:  The most I ever got, 20 pounds,

 6         or 25.

 7              THE WITNESS:  That's it.  That's -- by the

 8         way, that is normal.

 9              MS. BENTZ:  I'm old.  When I was younger.

10    BY MS. CHARLES-COLLINS:

11         Q.   All right.  Okay.  Let's move on.  Let's go

12    to --

13         A.   I'm laughing at you.

14         Q.   You are?

15         A.   Yes.  I think it's cute.

16         Q.   Oh, isn't that special.

17              Okay.  So the factual allegations that you

18    have in the report, did those come from the complaint?

19              So, for example, do you have the report -- in

20    Paragraph 12, where you say her brain injury has

21    significantly affected the quality of her life.  Where

22    did you get that type of information?

23         A.   Because I know about brain injuries, and

24    that's what happens.  Is that their quality of life is

25    affected for the rest of their lives, not just -- it's
```

 1    not a temporary thing.

 2        Q.    Okay.  All right.  When you say that the

 3    testing that you did, was demonstrative, tell me what

 4    that means, because you said demonstrative, and

 5    qualitative as opposed to something else.  Tell me what

 6    you mean by the testing that you performed?

 7        A.    In this field of being a consultant, there

 8    are many times that a test protocol are not created for

 9    the specific products.

10        Q.    Uh-huh.

11        A.    And, for example, if I was the manufacturer,

12    and I worked with manufacturers, a lot of manufacturers

13    in making a product safer.

14            The manufacturer of this particular product

15    would have -- knowing where the end use application would

16    have been in this case, in the islands, would have tested

17    the stanchion and the umbrella, and determined what wind

18    forces it could withstand prior to being knocked over.

19        Q.    Uh-huh.

20        A.    And the management of the hotel should have

21    requested this data prior to -- prior to ordering it, and

22    using the -- using the product, the umbrella at their

23    facility.

24        Q.    What -- what are you relying on to say that

25    they, in fact, had that duty to do that?

http://www.yeslaw.net/help



```
 1        A.    Oh, because you do, and no matter what
 2   product you order for use in application by --
 3   applications by the invitees, the guests at the hotel,
 4   you have to make sure that the product that you order,
 5   and expose the invitees to, is fail-safe.
 6              What that means is, that for all foreseeable
 7   uses and foreseeable misuses, that product will not in
 8   any way, pose any risks to any of the guests.  They did
 9   not do that in this case.  They just ordered the
10   umbrellas.  Just to get umbrellas, one of the reasons
11   they just ordered that is because management was never
12   taught, or trained in the area of risk analysis, or
13   safety, or safety engineering, warnings and instructions;
14   they're all in-ept.
15        Q.    Okay.  What do you base that on?
16        A.    Everyone that --
17              What?
18        Q.    That -- that last statement --
19        A.    Oh, why don't you look.
20        Q.    -- that they were never trained in risk
21   management, that they're in-ept.  What do you base --
22   what basis do you have for making that opinion?
23        A.    You never let me complete my sentence --
24        Q.    Okay.  Sorry.  Go ahead.
25        A.    -- even though, you are -- you are correct,
```



 1   because you foresaw what I was going to say.

 2           So I will accept your interruption.

 3   **Q.    Thank you.**

 4   A.    Okay.  The evidence is open and obvious to

 5   me, because not only have I been involved with many other

 6   cases against the Marriott Hotel chain, but in many areas

 7   throughout the country and Europe, but I know in this

 8   case, based upon the events that took place, where we

 9   take an individual that's a head of housekeeping, making

10   him a bellboy, and then have him go around issuing

11   warnings that he knows nothing about, to guess on hazard,

12   and enhanced risk posed against all, Ms. Redler and

13   other -- all people there, a hidden danger and, you know,

14   allowing this bellboy, who has no background, no training

15   whatsoever, to run around and do these things and still

16   if they were still open, why he didn't maintain that they

17   remain shut, or remove it, if Ms. Redler wanted it open

18   again.

19   **Q.    Who's this bellboy that you keep referring**

20   **to?**

21   A.    The name is mentioned --

22   **Q.    Where?**

23   A.    -- during a meeting.  The open meeting that

24   we had, where a presentation was made.

25   **Q.    Are you talking about at the mediation?**



```
 1        A.    Yeah.  I don't recall whether it was a

 2   mediation or not.  I know there was a presentation by the

 3   Defense, that I was able to get exactly every word that

 4   was said.

 5               MS. BENTZ:  What?

 6               MS. CHARLES-COLLINS:  Is he referring to the

 7        mediation?

 8               THE WITNESS:  Yes.

 9               MS. CHARLES-COLLINS:  Okay.  So don't talk

10        about what happened in the mediation.

11               THE WITNESS:  Well, I have to, because

12        they're claiming --

13               MS. CHARLES-COLLINS:  You cannot.  It's

14        confidential.  What happens in the mediation is

15        confidential.

16   BY MS. CHARLES-COLLINS:

17        Q.    Do you know outside of the mediation who this

18   bellboy is?

19        A.    If I may have -- I might know if -- just bear

20   with me for a minute.

21        Q.    Okay.

22        A.    By the way, off the record.

23               (Discussion held off the record.)

24   BY MS. CHARLES-COLLINS:

25        Q.    All right.  Back on the record.
```

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                           118

```
 1        A.    Unlike New York.

 2        Q.    Okay.

 3        A.    Wait, wait, wait one second.

 4              I don't have it here.

 5        Q.    Okay.

 6        A.    And I don't have the name.

 7        Q.    That's fine.

 8              And you were saying that he doesn't have the

 9    background or the training, this bellboy.  What do you

10    know about his background and training?

11        A.    Well, if you know that he was a head of

12    housekeeping, you know that he wasn't a physicist, and he

13    wasn't a safety engineer.  He wasn't a professional

14    engineer, and he was competent in being head of

15    housekeeping.  And head of housekeeping has different

16    responsibilities than going out and explaining to guests,

17    why they must keep it closed.

18        Q.    You're certainly making assumptions about his

19    educational background and his background, in general,

20    because you have no idea what -- anything about this

21    bellboy; isn't that correct?

22        A.    No.

23              MS. BENTZ:  Well, I'm going to object to the

24        form of that, because that -- just, I think he's

25        referring to the deposition of the guy.  So --
```



```
 1              THE WITNESS:  Yeah.

 2              MR. BENTZ:  I mean, I don't think he's making

 3         a complete assumption, but you can answer that.

 4              THE WITNESS:  Yeah, I think he doesn't have a

 5         college education.

 6          I'm not belittling him.  It's just the fact

 7         that management has allowed that, and you don't do

 8         that without proper training of an employee.  He

 9         doesn't need -- he doesn't have to be a scientist.

10         You train these individuals.  The fact that he was

11         head of housekeeping shows that he has capability

12         of doing more than just housekeeping.  And -- but

13         they never trained him to do the job properly.

14    BY MS. CHARLES-COLLINS:

15         Q.    What is your basis for saying that he did not

16    receive proper training for management?

17         A.    Based upon the fact that he didn't -- he

18    never presented Ms. Redler with proper and accepted

19    warnings, and instructions.

20         Q.    How do you know that?

21         A.    Because he never presented Ms. Redler, based

22    upon what I know about Ms. Redler, and evidence in this

23    case, of the consequence of being hit by a steel pole in

24    the head.

25         Q.    What duty does he have to do that?
```

```
 1       A.    He could have eliminated that duty, had he

 2  tied up the umbrella, or removed it.

 3       Q.    What duty does he have to want -- to make

 4  these warnings, that you're saying that they should have

 5  made these warnings, what duty did he or --

 6       A.    Wait, that he --

 7       Q.    -- or the Marriott have to make these

 8  warnings that you're talking about?

 9       A.    Well, they had the duty to make -- if you

10  cannot, through technical modifications, changes, or

11  through technical means to eliminate the inherent risks

12  associated with any type of product you're exposing the

13  guests to, then, you have to create warnings.  And if you

14  don't create warnings, that is the protocol that is

15  followed.  The standard of care that is followed

16  throughout the United States, and through all -- for all

17  of the American hotels located throughout Europe and the

18  far east.

19       Q.    What is the standard of care that you're

20  referring to?

21       A.    You eliminate the inherent risk.

22       Q.    Okay.  And where do you get that standard of

23  care from?  What authority is that based on?

24       A.    The nondelegable duty associated with

25  products.
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                         121

1      Q.    Okay.  Where does that come from?

2      A.    Actually, it's created by -- in the

3   manufacturing protocol -- oh, in the ANSI 9000, any

4   products that's manufactured, for example, in Europe, has

5   to go to an ANSI 9000, one through four, from the best of

6   my recollection, which is the protocol for manufacturing

7   products, you eliminate the risk.  If you don't eliminate

8   the risk, either it becomes too dangerous to place in

9   this stream of commerce.  If it is, you don't place it in

10  the stream of commerce.  If you can rectify it, and

11  reduce those risks with warnings and instructions, you do

12  that.

13     Q.    Did the Marriott manufacture these umbrellas?

14     A.    They didn't have to, because it's not up to

15  the manufacturer to know when the wind gusts are coming,

16  when that -- things have to be closed.  What you do is,

17  manu -- the Marriott had the nondelegable duty to make

18  things completely safe.

19     Q.    And where do you get that form from?

20     A.    That's the standard of care that's used

21  throughout the world.

22     Q.    Okay.  Where?

23     A.    Every -- every American hotel.  You have the

24  nondelegable duty to eliminate all the inherent risks

25  associated with exposing any one of the guests to a



**Orange Legal**
**800-275-7991**

 1   foreseeable risk, or injury.

 2       Q.    And where would I find that standard of care

 3   related to every hotel in the world?

 4       A.    In the -- if -- you can get us a copy, too.

 5   In the management -- the Marriott Hotel creates an

 6   employee -- a management book that contains all of this.

 7   And if you get it, all the chain stores have it.  I have

 8   it for, like, Walmart, for Target.  I'm involved with

 9   those stores.  I defend them, by the way.  So I get all

10   of these manuals.

11            Marriott has that.  The Hyatt has it.  The

12   Sheraton has it.  Every one of these hotels have it.  Get

13   me one copy, get me just one copy, I will show you within

14   that management book where they have the nondelegable

15   duty to create a -- a standard of care for every invitee,

16   or guest within that hotel.

17       Q.    Right.  But you're saying that there's a

18   standard of care, like world wide.  So I want to know

19   where that world wide standard -- where can we find that?

20       A.    Every hotel.  Get it for me for every motel.

21   I don't have them for every hotel.

22       Q.    No, you're the one telling me that.

23       A.    Yes.

24       Q.    I'm asking you.

25       A.    Yes.  Well, you can get it, because you're



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          123

```
 1    representing them.  So why don't you get us one of those

 2    volumes, and we'll be on an equal basis, and I will show

 3    you where your own hotel deviated from their own standard

 4    of care.

 5         Q.    But I'm not here to help you with your

 6    opinions.  Your opinion is that there's a standard of

 7    care.  So it's your job to tell me where you get that

 8    from.

 9         A.    Well, I get it from the standard of care that

10    I know about with reference to these hotels.  What they

11    have available on -- on the volumes of -- of publications

12    that they have for each manager of every hotel.  And,

13    indeed, the chain has a -- a safety manager that oversees

14    the safety of all of these hotels.

15         Q.    Okay.  Going back to the -- to the two

16    umbrellas that you looked at in December of 2012.  Did

17    you measure the length or the diameter of the pole?

18         A.    At the time, I was there, I did.  I think I

19    have it on some of my photographs, or in the videotape.

20         Q.    Of measurements?

21         A.    Yeah.

22         Q.    Did you record those measurements anywhere?

23         A.    No, I -- they're on the photographs, so I

24    didn't have to record them.

25         Q.    What do you mean they're on the
```



**Orange Legal**
**800-275-7991**

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 125 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    124

1   photographs -- was there a measurement --

2        A.    Well, I put a ruler adjacent to the diameter.

3        Q.    Okay.  How many holes or pins are there, that

4   you -- to hold the umbrella up?

5        A.    Two or three.  I don't know the exact; it was

6   not important to know the amount of holes.

7        Q.    How high up on the pole was the hole that you

8   used to hold the umbrella up at the --

9        A.    It was above my head, at about arm's length.

10  It had to be seven, seven and a half feet.

11       Q.    In Paragraph 13 of your report, you say once

12  this stanchion, steel pole, and umbrella moved

13  approximately 12 inches off center, the umbrella and

14  steel pole fell to the ground with more than enough force

15  to produce Ms. Redler's condition.  So what do you mean

16  by once this steel pole and umbrella moved approximately

17  12 inches off center -- what do you mean by that?

18       A.    In other words, if you tip the stanchion and

19  pole to one side.

20       Q.    Uh-huh.

21       A.    And you moved it ten to 12 inches, it would

22  fall by itself.

23       Q.    The pole itself, not the stanchion?

24       A.    No, the stanchion stays at the bottom.

25       Q.    Okay.

http://www.yaslaw.net/help



    1        A.     But it goes over with the umbrella.

    2        Q.     Okay.  And which -- what part of your testing

    3   showed that when you do that, it moved -- when it moved

    4   12 inches off center, that the umbrella and steel pole

    5   were able to fall to the ground with more than enough

    6   force to produce a concussion.

    7               When we're looking at the video, what will we

    8   be looking for in order to determine that that's the

    9   testing that you're doing?

   10        A.     You look at the results of the medicals of

   11   Ms. Redler, and you'll see that it's more than enough to

   12   produce a concussion to Ms. Redler.

   13        Q.     Okay.  I'm not talking about the medicals?

   14        A.     Oh.

   15        Q.     I'm talking about your testing.

   16        A.     You have to -- you have to relate her injury.

   17   It doesn't matter what force I threw it over.  I just

   18   allowed it to fall down.  By just falling down, itself,

   19   that was more than enough, that if I measured that impact

   20   force, it would be more than -- more than enough to

   21   produce a severe conclusion in any normal being.

   22        Q.     What are you basing that on?

   23        A.     The experience of impact forces in sports,

   24   where individuals get hit by a foot, a knee, an elbow.

   25   Head to head, a head to ground, head to a goal post,

http://www.yodane.net/help



**Orange Legal**
**800-275-7991**

Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 127 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                126

 1    those are impacts.  A -- balls hitting the head have

 2    produced concussions, a heading produces concussions.

 3    Just to let you know, it doesn't take much to produce a

 4    concussion in a person.  The threshold of people vary,

 5    not -- sometimes significantly, but in this case, just

 6    the pole going over was more than enough.

 7        Q.    How strong would a gust of wind have to be to

 8    knock over the -- I'm going to do them separately.

 9              How strong a gust of wind would have to be to

10    knock over the tan-colored umbrellas?

11        A.    I don't know.

12        Q.    What about the orange-colored umbrella?

13        A.    I don't know.  No one knows.  No one was able

14    to test it.  You have to take -- you have to put them --

15    to properly do it, to answer your question a little more

16    scientifically, you have to create a wind tunnel, and

17    place the umbrella and stanchion in the wind tunnel and

18    measure that.  The amount, the cost involved is

19    horrendous.  The question is, was it worth it?  The

20    answer is, no.

21        Q.    Why wasn't it worth it?

22        A.    Because we look at the results of what

23    occurred in a case, and we determine the mechanism by

24    which the accident occurred, and no one knows the exact

25    gusts, that the force of the gust at the time it was



Case: 3:14-cv-00017-CVG-RM Document #: 166 Filed: 05/29/15 Page 128 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                127

 1    blown over.

 2              So, no matter what you do in a wind tunnel,

 3    it doesn't matter.  Because the results in -- demonstrate

 4    in really life, that the umbrella went over, and

 5    Ms. Redler received a severe concussion.

 6        **Q.    Couldn't you determine or approximate the**

 7    **wind speed, or the wind gusts around the time of the**

 8    **accident by looking at historical weather data?**

 9        A.    No.  Because we don't know at the point that

10    the umbrella went over, what the exact wind gust was.

11    What the velocity of the wind per hour was.  We know that

12    the reports indicate that it was -- the winds were

13    blowing at 18 miles per hour as an average.

14              What is an average?  It could be ten, it

15    could be 30; right?

16        **Q.    Right.  But then --**

17        A.    And then the average is 18, but we don't know

18    at the point that the umbrella went over, what the actual

19    wind velocity was.  No one knows.  So, it doesn't matter

20    when you are asking me this question, how -- how strong a

21    wind gust does it have to be for the umbrella to roll

22    over, or be knocked over.  It's not important.  I don't

23    think it's important.

24        **Q.    If you're talking -- but if we're talking**

25    **about the wind gust, and how the umbrella fell over, why**



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 129 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                128

```
 1     wouldn't it be important to this case, cost or not, for

 2     you to have done testing in a wind tunnel?

 3               MS. BENTZ:  Seriously?  In St. Thomas?

 4               THE WITNESS:  Excuse me, are you just asking

 5          me these questions --

 6               MS. BENTZ:  I am going to object.

 7               THE WITNESS:  -- I'm going to ship that

 8          umbrella into the United States.

 9               MS. BENTZ:  I am going to object.

10               THE WITNESS:  Hire a laboratory.  We're

11          talking about another $5- 10,000 if that -- that

12          would be cheap, to have those tests done.  And

13          then, for what end?  You're going to tell me -- see

14          if I was sitting in your seat, you know, I'd say,

15          you know, Carl, you went through all this expense,

16          $10- 15,000.  You had all these engineers, how do

17          you know what the wind gust was at the time of the

18          incident?

19               Everything you did, all your expenses,

20          they're bull.  And I'd agree with you, by the way.

21     BY MS. CHARLES-COLLINS:

22          Q.   So why isn't --

23          A.   I wouldn't argue with you.

24          Q.   Okay.  So why isn't what you did with this

25     demonstrative, why isn't that bull?
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                     129

```
 1        A.    Because it's -- someone has to demonstrate

 2    what Ms. Redler would have experienced.  You have the

 3    tile there, you have the tile breaking, and you have the

 4    focal point, narrow area of a steel pole coming down.

 5    This is what we're demonstrating.  This is what

 6    Ms. Redler experienced.  Who cares how fast it came down?

 7    Who cares how -- what wind gusts were coming?  We know it

 8    came down.  We know that --

 9        Q.    Okay.

10        A.    We know that there was enough wind.  It came

11    down.  She was injured.  Tell me -- in all sincerity,

12    tell me how much more do we have to demonstrate to show

13    that -- are you going to tell me, you're going to agree

14    with Dr. Postal, she wasn't injured?  You got to be

15    kidding.

16        Q.    Is it your testimony that it doesn't matter

17    what speed, or what force the pole came down at?

18        A.    It does matter.  Because the amount of injury

19    is related to the amount of force that comes down.  But

20    we know that she didn't really receive any change in the

21    structure of her brain.  We know that she didn't receive

22    a subdural hematoma.  She received a concussion.

23              That injury has persisted, the -- the

24    residuals from that injury has persisted for more than

25    two years.  Once it goes that far, we know that the
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 131 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          130

```
 1    residuals are permanent.

 2         Q.    Okay.  Have you ever seen anyone do this type

 3    of demonstrative testing that you did with the pushing

 4    over of the umbrella, and hitting it on a tile?

 5         A.    I have to tell you, in all honesty, I do a

 6    lot of things have never been done before.

 7         Q.    Is this one of them?

 8         A.    And a lot of products.  Well, you know why?

 9    Because there's nothing -- I have to tell you, I've been

10    through every type of standard.  I've been through every

11    type of peer review article.  I'm going to tell you

12    something, it's like looking for -- I'm going to tell

13    you, ways to take dogs out, and ways for them to go to

14    the bathroom.  Who writes papers on that?  No one.  Who

15    cares; right?  Who cares about an umbrella going over?

16    No one does studies on that.

17         Q.    Okay.  So this test, this demonstrative test

18    that you did, this is -- you're the only one who does

19    this type -- you're the only one that you know of here,

20    that does this type of test?

21         A.    Excuse me.  Wait a second.  You know what?

22    They might make -- tell -- this call might tell me

23    someone else did it.  One second.  Let me just tell them

24    I'm in -- oh, let me just -- one second.  One second.

25              MS. CHARLES-COLLINS:  We can go off the
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                                131

```
 1      record.

 2             THE VIDEOGRAPHER:  Off the record at 3:01

 3      p.m.

 4             (At about 3:01 p.m. recess.)

 5             (At about 3:12 p.m. proceedings reconvened.)

 6             THE VIDEOGRAPHER:  Back on the record at 3:12

 7      p.m.

 8      BY MS. CHARLES-COLLINS:

 9         Q.    All right.  So we were talking about this,

10      the dropping -- the testing that you did with the

11      umbrella pushing it over, and you were saying that you do

12      a lot of testing that nobody else does.

13         A.    Yes.

14         Q.    Is this one of those tests?

15         A.    Yeah.  And one of the reasons you do that, if

16      I might point this out?  Because, in the old days, I

17      measured coefficient of friction, in a way that's

18      technically correct without an instrument, and sometimes

19      it's costly to do one test for one case.

20             I mean, eventually -- I mean, I have two

21      instruments that measure the coefficient of friction to

22      the tune of about a $10,000 investment.  But I do a lot

23      of that work.  So for -- to doing a wind tunnel -- wind

24      tunnel test, all these kind of force tests, it's not

25      worth it for one product.  So what you do is, you create
```

 1   a situation that can demonstrate what happens, since you

 2   know what happened already.  And you know -- you don't

 3   know the exact wind velocity, or when it -- at the time

 4   it happened.  All you can -- what's left is demonstrating

 5   what it looked like at the time of the incident, and

 6   that's what I did.

 7        Q.   Okay.  Is that -- the testing that you did,

 8   is it repeatable?

 9        A.   Oh, sure.

10        Q.   Okay.  And how would -- how would somebody,

11   not you, how would somebody repeat, or recreate those

12   testing conditions?

13        A.   You get any tile.  Any tile --

14        Q.   Uh-huh.

15        A.   -- that's large enough.  Place it between

16   two -- two chairs or two objects that would hold it, and

17   just let the steel beam come down on it.

18        Q.   Okay.  And when you wrote your report, and

19   came up with your opinions, were they based on the

20   testing done on both umbrellas, on one of the two

21   umbrellas?

22        A.   Both umbrellas.

23        Q.   Okay.  When you say the umbrella and pole

24   fell to the ground with more than enough force to produce

25   Ms. Redler's condition, how did you determine that from



1    your testing?

2        A.    Oh, I know from impacts to the head, and the

3    testing I have done with helmets in the past, with

4    accelerometers, and all of the instrumentation of heads,

5    with and without protection, that based upon -- I don't

6    know, between 500 and over 1,000 tests that I've

7    performed over the years, that the -- apparent force that

8    came down on the tile was more than enough to produce a

9    concussive injury to Ms. Redler, almost anybody.

10       Q.    Was there a way to measure the force that --

11   that came down on the umbrella when you pushed it over?

12   What that force was?

13       A.    Yeah -- yes.

14       Q.    Okay.  And did you measure that?

15       A.    No.

16       Q.    Why not?

17       A.    I really didn't have to.  Because no matter

18   what the force was, we know that she received a

19   concussion, and -- and the force varies.  And it wouldn't

20   have been an exact force that she would have experienced,

21   so, what could I say that force was reflective of?  I

22   wouldn't know.  I couldn't answer that question.

23       Q.    Am I correct in stating that what you're

24   explaining when you keep saying you can't recreate, and

25   if I misstate what you're saying -- if you can't recreate

http://www.yeslaw.net/help



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 135 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                      134

1    it, what was the purpose of doing this demonstrative

2    testing, or any type of this testing, if you couldn't

3    recreate the conditions under which she said that she was

4    injured?

5         A.    Because what we do is assimilate,

6    approximately, what was experienced by the person.  And

7    engineering, overall, is not an exact science.  It's an

8    approximation of events, and -- and that's what we do.

9              And, by the way, in my -- just to allow --

10   let you know what I do, I give a -- seminars each year to

11   the graduating class of mechanical engineering at CCNY

12   and Colombia, and this is what I do with these students

13   is, I will allow them to create in their life, that when

14   they go out and graduate, that they're not going to have

15   all the wherewithal to do everything.  That they have to

16   substitute what they know and what they've learned over

17   the years in creating something to evaluate.  So that

18   what -- the valuation is credible.

19        Q.    Okay.  Would the -- would the force with

20   which the pole went over be different from someone

21   actually pushing it, as opposed to a gust of wind going

22   under the umbrella, and pushing it over -- blowing it

23   over?

24        A.    That had six -- it's interesting how the

25   Rimkus Consulting Group -- I don't have to go through all

http://www.youtube.net/help



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 136 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                     135

1   the names -- came up with the fact that it would be

2   different.

3            Tell me.  Whether I push it -- the pole over,

4   or whether I hold -- take some wind and push the umbrella

5   over in the same way, so the force would be approximately

6   the same.  What would be the difference?  Nothing.  The

7   force is the force.

8            What hit her was the pole.  That's all that

9   we're interested in, is this steel pole coming in contact

10  with a finite part of the temporal area of her brain.

11       **Q.    Right.  Though, what I'm asking you is:  If**

12  **the wind goes under the umbrella and pushes it over, is**

13  **that force -- or could that force be different than me**

14  **standing, and pushing it over?**

15       A.    No.  I can make those forces equal to each

16  other.

17       **Q.    Uh-huh.**

18       A.    All right.  If I know the velocity -- all

19  we're interested in is the velocity of -- at the point of

20  impact.  So, if I can push it over to create that

21  velocity with my arms, I can create it with the wind, or

22  push it, the umbrella part over to create, and wind up

23  with the same velocity.

24            And then what you're doing is, continually

25  pushing to make them equal, and so it's a lot of time, a



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                      136

 1   lot of tests.  And what are you really proving?  That no

 2   matter what, and whether you push it from the umbrella,

 3   if we had a volunteer there, a live volunteer, or if we

 4   pushed it -- the pole over, that volunteer would have

 5   received a concussion the same as Ms. Redler.

 6        **Q.    And what was the velocity that it went over**

 7   **on the day of the incident?  That the pole went over,**

 8   **fell over?**

 9        A.    Why do you ask impossible questions?  Because

10   there's no answer to that.  No one in the world knows.

11        **Q.    Okay.**

12        A.    Great.  Why don't you ask me what Ms. Redler

13   was thinking about just prior to the accident?

14        **Q.    You might tell me.**

15        A.    She doesn't even recall, because she had a

16   concussion.

17        **Q.    When you were doing the testing when the**

18   **umbrella was open, and you pushed it over, isn't it true**

19   **that it wasn't able to crack the tile?  The pole did not**

20   **contact the tile?**

21        A.    Yeah.  We discussed that.  And that the

22   reason is, is that I -- instead of getting me two large

23   pieces, I was told that I was going to see the actual

24   umbrella.  So, I wasn't told that I was going to see two

25   umbrellas that were alleged to have identical, but



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 138 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                137

```
 1   they -- in looking at them and testing them, they were

 2   significantly different from one another.

 3            And then to believe that they were exemplars

 4   of the actual one, I mean who's kidding who here?  So

 5   I -- when you say that the second one didn't fracture, I

 6   predicted it wouldn't fracture in my own mind from a

 7   scientific standpoint, because it was just too small.

 8   And what the smaller -- the sample size, the harder it is

 9   to fracture.

10            For example, if I take a big piece of wood,

11   and I hit the center piece, I might fracture it.  Now, I

12   cut that wood so it's only this size, (Indicating,) I

13   wouldn't even get close to even think of even fracturing

14   it.

15        Q.   Okay.  So let's clear up a couple things

16   about these umbrellas before we move on.

17            When you came to the location, you were shown

18   two umbrellas; correct?  And stands?

19        A.   Yes.

20        Q.   Correct?  One was the tan color, one was the

21   orange color; right?

22            Yes?

23        A.   I only looked at it from the photographs that

24   I took, and, yes.

25        Q.   Okay.  And do you recall me explaining to
```



**Orange Legal**
**800-275-7991**

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    138

```
 1    you, that the orange color umbrella was not an exemplar

 2    of the umbrella that was alleged to have caused the

 3    incident; do you remember that?

 4         A.    No.

 5         Q.    Okay.  Do you remember me showing you --

 6    well, actually, you were at the -- you could see the pool

 7    from where we were; right?  Doing that inspection.

 8         A.    Yeah.  Yes.

 9         Q.    And you could see the umbrellas, they were

10    still there at the pool; right?  Yes?

11               The pool -- the umbrellas were out at the

12    pool?

13         A.    Go ahead.  Finish your --

14         Q.    That's my question.  You could see the

15    umbrellas that were at the pool; correct?

16         A.    I could look around and see other umbrellas,

17    yes.

18         Q.    Right.  And you could see that that orange

19    umbrella was nowhere in relation -- did not look like any

20    of the other umbrellas that were at the pool; right?

21    Yes?

22         A.    I don't recall.

23         Q.    Okay.  And you said that you had already seen

24    photographs of what the original, or actual umbrellas

25    were, so tell me what the difference is between the
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                139

1    umbrellas that you tested, and the umbrella that you say

2    is the actual umbrella?

3         A.   I -- I haven't seen the actual umbrella.  I

4    only saw photographs.

5         Q.   Okay.  So tell me ---

6         A.   The photographs weren't --

7         Q.   -- how they're different than the photos?

8         A.   -- they're not depicted, in my opinion, what

9    the -- what I -- I viewed at the time of my inspection.

10   One is -- what I do know is that they both was steel

11   poles.  And one was wider than the other in

12   circumference.

13        Q.   Right.  And you were told that the orange

14   umbrella was not the exemplar, but the tan umbrella was

15   the umbrella that was used at the pool; correct?

16        A.   I don't recall anyone telling me that.

17        Q.   Okay.

18        A.   At all.

19        Q.   Okay.  All right.  So which umbrella was able

20   to break the tile?

21        A.   Well, when you say which umbrella, you have

22   to understand --

23        Q.   Or which pole of the umbrella?

24        A.   Both -- both would have been able to break

25   the original the tile.



**Orange Legal**
**800-275-7991**

```
 1        Q.     I didn't ask you what would have.  Which one

 2    did?

 3        A.     The one -- I told you why it wouldn't -- it

 4    was impossible to break the other one because of the

 5    size, the small size of the sample.

 6        Q.     Which umbrella broke the tile?

 7        A.     The first one.  The one on the left.

 8        Q.     The orange one, or the tan one?

 9        A.     Facing towards the pool.  The one on the

10    left.

11        Q.     And did it break the tile while the umbrella

12    was open, or while it was closed?

13        A.     It was open.

14               MS. BENTZ:  Are you sure?

15               MS. CHARLES-COLLINS:  Karin, you know better

16        than that.  Don't ask him if he's sure.

17               THE WITNESS:  It was open.  Remember --

18               MS. BENTZ:  Okay.  I'm just --

19               MS. CHARLES-COLLINS:  Karin.

20               THE WITNESS:  I had to break it at a point

21        where the umbrella would not hit the ground.

22               MS. BENTZ:  Okay.

23               MS. CHARLES-COLLINS:  All right.

24    BY MS. CHARLES-COLLINS:

25        Q.     Do you know what -- what are you relying on
```

1    to say that -- what's your basis for saying that

2    Mrs. Redler had a severe concussion?

3         A.    Because of the permanency of the -- that's

4    gone on for two years, she has residual neurological

5    deficits.  That during the time -- and we don't know, by

6    the way, from the time she received the initial

7    concussion, and the time she finally requested to be

8    taken to the hospital, how much her brain deteriorated

9    during those hours.  And I don't know the -- I don't

10   recall the time element involved, but she should have

11   been taken immediately there, and not stressed her brain

12   for any reason whatsoever.

13           Even, just looking at a TV, asking or

14   answering questions, being interviewed.  All that

15   stresses the brain, and continually deteriorates the

16   preexisting condition relating to the concussive effect

17   that the pole had on her brain.

18           So, we don't know, even after the fact she

19   was hit, because no one is able to determine that, and

20   what activities that she performed during that time.

21        Q.    What evidence do you have that her brain

22   deteriorated?

23        A.    We don't know.  We know that, though, that if

24   it's not taken care of immediately, and she's stressed in

25   any way, what any type of questions, any type of



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 143 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                     142

 1   activity, that there is an effect on the preexisting

 2   condition.

 3       **Q.    What evidence do you have that there was any**

 4   **effect on her, at all?  Is this just an assumption?**

 5       A.    No.  But if you read peer reviewed articles

 6   on the care and treatment of individuals that are

 7   involved in concussive incidents, they immediately are

 8   taken away, and immediately placed in -- in the situation

 9   where they are not preoccupied with anything with

10   reference to their brain.

11           And in this case, the Marriott Hotel did not

12   recognize that her brain was involved, which anybody --

13   any witness would have, that's experienced, and that they

14   let her go back to her room.

15       **Q.    Okay.  So tell me what evidence you relied**

16   **on, what documents, what statements, what you relied on,**

17   **to say -- to come up with the opinion that she had a**

18   **severe concussion?**

19       A.    Well, because of the persistence within the

20   last two years, that she has residual neurological

21   deficits.

22       **Q.    But in your report of December of 2014, what**

23   **did you rely on to come up with that conclusion for this**

24   **report?**

25       A.    The -- only the medical -- medicals from



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 144 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    143

 1    the neurologist on St. Thomas.

 2         **Q.    Okay.  Now, when you were testifying earlier**

 3    **about concussions, you said a concussion is a concussion**

 4    **is a concussion.  So if we say that she has a mild**

 5    **concussion, that doesn't make sense.  But you say she has**

 6    **a severe concussion, and that makes sense.  How is**

 7    **that --**

 8         A.    No.  Okay.  That's a good point.  A mild

 9    concussion would have resulted in a -- if taken care of,

10    she would have been brought back to normal over a short

11    period of time.

12              But the fact that she is -- the steel came in

13    contact with a specific area of the temporal region of

14    her brain, and it's been two years, and she still has

15    residual effects, it couldn't be that mild of a

16    concussion.

17         **Q.    And what are you relying on to say that she**

18    **has these residual effects?**

19         A.    The reports by my discussions with Dr. Share,

20    more than anything else, that his findings is -- is that

21    she is -- has residual consequences from the -- and

22    neurological deficits from that trauma.

23         **Q.    Okay.  What scientific analysis have you done**

24    **to establish the amount of force required to produce a**

25    **severe concussion, a subdural hematoma that can actually**



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 145 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          144

1    **kill a young child, that this steel pole was enough to**

2    **produce the force to create those conditions?**

3        A.    Oh, that -- okay.  There are peer reviewed

4    articles on impact forces to the brain, hundreds of them

5    resulting in various levels.  I think, I even gave you

6    one.

7        **Q.    Okay.**

8        A.    Various levels of the -- relating to the

9    severity of the type of concussion, and that's readily

10   available.

11            There is certain impacts that change the

12   structure of the brain, other levels of impact that

13   result in subdural hematomas, or a bleeding of the brain,

14   a swelling of the brain, all these, the severity of these

15   impacts are -- they're all.

16            Peer reviewed articles on those.

17       **Q.    And did you rely on any specific article when**

18   **you were rendering your opinion for this case?**

19       A.    No, I -- and the reason I didn't have to is

20   because, number one, we don't know -- we know, based upon

21   the force coming down, that all these injuries can

22   result.

23       **Q.    Uh-huh.**

24       A.    Dependent upon the force.  I'm not saying

25   that the force that came down could produce a subdural



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                                      145

```
 1    hematoma, or kill a child, what I am saying it's capable

 2    of creating a subdural hematoma, or killing a child based

 3    upon the force that comes down, and that's a foreseeable

 4    event.

 5         Q.    What's the --

 6         A.    That didn't happen here, because Ms. Redler

 7    didn't receive any structural changes in her brain.  She

 8    didn't receive a subdural hematoma; she received a

 9    straight concussion.

10         Q.    What's the difference between saying that it

11    can do it, and it's capable of doing it?

12         A.    Synonymous.

13         Q.    Okay.

14         A.    I -- it's the same.

15         Q.    In Paragraph 16 of your December 2014 report,

16    you say that the impact was extreme because of the design

17    of the pole.  What do you mean by the impact was extreme?

18         A.    Well, the extreme about -- the pole is round.

19         Q.    Uh-huh.

20         A.    And so what happens, I can explain it in a

21    different way, so you'll under -- everyone will

22    understand.

23              If I take my heel and put it -- -and come

24    down on your toe, protect the toe with a shoe, I create a

25    force that's spread out.
```



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 147 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                              146

1        Q.     Uh-huh.

2        A.     Okay.  Now, I'm going to wear high heels.

3    Okay.  I'm going to come down on your toe, but now on a

4    finite point.  The difference is, you're going to feel my

5    weight, and that point coming into your foot.

6             In comparison, a significantly different than

7    if I took my heel on your shoe -- the top of your toes,

8    and came down.  Okay.

9             One is that you'll be able to withstand the

10   heel, but you will not be able to withstand the amount of

11   finite force in the finite point.

12            Now, if I take now, this pole, the whole pole

13   is not flat, the whole pole doesn't hit you.  The whole

14   circumference doesn't hit you.  Just that one point on

15   that round part comes down, and a finite point, you can't

16   get -- it's not flattened out in any way.  It's going to

17   come to down and severely come in contact with the

18   temporal area, which is highly sensitive.  And do what it

19   did.

20       Q.    **And would you agree that the amount of impact**

21   **would vary, depending on the velocity of which that pole**

22   **tips over?**

23       A.    I said previously that the severity of the

24   concussive level relates the amount -- the velocity of

25   that pole coming down.



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 148 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          147

1      Q.     Okay.  Are you saying that the design of

2    the -- there's something wrong with the design of the

3    pole?  Or are you just saying because of -- because it's

4    a round -- because the pole is rounded, and when it hits,

5    it hits at a finite point, that that causes the impact to

6    be extreme.  Is that what you're saying?

7      A.     I am saying there's something wrong with the

8    design of the pole, because this shouldn't have a

9    stanchion.  It should be put right into the cement.

10     Q.     Okay.

11     A.     So there is something wrong with the pole.

12     Q.     So the pole -- you're saying there's

13   something wrong with the pole, or there's something wrong

14   with the stanchion?  What's wrong with the -- let's start

15   with what's wrong with the design of the pole?

16     A.     The design of the umbrella as a whole, is

17   defectively designed for it's foreseeable use that was

18   chosen by the management of Marriott.

19     Q.     Okay.  So should the pole be something other

20   than round?

21     A.     No.  I don't know of a better type of --

22   well, sometimes you can have a -- a -- a rectangle, or a

23   square.

24     Q.     Uh-huh.

25     A.     But what goes up and down has to be shaped



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    148

```
 1   the same way.

 2              MS. BENTZ:  And that'd be called sticking a

 3        square peg in a round hole?

 4              THE WITNESS:  No, because you would have

 5        the round -- the -- okay.  Leave me alone.

 6              MS. CHARLES-COLLINS:  Yes.

 7              THE WITNESS:  Jesus.  I won't even answer

 8        that one.

 9              MS. CHARLES-COLLINS:  All right.

10   BY MS. CHARLES-COLLINS:

11        Q.    What was defective about the pole?  What was

12   defective about the umbrella and the stanchion, and what

13   do you base that on?  Base your opinion on?

14        A.    What was what?

15        Q.    What was defective about the umbrella and the

16   stanchion in Paragraph 18?  You say that both the

17   umbrella and the stanchion that it was placed in, were

18   defective.

19              So my question is:  What was defective about

20   the umbrella?  So I'll start there.  What was defective

21   about the umbrella?

22        A.    There wasn't anything that was defective with

23   reference to the manufacturer, and -- and sale of the

24   umbrella.  The defective nature of the umbrella is the

25   fact that the Marriott Hotel should have placed
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 150 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    149

 1    the -- not used the stanchion, not even purchased the

 2    stanchion, but placed the pole in a receptacle --

 3    receptacle in the cement, below surface.

 4        Q.    And what do you base your opinion on that

 5    using a stanchion as opposed to burying it in the cement,

 6    or placing it in the cement is -- renders it defective?

 7    Renders the umbrella or the stanchion defective?

 8        A.    Because you'll have to eliminate the inherent

 9    risk associated with protecting the guests.  And that the

10    only way to do that, was to place the pole in the cement,

11    so it wouldn't be blown over.

12        Q.    And your basis for that is what?  Your basis

13    for rendering that opinion, what are you relying on?

14        A.    Because -- oh, because that's the standard of

15    care in the industry, is that either you eliminate the

16    use of the umbrellas during high winds and gusts, a

17    predictable gust or foreseeable gusts, or you place them

18    in a position that it could withstand these gusts.

19        Q.    And that -- in that case, closing them?  That

20    would be one?

21        A.    Closing them and locking them in place with

22    something that costs a few pennies.

23        Q.    Okay.  Now, when you say the industry, the

24    standard of care in the industry, what industry are you

25    relating to?



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                150

```
 1        A.    The industry that involves hotels, and

 2   guests.

 3        Q.    Okay.  And do you know that on the day of the

 4   incident that the umbrellas had been closed by Marriott

 5   employees --

 6             MS. BENTZ:  Object to the form of the

 7        question.  That misstates the evidence.

 8             THE WITNESS:  Yeah.  You know what?  That's

 9        not correct.

10   BY MS. CHARLES-COLLINS:

11        Q.    Okay.  What is correct?

12        A.    You understand that when you say closed --

13        Q.    Uh-huh.

14        A.    -- they weren't closed and locked in place

15   with something that cost two or three cents.

16        Q.    I didn't ask you about locked in place.  I

17   asked you whether or not they were closed?

18        A.    But you see -- it's meaningless when they're

19   closed.

20             MS. BENTZ:  And I'm going to --

21             THE WITNESS:  Because they -- a whole bunch

22        of guests were reopening them, and there was a

23        whole bunch of guests that -- the umbrellas weren't

24        closed.  Not every guest had their umbrella closed.

25   BY MS. CHARLES-COLLINS:
```

http://www.yeslaw.net/help

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 152 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                      151

1        Q.    Okay.  So there were umbrellas that were

2    closed, that guests were reopening?

3        A.    No.  Their umbrellas --

4        Q.    You just testified to that.

5        A.    There were umbrellas that were not closed,

6    also.

7        Q.    Okay.  We can get to that, but that's not my

8    question.

9        A.    But we don't -- we don't -- we don't know

10    that.

11        Q.    Okay.

12        A.    We don't know how many.

13        Q.    But you just testified that there were guests

14    who were reopening umbrellas.

15        A.    Yes.

16        Q.    So if you have to reopen something, that

17    means that it was closed prior to?

18        A.    Yes.

19        Q.    Okay.  What basis do you have for your

20    opinion that the subject umbrella and stanchion were not

21    fit for their intended purpose, and foreseeable exposure

22    to wind gusts?

23        A.    If I give you a scientific answer, can we end

24    this?

25        Q.    If you give me the basis for your opinion



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                                    152

```
 1     then that would be the --

 2          A.    That's the whole issue of this case.

 3          Q.    Okay.  So give me the basis for this opinion.

 4          A.    Because the stanchion by itself, was not

 5     sufficient to withstand wind gusts that were foreseeable

 6     and -- the Marriott Hotel knew about prior to the

 7     incident.

 8          Q.    How do you know that?  What do you base that

 9     on?

10          A.    Well, that's easy now.

11          Q.    Okay.

12          A.    You ready?

13          Q.    Yep.

14          A.    That if it could withstand those gusts, they

15     would never have to close them.

16          Q.    But how does that make it not fit for their

17     intended purpose?

18          A.    Because it's foreseeable that guests -- and

19     guests may reopen them or not, and it's also foreseeable

20     that employees may not close every one.

21          Q.    How does that relate to not being fit

22     for -- the intended purpose of the umbrella is to provide

23     shade or cover, so how does what you're saying make them

24     unfit for their intended purpose?

25          A.    Okay.  You never finished the statement.  Fit
```

http://www.yeslaw.net/help



**Orange Legal**
**800-275-7991**

```
 1   to -- to cover a specific area so that guests would be

 2   able to block out the sun --

 3        Q.    Uh-huh.

 4        A.    -- at all times.  You forgot to add that.

 5        Q.    It's not -- what basis do you have for saying

 6   that it has to be -- to block out the sun at all times?

 7        A.    At all times?

 8        Q.    Yeah.  What basis?

 9        A.    Whether the wind is blowing or not.

10        Q.    What basis do you have for saying that?

11        A.    Because it's foreseeable that guests will go

12   out at any time, whether the wind is blowing or not, and

13   they want the -- the sun -- I -- I mean I went down there

14   and I watch all these people go all the way down to all

15   these islands, every one of them, you look at them, every

16   one's covered by an umbrella.  I don't know what the heck

17   they're going down there for if they want to be in the

18   sun.  They don't want -- but the fact is, they want to

19   block out the sun from coming on them, for whatever

20   reason.

21              So, if they are going to do that, then, the

22   management, the hotel management knows that these people

23   want the sun to be blocked out.  So when we know, also,

24   when the -- when the wind blows, the sun doesn't go down.

25   It still stays out there.  So it's foreseeable, that if
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                        154

```
 1    it's going to stay out there while the wind blows, they

 2    want to have sun to be blocked while they're out there

 3    looking at the water.  They're paying, I don't know how

 4    much they're -- how many hundreds of dollars they're

 5    paying, they want to see the water, and they want to see

 6    the sun, even though they don't want the sun on them,

 7    they still want to see it.

 8         Q.    What testing did you do to determine that

 9    they weren't fit for their intended purpose and

10    foreseeable exposure to wind gusts?

11         A.    I thought if we answered that other question

12    we wouldn't want to go any further.

13         Q.    Nope.

14         A.    Do you remember what you asked me?

15         Q.    I sure do.

16         A.    Why don't you ask me again.

17         Q.    What tests did you do to determine that the

18    subject umbrella and stanchion were not fit for their

19    intended purpose and foreseeable exposure to wind gusts?

20         A.    Okay.  The fact that Marriott knew, or should

21    have known that they'd get blown over, and they knew that

22    they get blown over because they close them.  And the

23    other test I did is, I found out that when the wind blows

24    in St. Thomas, the sun doesn't go away.  I stay there,

25    and watched the sun.  It stayed, continued to -- it
```



**Orange Legal**
**800-275-7991**

1    continued to come down on the people.

2        **Q.     How do you know what risk analysis was or was**

3    **not done by Marriott Frenchman's Cove of the -- regarding**

4    **the design of the umbrellas and the stanchion?**

5        A.    How do I know?

6        **Q.    Uh-huh.**

7        A.    Well, one way you determine how I would know,

8    would -- my experience, is that if anybody had any

9    experience in safety engineering, risk analysis, warnings

10   and instructions, I wouldn't be here today, because they

11   could have easily concluded that the -- that the

12   umbrellas, when the wind blows above us, or predicted to

13   be -- blow above a certain level, that they -- the

14   umbrellas be closed and locked in place for a few

15   pennies.  And if they did that, I wouldn't be here.

16          Knowing that -- anyone with that kind of

17   background would conclude that, and perform that protocol

18   every time the wind blew.  Okay.  I know the management

19   at the hotel, they were not trained to perform a risk

20   analysis.  They were not trained in safety, and they were

21   not trained in warnings and instructions.

22          Was -- how expensive do you think a little

23   warning sign would be to print out on a computer about

24   danger.  Keep the -- keep these umbrellas closed.  Wind

25   gusts up to 55 miles an hour.  Failure to follow these



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    156

1    instructions and warning, can result in severe brain

2    injuries, and possibility death.

3         Q.    How do you know --

4         A.    What is it --

5         Q.    -- how do you know what training they did or

6    did not receive?

7         A.    Because if the -- because I know.

8         Q.    How do you know?

9         A.    Okay.

10        Q.    I need to -- I don't want you to tell me

11   because I know.  I need to know specifically how you know

12   what training, or no train -- or what training the

13   Marriott Frenchman's Cove employees and/or management

14   received or did not receive?

15        A.    I'd like to --

16        Q.    What are you basing that on?

17             MS. BENTZ:  Object to the form.  Are you

18        talking about the specific ones in this case, or

19        just in general?

20             MS. CHARLES-COLLINS:  I'm talking about

21        specifically what he just testified to.

22             THE WITNESS:  I'd like to know how many

23        different ways you're going to answer that question

24        until you get what answer you're looking for --

25   BY MS. CHARLES-COLLINS:



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                        157

```
 1        Q.      No, I'm going to --

 2        A.      -- I'm not going to give it to you.

 3        Q.      I'm going to ask until you give me an answer.

 4    So, I want you to answer the question --

 5        A.      I gave you --

 6        Q.      -- how do you specifically know what training

 7    the employees and/or management at Marriott Frenchman's

 8    Cove received or did not receive in regards to risk

 9    analysis, opening, closing umbrellas, warnings and

10    instructions?  Where do you get that from?

11        A.      I'm not even going to say that's a good

12    question anymore.

13        Q.      That's okay.

14        A.      Because it's a redundant question.

15        Q.      Okay.

16        A.      You ready?

17        Q.      Yep.

18        A.      First of all, if they did receive that kind

19    of training, and I stated in my prior reply, they

20    would -- Miss -- I would not be at this table, because

21    Ms. Redler would not have been injured.  The management

22    would have put up signs, or removed the umbrellas, or

23    tied them up so no one could reopen them.

24        Q.      Is it your testimony --

25        A.      That's all.
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 159 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    158

1      Q.      -- that a warning sign would have -- the mere

2   presence of a warning sign would mean that this would

3   never happen?

4      A.    No.   What -- what it would mean to me is, I

5   would be on your side, and state that Ms. Redler was

6   placed on notice of the consequence of her decision,

7   whether -- to decide whether to reopen, or leave it, or

8   even leave it open -- leave the umbrella open, or have it

9   closed.

10     Q.    In Paragraph 15 of your report, you say that

11   the warnings and instructions associated with the hazard

12   were defective.   What specific warnings and instructions

13   are you saying were defective?   And what do you base that

14   on?

15     A.    The fact is, that there were no proper oral

16   or written warnings presented to Mr. Redler -- Ms. Redler

17   and her family, or any other guests, using the umbrellas.

18     Q.    And how does that make it defective?

19     A.    A warning -- because warnings were required

20   because of the potential hazard, which -- which she

21   experienced with a resultant concussion, because of the

22   lack of warnings.

23     Q.    Okay.

24     A.    She was never placed on notice that this was

25   a foreseeable event, and that she could wind up with



 1    permanent neurological deficits.

 2        **Q.    In your report in Paragraph 14 b, you say the**

 3    **management and owners of Marriott Frenchman's Cove has**

 4    **been on notice for a decade that the stanchions used by**

 5    **the Marriott were not sufficient to maintain the**

 6    **integrity of an open umbrella when strong breezes or wind**

 7    **was occurring.  What is the basis for that opinion?**

 8        A.    Oh, over the last 45 years, I've been

 9    involved with umbrellas going over, not only in the

10    islands, but other areas in hotels, and injuring people.

11    Not all brain injuries, but injuring parts of their body.

12            This happens, as it happened here, so they

13    have been on notice for decades.

14        **Q.    You specifically say the management and**

15    **owners of Marriott Frenchman's Cove, so who at -- who in**

16    **management, and who -- which owner of Marriott**

17    **Frenchman's Cove are you saying had been on notice?**

18            MS. BENTZ:  Object to the form of that.

19        Because Marriott Frenchman's Cove is a time share

20        and if you're asking him to name the specific

21        owners of the time shares.

22            MS. CHARLES-COLLINS:  I am asking him what

23        he's talking about.  He's the one that put it in

24        his report.

25            THE WITNESS:  Sure.



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    160

```
 1                 MS. CHARLES-COLLINS:  He said management and

 2       owners.

 3                 THE WITNESS:  They -- the management chain,

 4       the chain as a whole.

 5    BY MS. CHARLES-COLLINS:

 6       Q.    And who are the owners that you're talking

 7    about?

 8       A.    I have no idea, and I really don't care.  All

 9    I care about is the fact that the Marriott Hotels,

10    whether they're time shares or not, have been on notice

11    for decades.

12       Q.    And what basis do you have to say that they

13    were on notice for decades.  What notice were they on?

14       A.    Because it's a known fact that wind can blow

15    over umbrellas, that's no secret.  They have -- wind at

16    beaches blow over umbrellas.

17       Q.    Right.  So that's common knowledge; right?

18    That's -- don't need an engineer or anybody to tell you

19    that.  That winds can blow over an umbrella?

20       A.    At beaches.  However, at a hotel is

21    significantly different.  Because we're not putting the

22    umbrella in sand, here.  We're -- they put it on a

23    stanchion, and it is an expectation that whatever they

24    have there for the guests, is going to be safe for all of

25    it's foreseeable uses, and foreseeable misuses.  It was
```

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                      161

```
 1    not.

 2        Q.    Right.  But my last question was -- I don't

 3    need a scientific engineer --

 4        A.    You mean your last question now.

 5        Q.    -- to tell me -- no, I said my last question

 6    was --

 7        A.    Oh, okay.

 8        Q.    You don't need -- I don't need an engineer to

 9    tell me that wind can blow over an umbrella.

10        A.    Yes, you do.

11        Q.    Okay.  Why?

12        A.    In this -- with res -- not.

13            MS. BENTZ:  Whether you need one or not, you

14        have one.

15            THE WITNESS:  Not -- not --

16            MS. CHARLES-COLLINS:  I don't know about

17        that.

18            THE WITNESS:  Not -- not in the sand as we

19        all know, for a lot of different reasons.  Because

20        sand's -- sand, for example, is not a stanchion, as

21        we know it.  We try to get in as deep as possible,

22        but sand moves, and it can be moved very easily.

23            But the -- we have now a steel pole, and

24        a -- a stanchion that's supposed to hold the

25        umbrella up.
```

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                                    162

```
 1    BY MS. CHARLES-COLLINS:

 2         Q.      Uh-huh.

 3         A.      From a layman's standpoint, at all times, it

 4    doesn't.  That's not open and obvious.

 5         Q.      You say Marriott deviated from the standard

 6    of care followed by all hotels that umbrellas must be

 7    closed when there is a strong wind.  Tell me what's --

 8    where that standard of care comes from?

 9         A.      A standard of care is not a written standard.

10    It's just something that's followed as a protocol on --

11    by an industry.  And -- and that's what you find here, if

12    you go to the other hotels, they have different

13    stanchions, for example.  They have them -- the umbrellas

14    closed at certain times.  They have people observing the

15    guests to make sure they do stay closed.

16              Now, it wouldn't have taken much to have a

17    employee, say, the bellman, to stay in the area, or be

18    assigned to the area, that if anybody reopens or doesn't

19    have their umbrella closed, that he makes sure that he

20    goes over and tells the guests, why he's closing them,

21    and that it's to their benefit that they close them, and

22    his orders from management are to make sure that they

23    stay closed.  He didn't do that.

24         Q.      What basis do you have for saying -- for your

25    opinion, what facts you relied on, what authority you
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 164 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    163

 1    relied on to opine that guests are unable to close the

 2    umbrella at the Marriott?

 3         A.    Oh, I never said close.  I never said that.

 4         Q.    In Paragraph 14 c of your report, it says

 5    that the employees of the Marriott had to close all of

 6    the umbrellas because guests such as Ms. Redler did not

 7    have enough strength or the ability to lift up the

 8    connections between the umbrella and the steel pin that

 9    held the umbrella in place.  That steel pin had to be

10    released in order for the umbrella to fold up.

11         A.    Oh, that's good --

12         Q.    What do you mean by that?

13         A.    That's a good point.  In order to remove the

14    pin, you have to move the umbrella up slightly to release

15    it.

16         Q.    Uh-huh.

17         A.    Once it's in place, the frictional force

18    between the pin and the connection to the -- part of the

19    umbrella that goes up and down the pole is sufficiently

20    high.  And in order to break that frictional force, you

21    have to lift the -- you have to lift the umbrella up

22    slightly.

23         Q.    Okay.

24         A.    And she was too short, by the way.  She'd

25    never be able to reach it.



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                164

```
 1              You're marking up the evidence.

 2              MS. BENTZ:  That's her copy.

 3              MS. CHARLES-COLLINS:  That's mine.

 4              THE WITNESS:  Oh, that's yours.

 5              It looked like my marks.

 6              MS. BENTZ:  Some of it's pretty repetitive.

 7  BY MS. CHARLES-COLLINS:

 8       Q.   Dr. Abraham, are all of the Exhibits that

 9  you'll use to summarize or support your opinions, if

10  you're called to testify in Court, are all of those

11  attached to your report, your December 12, 2014, report?

12       A.   I'm sorry, just repeat that?

13       Q.   Sure.  Are all of those Exhibits that you

14  would use to summarize, or support your opinions if you

15  were to testify at a trial in this matter, are all of

16  those documents attached to your December 2014 report?

17       A.   I don't know.  I might add some, if I have to

18  testify.

19              MS. BENTZ:  Well --

20  BY MS. CHARLES-COLLINS:

21       Q.   Okay.

22       A.   I can't give you a definitive answer.

23              MS. BENTZ:  I just want to object to the form

24       of that, because he's delineated documents in the

25       report that he's reviewed.  Okay.
```



```
 1                  MS. CHARLES-COLLINS:  Okay.

 2                  MS. BENTZ:  All right.  So we reserve the

 3          right to refer to those.

 4    BY MS. CHARLES-COLLINS:

 5         Q.    Okay.  Now I know that you have been saying

 6    that you spoke with Dr. Share.

 7                  Are you ignoring me?

 8         A.    No, I'm paying attention.

 9         Q.    Okay.  Can you move your iPad for just a few

10    minutes.

11         A.    (Witness complied.)

12         Q.    Thanks.

13         A.    Sure.  I can move it this way?  Can you see

14    me okay?

15         Q.    Yeah.  I need you to pay attention, though.

16         A.    I'm here, ma'am.

17         Q.    Okay.  What are -- are you doing something

18    related to this case?  Are you reviewing documents

19    related to this case?

20         A.    No, not yet.

21         Q.    Okay.  So, can you put that aside while we're

22    taking this deposition and --

23         A.    Sure.

24         Q.    Okay.  Thank you.

25                  All right.  I know that you've testified
```



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 167 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                166

 1    throughout that you have spoken -- Dr. Abraham --

 2        A.    I'm listening.

 3        Q.    Okay.  I know that you've testified that

 4    you've spoken to Dr. Share on numerous occasions, or on

 5    occasion --

 6        A.    Yes.

 7        Q.    -- on -- subsequent to drafting your

 8    December 22nd, 2014 report.  So, is that report final or

 9    are you going to be drafting an additional report?

10        A.    It depends on the amount of information

11    that's obtained in the next few days in depositions.  I

12    would like to review those to see if it's necessary for

13    me to take that time to re -- to add to the preexisting

14    report.

15        Q.    Okay.  And the video that you took at the

16    inspection, will you be using that to support any of your

17    testimony or your opinions?

18        A.    Might be of interest to -- just for

19    demonstrative purposes, just to show what happens.

20        Q.    All right.  Will you be conducting any

21    additional inspections with regards to the umbrellas, or

22    the stanchion?

23        A.    If I have to stay in the same motel, I'm not.

24            MS. BENTZ:  Stay at the Cove next time.

25    BY MS. CHARLES-COLLINS:



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 168 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                        167

1      **Q.    Are any -- are there any tasks -- other than**

2      **the fact that you want to -- to maybe see what happens in**

3      **these depositions that are upcoming, are there any tasks**

4      **related to an inspection, or the opinions that you've**

5      **already rendered in your reports, that you feel**

6      **have -- are not complete, that you need to do something**

7      **else in order to complete those?**

8      A.    I have to tell you, I've been in this

9      business a long time.  You finish something, you think

10     you completed it, it's like putting a -- a question for

11     interrogatories together, you get finished, you send them

12     out, and all of a sudden, you -- yeah, on it, you forgot

13     something, or you could have done something better.

14             We could of all do better reports.  We could

15     all do more complete reports, we could all add something.

16     I would like to say that I hope that I don't have to do

17     any more.

18     **Q.    Okay.  So would you be able to say -- then**

19     **would you be able to say that the opinions that you have**

20     **rendered in your report, and given here today, are those**

21     **your final opinions in this case?**

22     A.    They can't be because there's other

23     depositions that are going to take place.

24     **Q.    Okay.  So your opinions may change based on**

25     **those?**



```
 1      A.     No, I will add to them.

 2      Q.     You will add to them?

 3      A.     Yes.

 4      Q.     So the ones that you have given today, the

 5  ones that you have rendered today, and the ones that are

 6  contained in your December 12, 2014 report, and your

 7  August 2013 report, are those opinions finalized?

 8      A.     They're okay for now.

 9      Q.     Okay.

10      A.     I don't know how I'll think about how I

11  answered these questions.  I mean, I will read my

12  deposition, and I will ask myself why did I say that.

13      Q.     Okay.

14      A.     I'm going to also say, why'd you ask me.

15      Q.     No, you won't.

16             We go off the record.

17             THE VIDEOGRAPHER:  Going off record at

18      4:02 p.m.

19             (At about 4:02 p.m. recess.)

20             (At about 4:04 p.m. proceedings reconvened.)

21             THE VIDEOGRAPHER:  Back on record at 4:04

22      p.m.

23  BY MS. CHARLES-COLLINS:

24      Q.     Dr. Abraham, did you understand the questions

25  that I asked you here, today?
```

```
 1        A.    Yes.

 2        Q.    Okay.  Is there any answer that you have

 3   given me throughout your deposition, that you have

 4   thought about, and need to change in any way?

 5        A.    I don't know because I haven't reflected on

 6   anything, yet.

 7        Q.    Okay.

 8        A.    But it's been fair.  You were very nice; I'll

 9   put that on the record.

10        Q.    Thank you.

11              MS. CHARLES-COLLINS:  All right.  Well, I

12        don't have any further questions at this time.

13              MS. BENTZ:  Okay.

14                       CROSS-EXAMINATION

15   BY MS. BENTZ:

16        Q.    Dr. Abraham, you have a Ph.D. in chemistry;

17   is that correct?

18        A.    Yes.

19        Q.    Okay.  In the course of the obtaining that

20   Ph.D., did you study premed courses?

21        A.    No.

22        Q.    Okay.

23        A.    No, I --

24        Q.    Did you take any medical courses?

25        A.    No.  I told you where -- that I obtained my
```

http://www.yodoe.net/help



**Orange Legal**
**800-275-7991**

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                      170

```
 1   medical knowledge was in the actual field in -- by two

 2   things.  By relating all of the hundreds of cases I've

 3   been involved with, with the medical prof -- specialist

 4   associated with the case.

 5          I also did a lot of medical malpractice work

 6   for 15 years, so I had 15 doctors on my staff, while

 7   I -- during the time I owned Intercity Testing and

 8   Consulting, and one of the individuals that I knew very

 9   well, was the assistant medical examiner in Nassau

10   County, and I went in and observed autopsies, well over

11   fifty autopsies during the time, and from -- a whole body

12   being taken apart, every part of the anatomy, and

13   that's how I learned it.  And also from books.  I have a

14   lot -- a whole medical library, in New York.

15       Q.    Okay.  What is your --

16       A.    Wait, one other thing.  And the fact is, I've

17   been involved with sports injuries and concussions from

18   1980 or before, just before that, to the present time.

19       Q.    That was my next question:  What is your

20   experience with dealing with, or working with sports

21   injuries and concussions?

22       A.    I work -- first of all, I handle concussive

23   injuries, and consult on them on a weekly basis.  The

24   people that are actually injured, I -- and I speak at

25   various national conventions during the year, here, and
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 172 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    171

 1    I'm going back to Europe, Munich, I'm invited back to

 2    Europe, Munich, to present to EPSO, which is 80,000

 3    visitors.  It's the largest sports convention in the

 4    world, and I'm the only one speaking there on concussive

 5    injuries in sports.

 6           And I deal with it, and I write peer review

 7    articles, and I have products that -- that are directly

 8    involved with protecting individuals, and significantly

 9    reducing the effect of the impact on the brain in a

10    variety of sports.

11       Q.    When you say you have products, did you

12    design products?

13       A.    Yeah.  They're my patents.

14       Q.    Okay.  And you hold patents on --

15       A.    A large number of -- a large number of

16    patents on these products.

17       Q.    Okay.  And is it your opinion, that there was

18    this spoliation of evidence in this case?

19       A.    That's what we --

20           MS. CHARLES-COLLINS:  Object to the form.

21           THE WITNESS:  That's how we designated,

22       throughout the United States.  I don't know why

23       it's any different in St. Thomas.

24    BY MS. BENTZ:

25       Q.    Do you know what I mean by spoliation?



Orange Legal
800-275-7991

```
 1        A.    Yeah, it's dissipated.

 2        Q.    Okay.

 3        A.    It evaporated.

 4        Q.    Did that -- the fact that the umbrella, the

 5   actual umbrella was not available for testing, the one

 6   that hit Ms. Redler, did that affect your conclusions in

 7   any way?

 8        A.    Not at all.

 9        Q.    Okay.  Would it have been better for purposes

10   of your report to have had the actual evidence that --

11        A.    It would have been better, because if we ever

12   go to trial, and bring in the exemplars -- I mean, we

13   could demonstrate it in court what happened, and I can go

14   through a demonstration there very easily.  But it's

15   always nice, so there's no question involved, to have the

16   actual umbrella.

17        Q.    Well, aren't you relying on the words -- word

18   and representations of the Defendants, that this was the

19   actual umbrella in the -- for your conclusions in your

20   report?

21        A.    Yeah.  But the representations were false,

22   based on their allegations.

23        Q.    Okay.  In other words, are exemplars as good

24   as the original -- the original umbrella?

25        A.    Not in this case.  I get exemplars in a lot
```



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                          173

```
 1    of my cases, because I will not, in any way, effect or

 2    destroy or taint the evidence.

 3         Q.    Okay.

 4         A.    But you can't do that in this case, be --

 5    unless I have the exact umbrella, and it wasn't the exact

 6    one.

 7         Q.    Okay.  So I'm going to show you what --

 8    what's marked previously, it's your -- and I don't know

 9    what number this is.  It's your August 12, 2013 report,

10    for purposes of showing you the photographs which are

11    Bate Stamp Numbers 142 and 143.

12         A.    Yes.

13         Q.    Now, the pictures that are shown there, are

14    pictures of an umbrella pole mounted in the ground; is

15    that correct?

16         A.    Correct.

17         Q.    Was it your understanding that that was what

18    the type of set up was at the time Ms. Redler was

19    injured?

20         A.    No, but that was available at the time, and

21    she was not sitting under an umbrella that had that type

22    of stanchion.

23         Q.    Okay.  Was it your understanding, that at the

24    time Ms. Redler was injured that -- were you aware of the

25    fact that the -- the Frenchman's Cove was actually
```



```
 1    mounting these poles into the ground?

 2         A.    Yes, I was told that.

 3         Q.    And is that significant in any way to you?

 4         A.    Sure.

 5         Q.    Why is that?

 6         A.    Because they knew at that -- what they had

 7    there, was dangerous --

 8         Q.    Okay.

 9         A.    -- prior to the injury.

10         Q.    Right.  So, do you know what a subsequent

11    remedial repair is?

12         A.    Yes.

13         Q.    Okay.

14               MS. CHARLES-COLLINS:  Object to form.

15               THE WITNESS:  But we don't have that here.

16    BY MS. BENTZ:

17         Q.    Okay.  So that's my question, is --

18         A.    That was being done before the -- before the

19    injury.

20         Q.    Being done -- what was being done?

21         A.    In other words -- in other words, those --

22    those -- that was installed prior to her injury, and that

23    means there's no subsequent -- subsequent repair in this

24    case.  What happened is, they should have taken out all

25    of the umbrellas knowing that they were doing this, and
```

 1  putting -- just putting these in, and nothing else.  Have

 2  no other umbrellas available.

 3      **Q.    Okay.  Let me ask you about this:  Did you in**

 4  **any of your reports ever state that Ms. Redler had a**

 5  **subdural hematoma?**

 6      A.    Never.

 7      **Q.    Okay.  ASTM Standard 1620, is that a**

 8  **mandatory standard?**

 9      A.    They're all -- they're -- first of all, you

10  have to understand that anything involved with the ASTM

11  are minimum standards.  Minimum standards.  And -- and

12  they're all voluntary.

13      **Q.    So, why did you object to ASTM 1620 at the**

14  **time that it was proposed?**

15      A.    I think out of -- all of the people on the

16  committee, I was most experienced in handling -- in

17  consultation, world wide.  And I had 100 Ph.D.s working

18  for me for 28 years I owned the company, before I sold

19  it.  And I never wrote reports that -- I never required

20  anybody to write a report in a certain way, and all of a

21  sudden, out of the clear blue sky, you have individuals

22  have nothing better to do but attend meetings, and create

23  work for everybody else, and think they're writing a

24  standard that is the law.  It's not.

25      **Q.    Okay.  Why is the Defendants expert reliance**



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 177 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    176

1    upon ASTM 1620 a faulty reliance?

2        A.    Evidently, they're not privy to what the ASTM

3    really is, and the fact is, that writing a report doesn't

4    make it defective if they write in an alternative way.

5        Q.    Okay.

6        A.    By the way, I've never been in a courtroom

7    where they said that you didn't write the report in

8    accordance with this ASTM standard.

9        Q.    Okay.  Now --

10       A.    It's not recognized.

11       Q.    Do you recall whether or not on the day that

12   you inspected the umbrella, the exemplar umbrella at the

13   Cove, whether or not you brought with you a bathroom

14   scale?

15       A.    Yeah, I had one.

16       Q.    Okay.  Did you weigh the umbrella?

17       A.    Yeah, I weighed it.

18       Q.    Okay.  And did you make a record of that for

19   purposes of your report?

20       A.    I think we took photographs; I didn't write

21   anything down.

22       Q.    So if opposing Counsel wanted to know the

23   weight of the umbrella, she could look at her videotape?

24       A.    Yes.

25       Q.    Okay.



1       A.    I could look at it, also.

2       Q.    Okay.  And we could -- now, there was a lot

3  of testimony about defective design; do you recall that

4  testimony?

5       A.    Yeah.  I recall that.

6       Q.    Okay.  Now, were you saying that the design

7  that was defective, was not the actual umbrella pole

8  itself; it was something else?

9       A.    Yes.

10      Q.    What was that something else?

11      A.    It's the fact that the management of the

12  hotel, of the Marriott, used the stanchion that was

13  incorrect for its foreseeable use, and foreseeable

14  misuse.  The stanchion should have been in the ground, so

15  it could withstand the changes in the velocity of the

16  wind.

17      Q.    Okay.  The -- the stanchion that was actually

18  used on the umbrella was -- was it mounted in any way to

19  the ground?

20      A.    No.  It -- by the way, as an alternative,

21  which we didn't discuss today.  They could have bolted

22  that stanchion into the ground, and they didn't do that,

23  either.

24      Q.    That was my next question.  I'm going to show

25  you the -- some pictures that were attached to your

http://www.yodaw.net/help



```
 1    report.  Just for purposes of example, because this is

 2    not a picture of the actual stand that was used -- used

 3    on this Ms. Redler's umbrella?

 4               MS. CHARLES-COLLINS:  Then, I'll object to

 5          form, because if it's not what was used, and it's

 6          not what was inspected, then what's the relevance?

 7               MS. BENTZ:  Okay.

 8    BY MS. BENTZ:

 9       Q.    Do you recall -- I'm showing you Bates Stamp

10    Number 364; do you recall that there was, like, a

11    stanchion of some type with a base --

12       A.    Yes.

13       Q.    -- that looked -- the square base like that?

14       A.    Yes.

15       Q.    Okay.  Do you recall whether or not there was

16    actually a bolt or a screw or anything, an area where it

17    could have been mounted?

18       A.    Yes.  But it doesn't take much to put a hole

19    in the stanchion -- through the stanchion, and then put a

20    bolt through -- a locking bolt into the ground, or put

21    a -- a female into the ground.  I mean, a female to

22    accept the bolt --

23       Q.    Okay.

24       A.    -- and lock it in place.

25       Q.    Okay.  And do you know whether or not from
```



Case: 3:14-cv-00017-CVG-RM  Document #: 166  Filed: 05/29/15  Page 180 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          179

```
 1    what you've read in the deposition testimony of the

 2    Defendants and the Plaintiffs that have been taken in

 3    this case, whether or not that umbrella was bolted to the

 4    ground?

 5         A.    It was not bolted to the ground.

 6         Q.    Okay.  Have you had an opportunity to review

 7    the written procedures that were provided to the

 8    Plaintiffs by the Defense as to what to do in high wind

 9    situations?

10         A.    Only they had it for hurricanes.

11         Q.    Okay.

12         A.    We didn't have a hurricane, here.

13         Q.    Okay.  So --

14         A.    And -- and --

15         Q.    Does the fact that --

16         A.    -- and usually --

17         Q.    Okay.

18         A.    -- during hurricanes, you don't have people

19    out in the sun.

20         Q.    Right.

21         A.    The sun doesn't shine during hurricanes.

22         Q.    Okay.

23         A.    So we wouldn't have that problem.

24         Q.    Well, my question is:  Were the instructions

25    that were provided for hurricane, adequate instructions
```



```
 1    for the management of the Cove to know what to do in a

 2    situation like the one that occurred on the day

 3    Ms. Redler was injured?

 4         A.    Yeah, those are --

 5               MS. CHARLES-COLLINS:  Objection, form.

 6    BY MS. BENTZ:

 7         Q.    Go ahead.

 8         A.    That's an extreme case, but that's the proper

 9    thing to do.

10         Q.    Okay.

11         A.    But usually you don't have your people out

12    there, that you have to be concerned about.  The poles

13    being knocked over onto your guests.

14         Q.    Okay.  So -- so were there any instructions

15    that you reviewed for situations other than hurricanes,

16    that would have advised the management of the Reef or

17    their employees what to do?

18         A.    No.

19               MS. BENTZ:  Okay.  That's all I have.

20               MS. CHARLES-COLLINS:  I have a few follow up

21         questions.

22               MS. BENTZ:  I knew that was going to happen.

23                    REDIRECT EXAMINATION

24    BY MS. CHARLES-COLLINS:

25         Q.    Dr. Abraham, the umbrella did not hit
```



**Orange Legal**
**800-275-7991**

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 182 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                      181

1    Ms. --  the umbrella itself did not hit Ms. Redler;

2    correct?

3        A.    Correct.

4        Q.    It was the pole?

5        A.    Correct.

6        Q.    You're saying the pole hit her.

7              And in Defense Exhibit 1, where they're

8    photographs on page, Bates Stamp 142 and 143, there are

9    no pictures of the actual umbrella; correct?

10       A.    A part of the umbrella -- you can actually

11   see the support for the umbrella.  You don't see the

12   actual umbrella.

13       Q.    Okay.  But you can see the poles; right?

14       A.    You see the pole and the support.

15       Q.    Okay.  So, tell me what is different about

16   the poles in those pictures -- those -- that's supposed

17   to be the actual umbrella; correct?

18             Or -- or on the -- the day of the incident

19   that picture was taken?

20             MS. BENTZ:  No, that's --

21             THE WITNESS:  That's not the --

22             MS. BENTZ:  -- that's not a correct

23        statement.

24             THE WITNESS:  -- that's not the actual

25        umbrella.  That's other umbrellas that were



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                 182

```
 1       already --

 2              MS. CHARLES-COLLINS:  On the day of the

 3       incident.

 4              THE WITNESS:  Correct.

 5              MS. CHARLES-COLLINS:  Okay.  I apologize for

 6       that.

 7  BY MS. CHARLES-COLLINS:

 8       Q.    Okay.  So -- but those are, that is a

 9  picture.  Those are pictures of other umbrellas that were

10  at the pool, the same pool that Ms. Redler was, when she

11  was alleged injured; right?

12       A.    It wasn't other umbrellas; it's just one

13  other umbrella.

14       Q.    Okay.

15       A.    If you look at the background, I think --

16       Q.    Another umbrella.

17       A.    One other umbrella.

18       Q.    At that same pool, she was --

19       A.    Correct.

20       Q.    -- where she was.

21              Okay.  Tell me what's the difference in

22  dimension, or other characteristics of that -- the pole

23  in those pictures, 142 and 143, from either of the two

24  poles on the umbrellas that you inspected in December of

25  2014?
```



**Orange Legal**
**800-275-7991**

```
 1        A.    You can't tell, because I'm not there to

 2   measure that umbrella.  I didn't measure that umbrella,

 3   so I don't know the circumference of it, but it really

 4   doesn't matter, whether it's that umbrella or any other

 5   umbrella, the umbrella came over, it was a steel pole, it

 6   hit Ms. Redler, she wound up with a permanent and

 7   residual -- permanent and residual neurological problems.

 8        Q.    So it doesn't matter what pole you tested?

 9        A.    No.

10        Q.    As long as it was the steel pole?

11        A.    A steel pole, plus the fact that it was large

12   enough to come over and hit her in the head.

13        Q.    Okay.  Is it your --

14        A.    I don't mean large enough, tall enough.

15        Q.    Tall enough.  Okay.

16              Have you ever been qualified as an expert in

17   court to testify about the force of an umbrella falling

18   over and injuring anyone?

19        A.    Where do you get these questions from?

20        Q.    From my brain.  But where --

21        A.    Well, sure.

22        Q.    Have you ever been qualified as an expert?

23        A.    On umbrellas?

24        Q.    Uh-huh.

25        A.    What kind of umbrellas, rain umbrellas?
```

http://www.youtube.net/help

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                              184

```
 1        Q.     No, we're talking --

 2        A.     Sun umbrellas?

 3        Q.     -- we're talking about the umbrellas in this

 4   case.  Have you ever been qualified to testify as an

 5   expert relating to the types of facts, and the injury

 6   that was caused in this case by an umbrella?

 7        A.     I have never been disqualified, but I've

 8   never had a case that I've had to go to trial on similar

 9   to this one with an umbrella.

10        Q.     Now, you said that you had a scale with you,

11   and that if we watched our video, that we would know how

12   much the scale weighed.  Was I videotaping right where

13   you were weighing the umbrellas?

14             MS. BENTZ:  I think you meant, we'd know how

15        much the umbrella weighed.

16             MS. CHARLES-COLLINS:  The umbrella weighed,

17        I'm sorry.

18   BY MS. CHARLES-COLLINS:

19        Q.     Was I -- how would I know that?

20        A.     You were watching me.

21        Q.     Right.  But I was not where you were,

22   supposedly, weighing the umbrella; correct?

23        A.     Hold it.  I never stopped you from getting

24   close.  I never stopped you --

25        Q.     That was not my question.
```



**Orange Legal**
**800-275-7991**

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                185

```
 1      A.      -- I never told you to stay back.

 2      Q.      That was not my question.

 3      A.      Yeah, but you're inferring that you didn't

 4  have any access to me.

 5      Q.      No, I never said that.

 6      A.      I would have welcomed you right over there.

 7  You would have helped me.  You could have held the camera

 8  for me.

 9      Q.      Mr. -- Dr. Abraham, Dr. Abraham --

10  Attorney Bentz just said that we would be able to know

11  the weight of the umbrella by our videotape, and my

12  question to you is:  Was I in the proximity to you at the

13  time that you were weighing the umbrella, to be able to

14  capture on the videotape, the numbers that were on the

15  scale?

16      A.      To tell you the truth, I don't recall

17  limiting you.

18      Q.      That's not my question.

19      A.      And I don't know where you were at the time.

20      Q.      Okay.

21      A.      And I don't know if you had a telescopic lens

22  on what you were using --

23      Q.      Okay.

24      A.      -- that you could have gotten those numbers.

25  But I never refrained you from asking me what the numbers
```



**Orange Legal**
**800-275-7991**

1   were.  I would have given you the numbers.  It's no

2   secret.

3        Q.   **Did you write down the numbers?**

4        A.   No.  I was holding the camera at the time and

5   I thought the camera was recording everything.  I hope it

6   was.

7        Q.   **Okay.**

8             MS. BENTZ:  I think it's on -- on his video.

9             MS. CHARLES-COLLINS:  Okay.  Okay.

10            MS. BENTZ:  Just so you know.

11            MS. CHARLES-COLLINS:  All right.

12            MS. BENTZ:  If I can find it.

13            MS. CHARLES-COLLINS:  No problem.

14            All right.  I don't have any other questions.

15            MS. BENTZ:  Great.

16            THE WITNESS:  Wait a second, the guy involved

17       with the camera has questions.  What do you want to

18       ask?  Go ahead.

19            MS. BENTZ:  No.  Thank God.

20            THE VIDEOGRAPHER:  Off the record?

21            MS. CHARLES-COLLINS:  Do you want to read or

22       waive?

23            MS. BENTZ:  He's reading and signing.

24            THE WITNESS:  We're waiting for a question.

25       I can't hear you.



1          THE VIDEOGRAPHER:   Going off record at

2     4:24 p.m.

3          (At about 4:24 p.m. deposition concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 189 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                188

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4         I, Barbara L. Kent, RMR, RPR, FPR, CSR-MI, Notary

5    Public, State of Florida, certify that Dr. Carl Abraham,

6    Ph.D., personally appeared before me on Thursday,

7    April 23, 2015, and was duly sworn.

8

9    Signed this 1st day of May, 2015.

10

11

12

13
                         *Barbara L. Kent*

14

15
              Barbara L. Kent, RMR, RPR, FPR, CSR-MI
16            Notary Public - State of Florida
              My Commission No.  FF 101803
17            My Commission Expires:  March 13, 2018

18

19

20

21

22

23

24

25

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 190 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    189

```
 1                    CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA

 3    COUNTY OF PALM BEACH

 4        I, Barbara L. Kent, RMR, RPR, FPR, CSR-MI, Notary

 5    Public, State of Florida, do hereby certify that I was

 6    authorized to and did stenographically report the deposition

 7    of Dr. Carl Abraham, Ph.D., that a review of the transcript

 8    was requested; and that the foregoing transcript, pages 5

 9    through 186, is a true and accurate record of my

10    stenographic notes.

11        I FURTHER CERTIFY that I am not a relative, or

12    employee, or attorney, or counsel of any of the parties, nor

13    am I a relative or employee of any of the parties' attorney

14    or counsel connected with the action, nor am I financially

15    interested in the action.

16

17    DATED this 1st day of May, 2015.

18

19

20

21

22                        Barbara L. Kent

23

24

25
```



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 191 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                190

```
 1                          ERRATA SHEET
                DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
 2    IN RE:  Redler vs. Marriott Ownership Resorts, et al
      CASE NO:  3:14-CV-0107
 3    DATE:    April 23, 2015

 4            Deposition of Dr. Carl Abraham, Ph.D.

 5    PAGE      LINE         CORRECTION & REASON
      _____
 6    _____
      _____
 7    _____
      _____
 8    _____
      _____
 9    _____
      _____
10    _____
      _____
11    _____
      _____
12    _____
      _____
13    _____
      _____
14    _____
      _____
15    _____
      _____
16    _____
      _____
17    _____
      _____
18    _____
      _____
19    _____
      Under penalties of perjury, I declare that I have read the
20    forgoing document and that the facts stated are true.

21

22    Signature: _____Date:_____

23

24

25
```



**Orange Legal**
**800-275-7991**

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 192 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                191

May 5, 2015


Dr. C.J. Abraham
3 Baker Hill Road
Great Neck, New York 11023

In Re:  April 23, 2015, deposition of Dr. C.J. Abraham
        Redler versus Marriott Ownership Resorts, et al

Dear Sir:

This letter is to advise that the transcript for the
above-referenced deposition has been completed and is
available for review.  Please contact our office at
(800)275-5991 to make arrangements for read and sign or
sign below to waive review of this transcript.

It is suggested that the review of this transcript be
completed within 30 days of your receipt of this letter,
as considered reasonable under Florida Rules, however,
there is no Florida Statute to this regard.

The original of this transcript has been forwarded to the
ordering party and your errata, once received, will be
forwarded to all ordering parties for inclusion in the
transcript.

                        Sincerely,




                        Barbara L, Kent, RMR, RPR
                        Orange Legal

cc:  K. Bentz; K. Charles-Collins

Waiver:


I,                      ,hereby waive the reading and
signing of my deposition transcript.


Deponent                        Date
*Federal Civil Procedure Rule 30(c)/Florida Civil
Procedure Rule 1.310(c)



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                                    Index: $10,000..actual

**$**

**$10,000** 131:22

**$10-** 128:16

**$5-** 128:11

**-**

**-and** 145:23

**0**

**075** 81:1

**076** 84:18

**1**

**1** 22:24 23:1 181:7

**1,000** 133:6

**10** 43:23 44:3

**10,000** 128:11

**100** 80:1 175:17

**102** 4:13

**11** 27:2 29:6 44:3,5

**11:10** 4:15

**11:21** 15:1,2

**11:22** 15:3,5

**11:31** 22:7,8

**11:32** 22:9,11

**11:54** 40:19,21

**12** 27:2 29:6 32:21
33:15 44:16,19 81:9
83:16,18,19 103:1
113:20 124:13,17,21
125:4 164:11 168:6
173:9

**12:01** 40:22,24

**12:28** 60:13,14

**12:45** 60:15,17

**12th** 20:8,24 21:5
49:19

**13** 45:19,23 124:11

**14** 45:19,20,23 63:25
64:3 66:4 67:1 87:17
91:6 159:2 163:4

**142** 29:10 30:2
173:11 181:8 182:23

**143** 29:10 30:2
173:11 181:8 182:23

**15** 46:6,11 91:6
158:10 170:6

**15,000** 80:2 128:16

**16** 46:10,11 75:20
84:22 145:15

**1620** 175:7,13 176:1

**17** 46:13,14 75:22

**17th** 78:2

**18** 46:25 47:1 48:1
76:18 103:5 127:13,
17 148:16

**19** 54:23 55:3 70:11,
12 76:24

**1900** 4:12

**1970** 17:3

**1980** 8:15 34:17 35:6
48:11 170:18

**1988** 79:25

**1998** 7:7

**1:10** 75:4,5

**1:30** 75:6,8

**2**

**2** 22:12,16,17 59:3,4,
9

**20** 113:5

**2000** 33:3

**2009** 69:14 93:21

**2012** 123:16

**2013** 22:22 24:19,24
25:15 27:1 29:6
168:7 173:9

**2014** 20:1,8,24 22:15
32:18 33:18 47:12

**50:25 51:1 53:10
54:7 58:9 59:10,11,
15 60:4 61:14 63:3
89:25 142:22 145:15
164:11,16 166:8
168:6 182:25**

**2015** 4:14 44:9 78:2

**21** 59:10

**22nd** 19:24 22:15
31:3 32:13 33:3,10,
18 47:11 48:23
50:25 59:15 63:3
90:8 166:8

**23rd** 4:14

**25** 113:6

**25th** 90:3

**28** 84:13 175:18

**2:04** 94:23,24

**2:15** 94:25 95:2

**3**

**3** 6:17 41:19,20 48:1

**30** 127:15

**35** 48:11 81:12 98:20

**360** 59:24

**361** 59:24

**362** 59:24

**364** 59:24 178:10

**3:01** 131:2,4

**3:12** 131:5,6

**3:14-CV-017** 4:5

**4**

**4** 42:1,2

**408** 25:3

**43** 83:4

**44** 37:17

**45** 10:15 15:11 83:4
159:8

**46** 83:4

**4:02** 168:18,19

**4:04** 168:20,21

**4:24** 187:2,3

**5**

**5** 42:5,6

**50** 52:16

**500** 133:6

**51** 103:5

**51-52** 103:1

**5232-A** 6:18

**55** 155:25

**6**

**6** 42:11,12

**60** 104:20 105:12,18
106:5,10 107:3,4,17,
25 108:6,7,12,16,19
109:2 110:4 112:7,
10,13,14,19

**60-pound** 112:24

**620** 87:3

**7**

**7** 42:16,19,20

**77** 81:12 87:3

**8**

**8** 43:2,3

**80,000** 171:2

**9**

**9** 43:14,16,18

**9000** 121:3,5

**99** 88:15,24 89:3,4,10

**A**

**a.m.** 4:15 15:1,2,3,5

**22:7,8,9,11 40:20,21**

**abilities** 106:16

**ability** 163:7

**abnormal** 69:5 70:2

**abnormalities** 70:7

**Abraham** 4:4 5:8,9,
16,17,18,22 9:7 14:1
17:22 22:14 30:21
39:2 41:1 54:12
57:18 59:23 60:19
63:3,17 70:14 75:10
79:17 80:11 84:23
86:12 95:4 164:8
166:1 168:24 169:16
180:25 185:9

**Abraham's** 82:24
84:21

**Absorbing** 42:9

**Academy** 43:22

**acceleration** 101:23

**accelerometer**
101:25

**accelerometers**
133:4

**accept** 116:2 178:22

**accepted** 97:24
80:14 119:18

**access** 21:8 38:13
185:4

**accident** 27:24
29:18 51:4 64:10
82:25 126:24 127:8
136:13

**accordance** 176:8

**activities** 141:20

**activity** 142:1

**acts** 53:14

**actual** 45:2 51:3
54:10 71:2,5,11
81:18 93:19 95:18
96:1 97:8 99:16
105:24 127:18
136:23 137:4 138:24
139:2,3 170:1 172:5,
10,16,19 177:7
178:2 181:9,12,17,



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 194 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    Index: add..Bates

24

**add** 153:4 164:17 166:13 167:15 168:1,2

**addition** 67:12

**additional** 166:9,21

**additionally** 86:11

**address** 6:16 82:11

**adequate** 179:25

**adjacent** 78:14,23 124:2

**admissible** 25:1

**admit** 84:11

**adolescents** 92:16

**advise** 21:18

**advised** 71:14 180:16

**Advisory** 7:5,14 8:9

**affect** 93:5 172:6

**affected** 101:6 113:21,25

**affirm** 5:5

**agree** 11:22 93:3 98:25 112:21 128:20 129:13 146:20

**agreement** 13:21

**ahead** 32:25 50:12 63:6 70:24 84:8 104:1 115:24 138:13 180:7 186:18

**aid** 52:17 104:25

**alike** 54:1

**allegation** 55:22 56:3,7 69:1

**allegations** 18:17 60:21 75:23 93:20, 22 113:17 172:22

**allege** 18:9 19:6

**alleged** 18:11,15 19:1,3,10,15 27:22 28:3,6,7 39:19 40:3 41:4 51:7 52:7 54:9 65:15 68:21 78:17

79:15 98:10 105:23 136:25 138:2 182:11

**alleges** 27:23

**alleging** 51:16 73:19

**allowed** 14:16 49:10,11,22 83:23, 24 119:7 125:18

**allowing** 37:12 116:14

**alternative** 77:5 80:18 93:11 176:4 177:20

**alternatives** 64:15

**amended** 26:11

**American** 73:24 120:17 121:23

**Amor** 77:21

**amount** 86:14 98:16 109:25 112:6 124:6 126:18 129:18,19 143:24 146:10,20,24 166:10

**analysis** 45:24 46:22 72:4 77:1 80:13 86:12 91:7 115:12 143:23 155:2,9,20 157:9

**anatomy** 13:6 42:3 170:12

**and/or** 156:13 157:7

**ankle** 13:9 66:7

**ANSI** 73:15,24 121:3,5

**answering** 14:3 37:15 141:14

**anymore** 28:19 157:12

**apologize** 77:10 182:5

**apparent** 133:7

**appellate** 17:9

**applicable** 82:24

**application** 114:15 115:2

**applications** 115:3

**applied** 82:5

**apply** 82:3

**approximate** 97:21 127:6

**approximately** 81:7 96:10,25 124:13,16 134:6 135:5

**approximation** 134:8

**April** 4:14 78:2

**area** 12:4 13:5 15:17 17:5,7,14 19:13 20:10,13 68:7 72:6 74:8 75:19 82:21 94:3 96:21 115:12 124:4 135:10 143:13 146:18 153:1 162:17,18 178:16

**areas** 8:7 10:11 12:9, 10,11,13,23 67:19 93:7 116:6 159:10

**argue** 110:23 128:23

**argumentative** 37:5

**arm** 109:7

**arm's** 124:9

**arms** 55:19 96:23 100:8 135:21

**article** 42:17 44:10 48:15 68:25 70:14, 15 109:14 130:11 144:17

**articles** 12:23 15:15 48:2,7,8,10,25 142:5 144:4,16 171:7

**artist** 86:10

**Asher** 70:10 89:3,5, 16,24 90:7,21 91:1

**aspects** 10:5 17:2,6 87:8,10 91:7

**assigned** 162:18

**assimilate** 134:5

**assistant** 13:6 15:9

170:9

**Association** 17:5

**assumption** 119:3 142:4

**assumptions** 118:18

**ASTM** 73:15,22 79:17,20 87:3 175:7, 10,13 176:1,2,8

**attached** 26:22 27:2 30:1,7 59:9,15 164:11,16 177:25

**attempted** 52:15 104:23

**attend** 175:22

**attention** 66:14 104:2 165:8,15

**attorney** 5:23 11:18 27:11 39:9 49:20 71:1,8,13 185:10

**attorneys** 78:18

**attractive** 101:4

**August** 22:22 23:19 24:19,24 25:15 27:1 29:6 30:16 168:7 173:9

**author** 68:23

**author's** 45:18

**authorities** 38:8 41:2

**authority** 35:24 36:14 37:7,21,23,24 38:11 39:11,20 88:23 89:6 120:23 162:25

**autopsies** 13:8 15:8 170:10,11

**average** 127:13,14, 17

**aware** 173:24

**axial** 86:20

─────── B ───────

**back** 15:4 18:22 22:10 39:17 40:14,

17,23 53:16 60:16 61:1 75:7 77:8 84:6 90:19 95:1 103:25 108:14 117:25 123:15 131:6 142:14 143:10 168:21 171:1 185:1

**background** 8:10 10:1 17:3,7 26:4 33:11 34:23 51:19 92:14 109:5 116:14 118:9,10,19 155:17 182:15

**badly** 80:17

**Baker** 6:17

**balls** 46:1 126:1

**bar** 17:5 112:14

**Baratta** 77:22

**Barbara** 4:16

**base** 54:3 81:12 88:23 115:15,21 148:13 149:4 152:8 158:13 178:11,13

**based** 16:21 17:2 36:10,13 66:9,22 68:14,21 77:19 80:14 91:13 92:14 106:4,8,22,23 109:23 116:8 119:17,21 120:23 132:19 133:5 144:20 145:2 167:24 172:22

**basing** 125:22 156:16

**basis** 8:14 16:15,16 64:12 90:18 104:22 107:25 108:17,25 109:1,13 110:19 115:22 119:15 123:2 141:1 149:12 151:19,25 152:3 153:5,8,10 159:7 160:12 162:24 170:23

**basketball** 34:21 35:9

**Bate** 30:2 173:11

**Bates** 29:9 59:18,20, 24 81:3 178:9 181:8



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 195 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                           Index: bathroom..certainty

**bathroom** 94:19 130:14 176:13

**beach** 67:4

**beaches** 160:16,20

**beam** 132:17

**bear** 61:11 117:19

**begin** 6:4

**beginning** 88:17 91:4

**begins** 4:3

**behalf** 4:17,23 5:1, 24

**belittling** 119:6

**bellboy** 65:10,11 93:15,17 116:10,14, 19 117:18 118:9,21

**bellboys** 67:8

**bellman** 162:17

**belt** 111:8

**Benbadis** 68:23

**benefit** 72:3 162:21

**Bentz** 4:22,23 8:4 11:20,24 14:1,9,14, 24 16:3 17:21,24 20:17 22:4 23:3,5,8, 11,14 24:25 25:6,10, 12,17 26:16 28:12, 24 29:1,9 30:14,16 36:9,21 37:3,8,12,16 38:1,19 39:5,11,14, 22 40:1,5,8,12,14 43:7,10 47:2,5 49:20,24 50:6,9 55:7,9 56:6,15 57:4, 14,17,21 58:2,6 59:18 60:9 61:7,10 71:1,8,13 73:1,6 74:24 83:21 84:2,5, 16 87:18,22,24 88:2, 6,8 94:15,19 103:18, 20 107:6,10,13 108:2,5 109:17 110:23 112:5,21 113:5,9 117:5 118:23 119:2 128:3, 6,9 140:14,18,22 148:2 150:6,20 156:17 159:18

161:13 164:2,6,19, 23 165:2 166:24 169:13,15 171:24 174:16 178:7,8 180:6,19,22 181:20, 22 184:14 185:10 186:8,10,12,15,19,23

**bet** 106:19 110:13

**big** 66:2 70:4 137:10

**biomechanical** 9:25 10:2,5,9,17 11:9 87:8,10

**Biomechanics** 45:16,21

**Birthisel** 5:1 78:3

**bit** 91:1

**bleeding** 144:13

**blew** 155:18

**block** 58:14 153:2,6, 19

**blocked** 153:23 154:2

**blocking** 77:5

**blow** 82:7,8 92:3 155:13 160:14,16,19 161:9

**blowing** 67:15 127:13 134:22 153:9,12

**blown** 52:24 64:17 127:1 149:11 154:21,22

**blows** 36:3,6 44:20 45:3,20 54:21 153:24 154:1,23 155:12

**blue** 80:3 175:21

**Boca** 4:13 6:19,21

**bodily** 34:6

**body** 10:8 13:8 68:16 92:17 99:3 159:11 170:11

**bolt** 178:16,20,22

**bolted** 177:21 179:3, 5

**book** 122:6,14

**books** 170:13

**borrow** 61:17

**bottom** 42:25 43:13 81:6 84:18,21 124:24

**box** 32:21 33:15 89:14

**brain** 8:13 12:21 13:9 15:11 16:14,20, 23 34:5 35:5,16,23 36:4,6 41:10,23 42:25 43:13,21 44:8 45:25 46:23 52:25 66:10 69:3,25 75:21 85:21 86:24 91:21 92:17,24 93:1 94:4 95:14 99:15 113:20, 23 129:21 135:10 141:8,11,15,17,21 142:10,12 143:14 144:4,12,13,14 145:7 156:1 159:11 171:9 183:20

**braininjury.com.** 41:13

**break** 6:12,13,15 41:1 60:8,10 74:22 75:2,11 94:20 139:20,24 140:4,11, 20 163:20

**breaking** 95:13 129:3

**breeze** 67:3

**breezes** 64:8 67:15, 23 72:6 159:6

**bring** 23:5 41:7 80:10 89:13 99:24 112:24 172:12

**broke** 140:6

**brought** 42:23 65:5 95:7,9 96:13 143:10 176:13

**brown** 111:8

**Bryan** 4:6,24

**building** 105:6

**bull** 128:20,25

**bunch** 150:21,23

**burying** 149:5

**business** 4:7 10:15 167:9

------

**C**

**C.J.** 5:8,9

**call** 5:17 58:14 79:1 89:14 91:9 130:22

**called** 7:23 69:5 105:9 148:2 164:10

**calling** 66:15

**calls** 79:20

**Camachtcho** 77:21

**camera** 185:7 186:4, 5,17

**Canada** 12:5 34:15

**candidate** 91:5

**canopies** 57:3,9,13 58:11,13,14

**canopy** 56:14,16,19, 22 81:7 82:4 85:10, 12

**canopy's** 56:25

**capability** 83:7 105:20 119:11

**capable** 105:14 106:20 110:14 145:1,11

**capture** 185:14

**care** 12:12 67:1 72:8, 10 76:19 120:15,19, 23 121:20 122:2,15, 18 123:4,7,9 141:24 142:6 143:9 149:15, 24 160:8,9 162:6,8,9

**cares** 129:6,7 130:15

**Caribbean** 67:2

**Carl** 4:4 5:16,18 88:6 107:10 110:24 128:15

**case** 4:5 8:1 16:18 17:2 18:17 23:18

24:16 25:18,24 26:6 33:2,6 34:8,10,24 35:2,8,21 47:9,24 48:5,9,25 51:8 52:22 60:19,21,25 65:5 68:8 69:12 75:11 76:6 85:15,17,19 87:6,9,11 88:19,21 89:23 92:19,21 93:24 98:10 101:14 114:16 115:9 116:8 119:23 126:5,23 128:1 131:19 142:11 144:18 149:19 152:2 156:18 165:18,19 167:21 170:4 171:18 172:25 173:4 174:24 179:3 180:8 184:4,6, 8

**cases** 10:24 11:2,4,5, 11,13 12:21 15:10, 21 16:22 17:3,7,10, 12 26:5 32:19,20,22 33:4,13 34:4 42:24 48:17 66:8 68:2 89:13,14 116:6 170:2 173:1

**CAT** 86:22

**Catalina** 6:18,21

**causation** 16:11 35:22

**caused** 16:20,21 51:8 138:2 184:6

**causing** 52:25

**CCNY** 134:11

**ceased** 67:15

**cement** 27:14 72:13, 16 101:18 147:9 149:3,5,6,10

**center** 55:18 86:17 96:25 124:13,17 125:4 137:11

**cents** 64:23 93:14 150:15

**ceramic** 96:20 99:1, 21

**certainty** 65:24 78:7 105:25 106:18 107:24 108:18



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 196 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                              Index: cetera..continued

109:24

cetera 75:25

chain 116:6 122:7
123:13 160:3,4

chains 76:20

chair 78:14,23 96:23

chairs 100:7,9,10,11
132:16

change 129:20
144:11 167:24 169:4

characteristic
82:16

characteristics
53:12 66:24 99:1,2
182:22

charge 87:9

Charles 39:9 79:16

CHARLES-
COLLINGS 22:5

Charles-collins
4:25 5:13,23 8:5
11:21 12:1 14:3,13,
15,18,22 15:23 16:5
17:23,25 18:3 20:20
22:13,25 23:4,7,9,
12,16 25:4,8,14
26:19 28:16,18,21
29:5,12,13 30:19
31:21 36:10,18,22
37:1,6,10,14,20
38:3,7,9,12,15,24
39:10,13,15,24 40:2,
18,25 41:25 42:5,10,
15,21 43:2,5,9,15
44:4,17 46:3,13,15
47:4,6,7 50:3,12,14,
18 54:22 55:13 56:9,
17 57:5,7,20,24
58:5,7,10 59:20,22
60:1,10,18 61:13,18
62:1 70:13 72:23
73:3,10,11 75:2,9
77:12 84:1,4,19
85:22 87:20 88:22
94:17,21 95:3
103:21 107:11,18,21
108:4,9,24 109:19,
21 111:1 112:8,12,
16,23 113:1,10
117:6,9,13,16,24

119:14 128:21
130:25 131:8
140:15,19,23,24
148:6,9,10 150:10,
25 156:20,25 159:22
160:1,5 161:16
162:1 164:3,7,20
165:1,4 166:25
168:23 169:11
171:20 174:14 178:4
180:5,20,24 182:2,5,
7 184:16,18 186:9,
11,13,21

cheap 128:12

check 77:11 94:8

checked 94:1,7

chemistry 69:25
169:16

chief 68:24

child 76:5 85:1
86:15 91:17 144:1
145:1,2

children 91:14

chime 20:17

choice 67:16

chosen 147:18

circumference
95:16 139:12 146:14
183:3

circumstances
24:18

claiming 69:8
106:12 117:12

clarify 59:23 63:2

class 134:11

clear 29:15 50:20,21,
22,23 57:14 58:2,7
80:3 91:16 137:15
175:21

clearer 28:11

clinically 69:9 70:5

close 47:23 52:24
89:3 103:24 137:13
152:15,20 154:22
162:21 163:1,3,5
184:24

closed 64:21 65:1
67:4,5,11,13 85:13
106:14 118:17
121:16 140:12
150:4,12,14,17,19,24
151:2,5,17 155:14,
24 158:9 162:7,14,
15,19,23

closing 149:19,21
157:9 162:20

co-signed 78:11

coasts 17:17

coefficient 131:17,
21

cognitive 90:15,23

cold 74:19

collections 86:20

college 119:5

Colombia 134:12

color 58:16 100:25
101:3,4,7 137:20,21
138:1

colored 101:8

colorful 59:1

colors 58:17,18,23
59:13 60:6

commerce 121:9,10

Commission 73:16
74:3

committee 79:21
175:16

common 109:17,22,
23 160:17

community 80:15

companies 7:11

company 7:2,4,6,9,
21,23 55:5,6 175:18

compared 85:12

comparison 146:6

competent 118:14

complaint 26:6,8,
10,11,12,13,18 27:22
28:4,6,8 39:19 40:4

113:18

complete 23:2 59:4
110:7 115:23 119:3
167:6,7,15

completed 167:10

completely 95:18,
19,20 121:18

complied 165:11

comply 85:14

compound 37:4

computer 155:23

con 88:12

concentrated 82:5

concerned 180:12

conclude 14:11 79:7
82:23 109:9 155:17

concluded 81:13
83:15 155:11 187:3

concludes 78:13,22
87:2 88:12

conclusion 78:8
79:2 102:4 106:9
125:21 142:23

conclusions 78:4
80:13 172:6,19

concussion 43:24
45:16,21 46:12,17
63:12,15 66:16,19,
20 76:4,7 82:22
84:25 86:14,25 87:1
88:14,16,25 89:10
91:11 97:8 101:14
102:5 125:6,12
126:4 127:5 129:22
133:19 136:5,16
141:2,7 142:18
143:3,4,5,6,9,16,25
144:9 145:9 158:21

concussions 10:7
12:3,4,25 48:20
69:23 92:17 126:2
143:3 170:17,21

concussive 32:20
35:23 36:3,6 41:3
70:1 91:23 92:3
133:9 141:16 142:7
146:24 170:22 171:4

condition 47:22
69:24 124:15 132:25
141:16 142:2

conditions 80:12
82:25 132:12 134:3
144:2

conduct 18:8 49:22

conducted 71:3

conducting 21:3
166:20

confidential 52:6
117:14,15

confused 27:25

conjunction 8:11

connection 163:18

connections 163:8

consequence 73:18
119:23 158:6

consequences 65:19
143:21

considered 25:3
70:6

consistent 78:5

consult 170:23

consultant 114:7

consultants 87:5

consultation 175:17

consulting 30:22
79:24 134:25 170:8

Consumer 73:16
74:2

contact 85:11 95:15
135:9 136:20 143:13
146:17

contacted 78:14,25

contained 63:17
168:6

continually 135:24
141:15

continue 75:12

continued 91:6
154:25 155:1



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 197 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM

Index: contrary..deviated

**contrary** 75:23

**control** 74:24

**controlled** 55:19

**convention** 171:3

**conventions** 12:5 170:25

**conversation** 25:17 90:6

**Copied** 45:7

**copies** 43:4,7 62:10

**copy** 22:17,19 23:2,3 44:6,10,13,14 68:25 74:5 104:14 122:4, 13 164:2

**corporation** 79:24

**correct** 7:2 8:3,18, 22 9:12,15,16 11:15 16:8,9,11 22:22 35:3,10 53:3 60:22 63:4 64:1,2 78:8 86:6 89:19 91:17 96:14 106:6 115:25 118:21 131:18 133:23 137:18,20 138:15 139:15 150:9,11 169:17 173:15,16 181:2,3,5, 9,17,22 182:4,19 184:22

**correctly** 81:4

**cosigned** 77:21

**cost** 64:22 93:13,16 126:18 128:1 150:15

**costly** 131:19

**costs** 149:22

**Counsel** 4:19 8:2,6 16:18 21:11,18 176:22

**country** 116:7

**County** 13:7 15:9 170:10

**couple** 6:1 7:11 8:17 95:4 137:15

**courses** 169:20,24

**court** 4:9,16,20 5:3,

10 6:8,10 10:10 25:5,9 31:16,19 83:23 112:25 164:10 172:13 183:17

**courtesy** 14:6,7 79:13

**courtroom** 176:6

**Cove** 4:8 19:17 49:6 58:9 59:12,16 60:4 155:3 156:13 157:8 159:3,15,17,19 166:24 173:25 176:13 180:1

**cover** 152:23 153:1

**covered** 153:16

**covering** 56:19,20

**CPSA** 74:3

**crack** 136:19

**Crashes** 46:24

**create** 82:10 83:5,6 120:13,14 122:15 126:16 131:25 134:13 135:20,21,22 144:2 145:24 175:22

**created** 79:22 85:17 87:4 114:8 121:2

**creates** 122:5

**creating** 80:4 83:2 134:17 145:2

**credible** 88:21 90:14 134:18

**critique** 80:17

**CROSS-EXAMINATION** 169:14

**CT** 69:4,14,15,21 86:16

**cut** 137:12

**cute** 113:15

---

**D**

**daily** 8:14 90:18

**danger** 65:18 67:14 76:14,15 116:13

155:24

**dangerous** 77:3 102:11 121:8 174:7

**dangers** 76:22

**data** 45:24 114:21 127:8

**date** 4:14 10:13 20:3, 4 26:15 28:3,7,9 29:15 53:3

**dated** 22:15 33:17

**David** 31:20

**day** 27:21,24 28:2,14 51:12 86:18 102:24 136:7 150:3 176:11 180:2 181:18 182:2

**days** 131:16 166:11

**deal** 8:13 16:14 70:4 91:13 92:7 171:6

**dealing** 35:5 92:24 98:17,18 170:20

**death** 74:12 156:2

**decade** 159:4

**decades** 64:5 159:13 160:11,13

**December** 19:24 20:8,24 21:5 22:15 23:12,19 31:3 32:12, 13,18 33:3,10,18 39:14 47:11 48:23 49:19 50:25 51:11 53:10 54:7,15 55:15 56:12 57:19 58:9 59:10,11,15 60:4 61:14 63:3 89:25 90:3,8 98:8 100:23 104:14 123:16 142:22 145:15 164:11,16 166:8 168:6 182:24

**decide** 158:7

**decided** 20:17

**decision** 158:6

**decisions** 17:9

**deep** 161:21

**defective** 73:19 93:8 148:11,12,15,18,19,

20,22,24 149:6,7 158:12,13,18 176:4 177:3,7

**defectively** 102:21 147:17

**defend** 122:9

**Defendant** 5:2 52:21

**Defendant's** 23:1 75:23 76:18

**Defendants** 22:16 76:16 88:20 172:18 175:25 179:2

**defending** 88:21

**defense** 69:12 71:4 78:18 88:21 93:21 103:4 117:3 179:8 181:7

**deficits** 141:5 142:21 143:22 159:1

**definite** 70:7

**definitive** 164:22

**degree** 17:22

**delineated** 164:24

**demonstrate** 65:12 76:2,9 83:2 84:23 86:3 95:13 97:14,23 98:14 127:3 129:1, 12 132:1 172:13

**demonstrated** 67:17

**demonstrates** 98:20

**demonstrating** 82:13 129:5 132:4

**demonstration** 95:12 172:14

**demonstrative** 85:7 97:5 99:16 114:3,4 128:25 130:3,17 134:1 166:19

**Dependent** 144:24

**depending** 146:21

**depends** 26:8 105:4 166:10

20,22,24 149:6,7 158:12,13,18 176:4 177:3,7

**depicted** 139:8

**depose** 89:2

**deposition** 4:4,11 5:24,25 9:8 13:24 18:19 20:18 22:12, 24 38:10,17 41:20 42:2,6,12,20 43:3,14 44:3,16 45:23 46:11, 14 47:1 55:10 58:3 70:12 118:25 165:22 168:12 169:3 179:1 187:3

**depositions** 166:11 167:3,23

**Depot** 64:23

**Depression** 43:19

**describe** 32:21 53:8 54:6,7,14 55:15 57:8,13 58:11,23 66:4 95:6 96:19 97:18

**description** 101:2 105:10

**design** 75:17 145:16 147:1,2,8,15,16 155:4 171:12 177:3, 6

**designated** 171:21

**designation** 66:18

**designed** 72:5 102:21 147:17

**destroy** 173:2

**deteriorated** 91:21 141:8,22

**deteriorates** 141:15

**determinations** 16:11

**determine** 16:19 17:1 69:22,24,25 86:24 125:18 126:23 127:6 132:25 141:19 154:8,17 155:7

**determined** 86:23, 25 96:10 114:17

**deviated** 76:19 123:3 162:5



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 198 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                          Index: Diagnosing..explain

**Diagnosing** 43:21

**diagnosis** 11:23
12:2,14,19 15:13
16:7

**diameter** 54:2 81:8
123:17 124:2

**difference** 53:15
82:18 92:25 135:6
138:25 145:10 146:4
182:21

**difficult** 57:11 97:13

**dimension** 182:22

**dimensions** 97:18

**dinner** 72:22

**direct** 5:12 96:24

**directly** 171:7

**disclosures** 25:5

**discuss** 177:21

**discussed** 47:9
89:18 136:21

**discussing** 15:12
47:22 48:17

**discussion** 54:19
77:9 117:23

**discussions** 143:19

**disqualified** 184:7

**dissipated** 172:1

**Dissipating** 42:9

**distributed** 82:3,15

**distributor** 55:6

**District** 4:9

**Division** 4:9

**DNA** 66:23 92:8

**DNAS** 92:2

**doctor** 8:18 9:2,3,6
31:7,8 70:21 86:25

**doctors** 9:4,14 13:2,
11 48:17 69:18,19
89:16 92:10 170:6

**document** 45:2

**documentation**

33:20 34:11 70:8

**documents** 31:4
32:17 34:1 35:1
38:18 39:1 48:4 49:2
89:9 142:16 164:16,
24 165:18

**dogs** 130:13

**dollars** 154:4

**downloaded** 55:4

**draft** 24:11,24 26:7

**drafting** 33:10 90:7
166:7,9

**drawn** 86:8

**Drive** 6:19,21

**dropping** 131:10

**due** 82:16

**duly** 5:10

**dummy** 85:23,24,25
86:5 98:12

**dump** 84:11

**duty** 114:25 119:25
120:1,3,5,9,24
121:17,24 122:15

**Dynamics** 44:20
45:3,20 54:21

**dysrhythmia** 69:6
70:3

---

**E**

**E-620** 79:17,20

**earlier** 143:2

**easier** 93:11

**easily** 64:21 93:12
155:11 161:22
172:14

**east** 120:18

**easy** 79:2,7 152:10

**eat** 73:2 74:23

**edification** 12:24

**editor** 68:24

**education** 43:22

119:5

**educational** 118:19

**EEG** 70:2

**effect** 78:5 86:19
141:16 142:1,4
171:9 173:1

**effects** 143:15,18

**elbow** 125:24

**element** 141:10

**eliminate** 120:11,21
121:7,24 149:8,15

**eliminated** 64:18
120:1

**else's** 92:8

**Elusive** 45:17,22

**embedded** 72:16

**employee** 52:8,18
65:8 85:18 99:18
106:14 110:6 119:8
122:6 162:17

**employees** 7:8
49:21 67:8 95:24
99:22 104:25 150:5
152:20 156:13 157:7
163:5 180:17

**end** 48:1 114:15
128:13 151:23

**engineer** 9:25 10:9,
17 11:9 118:13,14
160:18 161:3,8

**engineering** 7:12
10:2 65:24 87:8
115:13 134:7,11
155:9

**engineers** 128:16

**England** 34:15

**enhanced** 76:14,15
116:12

**entire** 81:11

**EPSO** 171:2

**equal** 123:2 135:15,
25

**era** 69:9 70:5

**essence** 106:3

**essentially** 91:13
95:13

**establish** 8:17 86:13
143:24

**estimate** 81:10
97:21

**Europe** 12:6 68:3
116:7 120:17 121:4
171:1,2

**evaluate** 34:24
57:22 68:13 134:17

**evaluated** 47:18
92:10

**evaluating** 77:24
92:15

**evaluation** 15:13
31:6 47:10 93:23

**evaporated** 172:3

**event** 145:4 158:25

**events** 116:8 134:8

**eventually** 131:20

**evidence** 65:21 68:6
83:24 86:19 89:22
90:15 93:18 116:4
119:22 141:21
142:3,15 150:7
164:1 171:18 172:10
173:2

**evidently** 98:19
176:2

**exact** 11:2 97:3,4
100:13 124:5 126:24
127:10 132:3 133:20
134:7 173:5

**exactness** 97:5

**EXAMINATION**
5:12 180:23

**examine** 93:19

**examined** 5:11

**examiner** 13:6
170:9

**excellent** 28:20

**excerpts** 48:2

**excuse** 18:24 57:16
67:7 128:4 130:21

**exemplar** 51:3,6
52:23 65:25 95:17
104:23 106:1 138:1
139:14 176:12

**exemplars** 53:24
54:9 71:15 95:21
137:3 172:12,23,25

**exerted** 110:2

**Exhibit** 22:12,16,17,
24 23:1 41:19,20
42:2,6,11,12,20
43:3,14 44:16 45:19,
20 46:14 47:1 55:9
59:3,4,9 70:11,12
181:7

**Exhibits** 28:13 44:3
45:23 46:11 47:25
164:8,13

**existed** 66:13

**expectation** 160:23

**expense** 128:15

**expenses** 128:19

**expensive** 155:22

**experience** 16:22
26:4 33:11 37:18,22
48:16 77:20 92:15,
23 95:14 106:23
109:24 125:23
155:8,9 170:20

**experienced** 48:19
76:11,25 85:3 98:21
129:2,6 133:20
134:6 142:13 158:21
175:16

**experiences** 97:24

**expert** 7:13 8:3
11:10 12:10,13
17:13 39:12 44:21
61:6,9 88:3 89:23
175:25 183:16,22
184:5

**experts** 66:18 79:15,
18 80:4

**explain** 37:18 73:13
78:20 145:20



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                              Index: explaining..general

**explaining** 118:16
133:24 137:25

**expose** 115:5

**exposed** 74:10 76:13
101:19

**exposing** 120:12
121:25

**exposure** 151:21
154:10,19

**extended** 91:20

**extensive** 91:15
92:23

**extent** 66:22 83:23

**extra** 86:19,20

**extract** 45:1

**extracted** 45:5
46:21 68:6

**extraneous** 35:19

**extreme** 74:13 75:17
145:16,17,18 147:6
180:8

**extremely** 75:18

——————

**F**

——————

**fabricating** 106:14

**face** 86:8

**faced** 105:6

**facilities** 21:8

**facility** 65:14 114:23

**Facing** 140:9

**fact** 17:4 21:7 33:19
63:14 66:17 67:5
68:1,18 70:22 71:14
81:18 82:20 89:18,
20 98:15 103:11
105:19 106:11
111:18 114:25
119:6,10,17 135:1
141:18 143:12
148:25 153:18
154:20 158:15
160:9,14 167:2
170:16 172:4 173:25
176:3 177:11 179:15

183:11

**facts** 25:18 34:25
46:12,17 60:21
85:15,17 98:9,10
162:25 184:5

**factual** 113:17

**factually** 98:11

**fail-safe** 115:5

**failed** 67:1 71:4
82:11

**fails** 82:12

**Failure** 155:25

**fair** 169:8

**fall** 66:8 69:13 76:10
124:22 125:5,18

**falling** 125:18
183:17

**Falls** 44:20 45:3,20
54:21

**false** 56:8 81:22
172:21

**family** 65:16 74:9
158:17

**fans** 82:9

**fast** 129:6

**faster** 9:8 54:13
99:10,13

**faulty** 176:1

**favor** 63:16

**February** 44:9

**fee** 106:19 110:13

**feel** 99:6 146:4 167:5

**feet** 81:7 111:5
124:10

**fell** 57:23 66:2 95:12
96:24 124:14 127:25
132:24 136:8

**female** 178:21

**FF** 7:23,24,25

**field** 8:15 66:18
114:7 170:1

**fifty** 11:5 13:7 15:8
170:11

**fight** 18:16

**figure** 43:9 86:4
110:17

**figured** 95:11

**file** 38:22

**filed** 25:4,8 83:25

**files** 32:22

**final** 166:8 167:21

**finalized** 168:7

**finally** 71:18 72:10,
14 141:7

**find** 26:17 30:12
54:10 61:12 71:19
97:17 103:16 122:2,
19 162:11 186:12

**finding** 69:8,10 70:6

**findings** 69:3,5 70:3
91:2 143:20

**finds** 90:14

**fine** 47:6 110:24
118:7

**finish** 6:3,5 14:7,9
37:9,13 56:5,6 72:24
73:1 107:10 138:13
167:9

**finished** 13:19,20
152:25 167:11

**finite** 135:10 146:4,
11,15 147:5

**firm** 78:2 84:13

**fit** 151:21 152:16,21,
25 154:9,18

**flat** 146:13

**flattened** 146:16

**Flier** 21:6

**Florida** 4:13 78:3

**flying** 71:9,11

**focal** 69:5 70:3 129:4

**focus** 104:9

**fold** 163:10

**follow** 67:1 72:20
83:12,13 155:25
180:20

**follow-up** 90:10

**foot** 125:24 146:5

**football** 42:3 91:19

**footer** 46:18

**force** 54:3 74:13
76:2,8 81:8,14 82:8
84:23 85:6 86:14
95:9,10 96:11,13
97:1,2,3,8,15 98:16
101:21,24 105:25
109:25 110:1,3
124:14 125:6,17,20
126:25 129:17,19
131:24 132:24
133:7,10,12,18,19,
20,21 134:19 135:5,
7,13 143:24 144:2,
21,24,25 145:3,25
146:11 163:17,20
183:17

**Forced** 45:25

**Forcedfield** 8:9

**Forcefield** 7:23,25
8:11,14

**forces** 42:9 46:23
82:4,14 85:3 97:6
114:18 125:23
135:15 144:4

**foresaw** 116:1

**foreseeable** 72:2,3
76:21 101:19
102:21,22 103:12
115:6,7 122:1 145:3
147:17 149:17
151:21 152:5,18,19
153:11,25 154:10,19
158:25 160:25
177:13

**forgot** 96:23 102:13
153:4 167:12

**form** 8:4 11:20,24
37:4,11 49:25 107:6,
14 108:2 118:24
121:19 150:6 156:17
159:18 164:23

171:20 174:14 178:5
180:5

**formal** 16:1 50:25
51:2

**forming** 39:12

**found** 69:5 70:2
96:21 154:23

**fracture** 85:25 86:1
96:25 97:14,15
98:16 137:5,6,9,11

**fractured** 100:6

**fracturing** 137:13

**frame** 22:1

**Frenchman's** 4:8
19:17 49:6 58:9
59:12,16 60:4 155:3
156:13 157:7 159:3,
15,17,19 173:25

**Frequent** 21:6

**friction** 131:17,21

**frictional** 163:17,20

**friends** 47:23

**front** 104:15

**full** 22:19 51:14 80:1

**fully** 68:13

**function** 91:21 93:6

**functional** 69:24

**funny** 20:19

——————

**G**

——————

**G-forces** 46:9

**gall** 84:18

**garbage** 84:11

**Gauge** 95:9 101:24

**gauges** 95:10 96:13

**gave** 25:23 33:19
34:1 65:16,19 93:11
144:5 157:5

**gear** 34:17,19 35:3
104:12

**general** 10:20 86:17



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 200 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                              Index: Geographic..important

118:19 156:19

**Geographic** 44:9

**get all** 122:9

**give** 5:6 10:20,21,23
14:6 23:10 34:25
43:24,25 44:2,7
52:11 68:17 77:7
134:10 151:23,25
152:3 157:2,3
164:22

**giving** 14:7 38:5,11
51:19

**Glades** 4:12

**goal** 125:25

**God** 5:7 186:19

**good** 24:17 28:25
47:5 50:11,14,23
51:13 92:8 93:5
105:10 108:20
110:20 113:1 143:8
157:11 163:11,13
172:23

**graduate** 134:14

**graduating** 134:11

**great** 6:17 50:15
51:15 109:19 136:12
186:15

**ground** 124:14
125:5,25 132:24
140:21 173:14 174:1
177:14,19,22
178:20,21 179:4,5

**Group** 30:23 134:25

**guess** 64:22 116:11

**guest** 33:8 122:16
150:24

**guests** 66:7 67:20,23
76:21 77:6 115:3,8
118:16 120:13
121:25 149:9 150:2,
22,23 151:2,13
152:18,19 153:1,11
158:17 160:24
162:15,20 163:1,6
180:13

**Guller** 86:17

**gust** 78:5 82:3,10
83:18 126:7,9,25
127:10,21,25 128:17
134:21 149:17

**gusts** 67:24 72:7
103:1,5,12 121:15
126:25 127:7 129:7
149:16,17,18 151:22
152:5,14 154:10,19
155:25

**guy** 45:17 118:25
186:16

**guys** 80:3

**gym** 111:16

**gyms** 112:4

---

**H**

**half** 124:10

**Hamilton** 5:1 78:3

**hand** 5:4 100:2
112:15,17

**handed** 38:21

**handle** 10:1,4,5
170:22

**handled** 33:13 34:4
68:2

**handling** 15:10 26:5
66:10 175:16

**hands** 112:18,19

**handwritten** 23:24,
25 24:1,5

**hang** 112:13

**happen** 76:6 79:5
112:1 145:6 158:3
180:22

**happened** 79:8 92:4
95:23 117:10 132:2,
4 159:12 172:13
174:24

**hard** 36:1 98:19

**harder** 137:8

**hazard** 116:11
158:11,20

**he'll** 89:3

**head** 34:16,19 35:2
41:24 42:8 63:9
65:9,19 66:10 68:15
69:13 85:19 86:16
99:19 107:15 108:6,
13,23 111:24 112:9,
11,15 116:9 118:11,
14,15 119:11,24
124:9 125:25 126:1
133:2 183:12

**headaches** 91:22

**header** 46:17

**heading** 126:2

**heads** 99:5,22 133:4

**hear** 186:25

**heard** 4:8

**hearing** 24:3,4 52:1

**heavier** 98:20

**heavy** 74:12

**heck** 153:16

**heel** 145:23 146:7,10

**heels** 146:2

**held** 4:11 54:19 77:9
117:23 163:9 185:7

**helmets** 133:3

**helped** 95:24 185:7

**hematoma** 76:5,7
84:25 86:15,20
129:22 143:25
145:1,2,8 175:5

**hematomas** 144:13

**hemorrhage** 86:19

**hidden** 76:14,15,17,
21 116:13

**high** 97:15 124:7
146:2 149:16 163:20
179:8

**highly** 106:1 146:18

**Hill** 6:17

**hire** 84:12 128:10

**historical** 127:8

**hit** 42:4 52:24 65:18
82:21 92:3,6 96:24
98:21 99:5 119:23
125:24 135:8 137:11
140:21 141:19
146:13,14 172:6
180:25 181:1,6
183:6,12

**hits** 147:4,5

**hitting** 46:1 126:1
130:4

**hold** 17:22 26:25
37:3 59:22 72:24
104:21 124:4,8
132:16 135:4 161:24
171:14 184:23

**holding** 186:4

**hole** 124:7 148:3
178:18

**holes** 104:21 124:3,6

**home** 64:23 94:12
105:21

**homework** 36:3

**honesty** 130:5

**hope** 81:5 167:16
186:5

**horrendous** 126:19

**hospital** 141:8

**hotel** 21:9 54:9
64:12 65:13 66:25
67:19 76:20 77:4
82:10 93:13 99:18
114:20 115:3 116:6
121:23 122:3,5,16,
20,21 123:3,12
142:11 148:25 152:6
153:22 155:19
160:20 177:12

**hotels** 21:7,24 64:13
66:7 120:17 122:12
123:10,14 150:1
159:10 160:9 162:6,
12

**hour** 103:1,2,5,6
127:11,13 155:25

**hours** 73:9 141:9

**housekeeping** 65:9

116:9 118:12,15
119:11,12

**human** 86:3 99:2,3

**hundred** 15:10

**hundreds** 12:20
35:5 144:4 154:4
170:2

**hurricane** 179:12,
25

**hurricanes** 179:10,
18,21 180:15

**husband** 28:14
53:16

**Hyatt** 122:11

---

**I**

**idea** 62:16 118:20
160:8

**identical** 35:17
39:18,25 40:3 41:4
53:23 66:1 68:10
81:21 92:2 95:20
136:25

**identified** 59:4

**identify** 41:2

**ignoring** 165:7

**im** 52:22

**immediately** 67:11
141:11,24 142:7,8

**impact** 35:4,16
42:18 66:23 68:14
75:16,18 85:3 95:14
97:23 98:14 125:19,
23 135:20 144:4,12
145:16,17 146:20
147:5 171:9

**impacts** 16:14,23
42:8 92:16 126:1
133:2 144:11,15

**impairment** 90:15,
23

**implied** 82:7

**important** 45:15
81:17 83:16,17 97:3
101:10,12 102:20



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM

103:11 124:6
127:22,23 128:1

**impossible** 52:19
65:25 81:23 95:22
136:9 140:4

**improbable** 106:1

**in-ept** 67:18 84:14
115:14,21

**inability** 67:18

**inadvertently** 77:10

**inches** 124:13,17,21
125:4

**incidences** 35:6

**incident** 27:22
28:10,15 29:18 34:5
51:12 53:3 66:9
72:11 80:12 86:18
96:2 102:24 128:18
132:5 136:7 138:3
150:4 152:7 181:18
182:3

**incidents** 32:20
33:21 34:3 142:7

**incorrect** 16:12 19:4
86:7 177:13

**independent** 34:18

**Indicating** 137:12

**indication** 109:4

**indications** 91:9

**individual** 14:17
65:4 67:8 68:1,5
76:25 79:14 84:12,
14 85:3 87:5,13,17
116:9

**individual's** 85:21

**individuals** 33:21
48:18 63:8 74:8
78:11 83:3 88:15
119:10 125:24 142:6
170:8 171:8 175:21

**Induced** 45:25

**indulge** 6:1

**industry** 87:4
149:15,23,24 150:1
162:11

**inexpensive** 93:11

**infarct** 86:19

**inference** 108:22

**inferring** 67:5 185:3

**information** 34:1,
10 45:11 103:3
113:22 166:10

**informed** 77:2

**inherent** 64:17
120:11,21 121:24
149:8

**initial** 141:6

**initials** 7:17

**injured** 18:10,12
19:1,7,10,14,15
33:7,22 41:11 48:18
66:13 68:1,5,11,15
76:12 83:3 91:14,20
92:24 93:1 94:4
129:11,14 134:4
157:21 170:24
173:19,24 180:3
182:11

**injuries** 8:13 10:5,8
15:11 16:15,20 34:6
35:17,22,23 39:19
40:3 41:3,4 51:8
52:25 66:6,10 76:23
85:4 92:9,13 113:23
144:21 156:2 159:11
170:17,21,23 171:5

**injuring** 159:10,11
183:18

**injury** 12:21 17:3
35:9,21 39:18,22,23
40:2 43:21 45:17,22
46:23 53:17 66:15
68:13 69:17 74:11
91:20,21,24 92:16
93:21 113:20 122:1
125:16 129:18,23,24
133:9 174:9,19,22
184:5

**insignificant** 83:17

**inspect** 20:13,21
49:5,12 50:24 54:11

**inspected** 20:10
57:18 59:11,16 60:3

62:4,9,10 176:12
178:6 182:24

**inspecting** 71:15

**inspection** 18:9,25
19:9,13,20 20:3 21:4
24:13,22 49:4,13,20,
23 50:4 51:1,2 52:15
53:24 55:16 71:14
79:9 95:6,8 98:6
103:17 138:7 139:9
166:16 167:4

**inspections** 79:13
166:21

**installed** 174:22

**installing** 72:12,13

**instance** 64:9

**Institute** 73:24

**instruct** 38:15

**instructions** 65:15
73:20 93:8 115:13
119:19 121:11
155:10,21 156:1
157:10 158:11,12
179:24,25 180:14

**instrument** 131:18

**instrumentality**
67:23 68:6 77:3
101:17 102:11

**instrumentation**
133:4

**instruments** 102:1
131:21

**integrity** 64:7 83:7
159:6

**intended** 151:21
152:17,22,24 154:9,
19

**interaction** 17:6

**Intercity** 79:24
170:7

**interest** 166:18

**interested** 135:9,19

**interesting** 79:20
88:13 95:23 96:3
134:24

**international** 64:12
73:25

**internationally**
15:17

**interpreted** 76:24

**interrelated** 35:20

**interrogatories**
51:17 167:11

**interrupt** 36:12
51:24

**interruption** 20:15
116:2

**interviewed** 141:14

**introduce** 4:19

**invent** 83:7,8

**investment** 131:22

**Invisible** 44:8

**invited** 67:20 76:21
171:1

**invitee** 21:9 33:8
49:16 122:15

**invitees** 67:7 115:3,5

**involve** 35:2,8

**involved** 8:15 12:20
13:5 17:10 51:4
77:17 79:23 82:14
88:18 92:16 116:5
122:8 126:18 141:10
142:7,12 159:9
170:3,17 171:8
172:15 175:10
186:16

**involves** 35:4 150:1

**involving** 15:7,10
16:22 67:19

**ipad** 20:15 62:11
103:14 165:9

**island** 33:21

**islands** 4:9 67:2
72:10 114:16 153:15
159:10

**ISO** 73:15,25

**isolated** 35:21

**issuance** 78:18

**issue** 152:2

**issued** 78:1

**issues** 91:23 93:23

**issuing** 116:10

---

**J**

**J.D.** 11:17

**James** 31:24

**JD** 17:22

**Jeffrey** 4:12 86:17

**Jessica** 90:24

**Jessyca** 4:5,23

**Jesus** 148:7

**job** 7:12 90:19
119:13 123:7

**Johns** 4:10

**Jones** 41:22

**jot** 90:17

**Jury** 110:24

---

**K**

**karate** 111:6,7,9,11

**Karen** 14:17 87:21

**Karin** 4:22 14:22
28:18 29:21 36:11
38:12,15 60:7
140:15,19

**keeping** 88:1,4

**Kelly** 4:25 5:22

**Kent** 4:16

**khaki** 100:25 101:8

**Kicked** 41:23

**kidding** 129:15
137:4

**kill** 76:5 85:1 86:15
144:1 145:1

**killing** 145:2



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                        Index: kind..means

**kind** 35:9 38:19 105:25 131:24 155:16 157:18 183:25

**knee** 125:24

**knew** 64:9,15,19 68:4 87:13 97:16 152:6 154:20,21 170:8 174:6 180:22

**knock** 126:8,10

**knocked** 63:12 96:10 114:18 127:22 180:13

**knowing** 64:11,13 66:6 68:17 105:25 106:24 114:15 155:16 174:25

**knowledge** 16:22 90:22 160:17 170:1

---

**L**

**laboratories** 80:2

**laboratory** 128:10

**lack** 158:22

**ladies** 40:8

**lady** 111:22

**Lake** 6:18,21

**large** 64:24 132:15 136:22 171:15 183:11,14

**larger** 97:17

**largest** 171:3

**laughing** 113:13

**law** 4:11,22 17:5,7, 18 18:2 75:1 78:2 175:24

**lawsuit** 41:5

**layman's** 162:3

**leading** 34:19

**learn** 111:14

**learned** 13:1,2 15:14,15 134:16 170:13

**leave** 26:21 148:5 158:7,8

**leaving** 65:20

**left** 43:6 105:7 132:4 140:7,10

**legal** 4:18 16:24 17:2,16 24:7

**length** 123:17 124:9

**lens** 185:21

**letting** 75:14

**level** 70:1 146:24 155:13

**levels** 144:5,8,12

**liability** 16:19 17:1

**library** 170:14

**license** 94:5

**licensed** 11:18 18:2 94:2

**life** 15:7 79:8 93:5 113:21,24 127:4 134:13

**lifetime** 106:23

**lift** 52:16,17 66:5 104:19,20 105:15,22 106:1,5,10,11,25 107:1,3,24 108:6,7, 12,15,18 109:2,8 110:9,10,12 111:8, 18 112:6,8,10,14,18 113:4 163:7,21

**lifted** 105:23 106:21 109:5

**lifting** 105:14 106:17,20 107:15,16 108:22 110:14 111:23

**ligament** 66:8

**likes** 74:24

**limitations** 106:4

**limiting** 185:17

**list** 60:25

**listed** 61:22

**listen** 9:8 18:16

**listening** 166:2

**listing** 61:23,24 74:15

**literature** 36:15 48:24 86:13 89:2,8, 12

**live** 136:3

**lives** 113:25

**load** 82:5,15

**located** 4:12 82:9 96:22 108:23 120:17

**location** 18:9,25 19:10,14,16 20:21 85:6 110:1 137:17

**lock** 95:25 105:2 178:24

**locked** 150:14,16 155:14

**locking** 55:19 149:21 178:20

**long** 7:6 167:9 183:10

**looked** 21:17,22 54:1,15,16 58:8,12 95:10 123:16 132:5 137:23 164:5 178:13

**loss** 63:7

**lot** 13:11 17:12 34:24 44:25 54:12 62:21 83:8 88:19 90:17 112:4 114:12 130:6, 8 131:12,22 135:25 136:1 161:19 170:5, 14 172:25 177:2

**lounge** 78:14 100:11

---

**M**

**machine** 44:13

**made** 17:16 34:14,16 36:11,14 39:25 47:2 58:7 72:15 108:10 116:24 120:5

**magazine** 44:11

**magnitude** 85:6

**maiden** 88:5

**maintain** 64:7 116:16 159:5

**major** 12:5

**make** 6:7 9:7 11:23 16:10 29:14 32:8 35:24,25 36:19 41:3 44:10,14,18 50:19, 22 58:2 63:21 67:9 88:20 110:16 115:4 120:3,7,9 121:17 130:22 135:15,25 143:5 152:16,23 158:18 162:15,22 176:4,18

**makes** 143:6 162:19

**making** 39:20 44:12 50:21,23 70:4 89:20 114:13 115:22 116:9 118:18 119:2

**malpractice** 170:5

**management** 63:7, 23 65:13 67:18 68:4 77:3 114:20 115:11, 21 119:7,16 122:5,6, 14 147:18 153:22 155:18 156:13 157:7,21 159:3,14, 16 160:1,3 162:22 177:11 180:1,16

**manager** 123:12,13

**mandatory** 175:8

**manu** 121:17

**manuals** 122:10

**manufacture** 121:13

**manufactured** 121:4

**manufacturer** 55:5 114:11,14 121:15 148:23

**manufacturers** 114:12

**manufacturing** 121:3,6

**Mar** 81:1

**mark** 41:19 42:1,5, 10,16,19 43:2 54:23 70:11

**marked** 22:12,16,24 41:20 42:2,6,12,20 43:3,14 44:3,16 45:23 46:11,14 47:1 48:1 59:3 70:12 173:8

**marking** 164:1

**marks** 4:12 77:11 164:5

**Marriott** 4:6,7 5:2, 24 19:17 21:6,7 33:20,23 34:2 49:21 52:18 54:9 63:8 65:9,13 66:25 68:2,4 71:2 77:2 82:10 85:18 93:13 99:18 116:6 120:7 121:13, 17 122:5,11 142:11 147:18 148:25 150:4 152:6 154:20 155:3 156:13 157:7 159:3, 5,15,16,19 160:9 162:5 163:2,5 177:12

**Marsenison** 77:21 78:12

**Marsenisont** 78:12

**mass** 86:19 101:23

**Massachusetts** 94:3

**materials** 95:7

**matter** 4:4 5:20 16:20 35:11,14 79:19 93:9 101:15 102:7,9 115:1 125:17 127:2,3,19 129:16,18 133:17 136:2 164:15 183:4, 8

**matters** 101:16

**maximum** 46:22 105:20

**MD** 68:24

**meaningless** 70:3 150:18

**means** 114:4 115:6



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 203 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM
Index: meant..open

120:11 151:17 174:23

**meant** 21:21 78:21 184:14

**measure** 101:21,24, 25 105:16 123:17 126:18 131:21 133:10,14 183:2

**measured** 81:8 125:19 131:17

**measurement** 124:1

**measurements** 85:5 123:20,22

**mechanical** 134:11

**mechanism** 55:19 126:23

**mediation** 24:3,4 52:1,4 116:25 117:2, 7,10,14,17

**Mediations** 52:6

**medical** 8:18 9:1,3, 14 11:23 12:2,14,19 13:1,4,6,18 15:6,9, 12,13 16:1,7,11 31:6,22 32:10 36:15 47:10,19,22 48:17 66:14 68:24 69:16 86:17 89:1,2,7,8,12 92:21 142:25 169:24 170:1,3,5,9,14

**medically** 15:18,19, 20

**medicals** 15:12 25:22 31:6 125:10, 13 142:25

**medicine** 69:9

**meet** 79:17 87:3

**meeting** 103:5 106:18 116:23

**meetings** 175:22

**member** 21:6 79:21 112:3

**memory** 29:21

**men** 106:12

**mention** 81:19 87:11

**mentioned** 18:15 80:20 116:21

**mere** 158:1

**met** 18:4

**method** 42:8 82:13

**methods** 64:16 77:5 80:14,18 83:5 93:11

**Miami** 78:3

**microwave** 74:20

**microwaved** 74:21

**middle** 48:19 69:4

**mike** 84:5

**mild** 43:21 66:16,19 143:4,8,15

**miles** 103:1,5,6 127:13 155:25

**milk** 32:21 33:15 89:14

**Miller** 5:1 78:3

**mind** 99:8,11,13 104:5 112:6 137:6

**mine** 164:3

**Ming** 77:21 87:9

**minimum** 175:11

**minute** 117:20

**minutes** 40:10 74:17 104:16 165:10

**misstate** 133:25

**misstates** 150:7

**mistake** 47:2

**misuse** 102:22 177:14

**misuses** 115:7 160:25

**modern** 69:9 70:5

**modifications** 120:10

**money** 88:19

**monitor** 4:15

**months** 6:24

**motel** 122:20 166:23

**Mother** 41:22

**motion** 83:25 84:1

**Motorsports** 46:23

**mounted** 173:14 177:18 178:17

**mounting** 174:1

**mouth** 50:10,11,17

**move** 14:18,20 17:25 110:21 111:14 112:20 113:11 137:16 163:14 165:9,13

**moved** 124:12,16,21 125:3 161:22

**moves** 161:22

**MRI** 69:3,17,22

**multi-task** 104:8

**multi-tasking** 104:6

**Munich** 171:1,2

**Municipal** 73:15

**N**

**NA** 7:25 8:9

**names** 11:6,11 135:1

**Nancy** 71:25

**narrow** 22:1 75:18 129:4

**Nassau** 13:7 15:9 170:9

**national** 43:21 44:8 73:24 170:25

**nationally** 15:16

**nature** 148:24

**Neck** 6:18

**needed** 66:13 104:24 110:6

**Nelson** 31:24 32:11

**neurological** 141:4 142:20 143:22 159:1 183:7

**neurologist** 8:20,21, 22 87:16 143:1

**neuropsychiatrist** 92:22

**neuropsychologist** 8:25 9:1,12,13,15

**neuropsychology** 43:22 94:6

**nice** 169:8 172:15

**night** 31:11

**NMR** 69:24

**nondelegable** 120:24 121:17,24 122:14

**nonscientific** 84:10

**normal** 86:18 99:25 113:8 125:21 143:10

**North** 6:19,21

**nose** 108:14

**noted** 86:16

**notes** 23:21,22,24,25 24:1,5,6,8,11,13

**notice** 33:20 34:2 63:8 67:25 74:9 158:6,24 159:4,13, 17 160:10,13

**noticed** 11:17

**November** 6:25 7:1

**number** 4:5 21:23 22:16,17 43:23 44:5, 18 46:6,10,13,25 48:1 52:22 54:23 55:3 59:20 62:24 67:6 76:24 79:16 81:3 101:25 105:11 144:20 171:15 173:9 178:10

**numbered** 63:20 70:16

**numbers** 29:10 30:2 59:18,24 173:11 185:14,24,25 186:1, 3

**numerous** 166:4

**O**

**object** 8:4 11:20,24 107:6 108:2 112:5 118:23 128:6,9 150:6 156:17 159:18 164:23 171:20 174:14 175:13 178:4

**objected** 79:22

**objecting** 37:3 107:13

**objection** 37:11 49:24 180:5

**objects** 132:16

**observed** 77:1 92:25 170:10

**observing** 162:14

**obtained** 166:11 169:25

**obtaining** 169:19

**obvious** 66:11 67:21 109:8 116:4 162:4

**occasion** 166:5

**occasions** 166:4

**occur** 64:20 66:6 67:24 82:16

**occurred** 28:10 34:5 82:14 126:23,24 180:2

**occurring** 64:9 159:7

**off-hand** 11:3

**offer** 110:20

**offered** 25:2 28:13

**office** 4:22 11:13 27:9,12

**offices** 4:12 80:1

**On-field** 42:18

**one's** 80:6 92:4 153:16

**open** 52:15,17,21 53:17 55:18,23,25



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 204 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    Index: opened..Plaintiffs

56:23 64:8,25 65:2, 21 66:11 67:9,21 74:10 78:4 85:9,10 96:3 104:22 106:5 108:11 109:3,8,10 110:23 116:4,16,17, 23 136:18 140:12, 13,17 158:8 159:6 162:4

**opened** 55:20 56:21 105:23 106:7

**opening** 53:20 65:20 157:9

**operative** 24:16 25:9

**ophthalmologist** 9:17

**opine** 163:1

**opinion** 11:2 13:11, 14 16:21 17:8,11 39:12,21,24 48:16 49:10 63:11 66:17 73:2 84:14 87:13,14 88:24 89:7 92:9,12, 14,20 93:2,3 95:5 104:22 106:3 107:2 108:1,10 109:2,13, 16 110:19 115:22 123:6 139:8 142:17 144:18 148:13 149:4,13 151:20,25 152:3 159:7 162:25 171:17

**opinions** 16:25 31:5 33:5,17 34:8 48:4,9, 23 60:22,25 63:10 70:24 71:22 73:7 74:16 75:11,14 79:18 80:23 84:2,7 87:6 90:9 92:18 104:13 123:6 132:19 164:9,14 166:17 167:4,19,21,24 168:7

**opportunity** 18:8 19:9 49:5 68:13 179:6

**opposed** 114:5 134:21 149:5

**opposing** 176:22

**oral** 25:17 72:19 73:12 158:15

**orange** 4:17 101:5 137:21 138:1,18 139:13 140:8

**orange-colored** 126:12

**order** 24:23 26:7 31:5,11 33:4 64:14 104:20 108:12 115:2,4 125:8 163:10,13,20 167:7

**ordered** 115:9,11

**ordering** 114:21

**orders** 162:22

**Organization** 73:25

**original** 26:10,13 39:16 67:16 138:24 139:25 172:24

**originally** 26:9

**orthopaedic** 11:15

**orthopaedist** 11:14

**orthopedist** 15:20

**outwardly** 73:20

**oversees** 123:13

**overturned** 81:15

**overturning** 78:4, 15 79:2 81:8,14

**owned** 79:23 170:7 175:18

**owner** 159:16

**owners** 159:3,15,21 160:2,6

**Ownership** 4:6 5:2

---

**P**

**p.m.** 40:22,24 60:13, 14,15,17 75:4,5,6,8 94:23,24,25 95:2 131:3,4,5,7 168:18, 19,20,22 187:2,3

**pages** 27:2 29:6

**paid** 88:19

**paper** 23:5 43:22 44:21,22 45:6,25

**papers** 15:16 17:5, 16 34:13 45:1,14,15 130:14

**paragraph** 70:16 75:20 76:15 81:6 84:22 87:3 104:19 113:20 124:11 145:15 148:16 150:10 159:2 163:4

**paragraphs** 63:20

**part** 13:8 25:5 30:11 38:21 68:16 75:21 100:4 125:2 135:10, 22 146:15 163:18 170:12 181:10

**parts** 44:25 45:15 159:11

**past** 10:18,19 133:3

**paste** 45:7

**patents** 83:4 171:13, 14,16

**pathological** 70:6

**pathologist** 15:9

**patients** 94:4

**Paul** 4:17 77:20

**pay** 104:2 165:15

**paying** 93:15 154:3, 5 165:8

**PC** 4:23 88:8

**peer** 12:22 15:15 75:25 86:13 109:14 130:11 142:5 144:3, 16 171:6

**peer-reviewed** 37:23

**peg** 148:3

**pending** 6:14

**pennies** 149:22 155:15

**people** 17:12,15 54:10 66:15 67:7

**69:16 88:24 89:10** 92:1,5,24 93:1 99:25 107:9 116:13 126:4 153:14,22 155:1 159:10 162:14 170:24 175:15 179:18 180:11

**percent** 88:15,24 89:3,10

**perform** 19:13 24:21 86:12 155:17, 19

**performed** 20:6 76:1,2 77:23 78:16, 17 82:4 84:22 114:6 133:7 141:20

**performing** 72:4

**period** 91:15 143:11

**permanency** 93:4 141:3

**permanent** 52:25 74:11 91:15 92:9,13 130:1 159:1 183:6,7

**permanently** 72:16

**persisted** 129:23,24

**persistence** 142:19

**persists** 91:24

**person** 66:21,22 78:13 80:18 106:19 109:6 111:7 126:4 134:6

**personal** 17:3 48:16 90:22 92:12

**personally** 29:16

**Ph.d.** 87:16 169:16, 20

**Ph.d.s** 80:1 175:17

**photograph** 53:11

**photographs** 25:20 27:4,8,13 29:19 30:1,3,6,8 53:2 58:18,19 59:2,9 61:21,23,24,25 62:11,21 97:20,25 98:1 100:12,13,14, 16 103:16 123:19,23 124:1 137:23 138:24

**139:4,6 173:10** 176:20 181:8

**photos** 26:22 27:15 28:2,13 29:1,2,6,15 30:10 53:9 60:2 62:6,15 103:22 139:7

**physical** 9:19 53:12 79:3

**physicist** 118:12

**Physics** 42:3

**physiology** 66:24

**picked** 96:20

**picture** 178:2 181:19 182:9

**pictures** 23:10 28:8, 9 53:5 59:10,14,15 60:2,3 173:13,14 177:25 181:9,16 182:9,23

**piece** 85:14 97:10, 12,13,15,17,19 137:10,11

**pieces** 48:8 136:23

**pin** 104:21 108:23 109:10 110:2 163:8, 9,14,18

**pins** 124:3

**place** 82:20 85:19 95:25 98:15 104:20 105:2 109:11 110:2 116:8 121:8,9 126:17 132:15 149:10,17,21 150:14,16 155:14 163:9,17 167:23 178:24

**places** 6:22

**placing** 149:6

**plaintiff** 8:1 57:23 101:13

**Plaintiff's** 27:11 28:14

**Plaintiffs** 4:23 8:2,6 16:18 18:4 21:11,18 179:2,8



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 205 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                           Index: plastic..question

**plastic** 64:24 98:18

**players** 91:19

**plenty** 68:2

**point** 78:9 79:5 108:21 127:9,18 129:4 131:16 135:19 140:20 143:8 146:4, 5,11,14,15 147:5 163:13

**pole** 54:2 63:9 66:3 75:17 76:3,10,11 77:1 79:1 82:5,17, 18,19,20 84:24 95:16 96:24 98:19 100:5 119:23 123:17 124:7,12,14,16,19,23 125:4 126:6 129:4, 17 132:23 134:20 135:3,8,9 136:4,7,19 139:23 141:17 144:1 145:17,18 146:12, 13,21,25 147:3,4,8, 11,12,13,15,19 148:11 149:2,10 161:23 163:19 173:14 177:7 181:4, 6,14 182:22 183:5,8, 10,11

**poles** 72:13,15 74:12 139:11 174:1 180:12 181:13,16 182:24

**pool** 49:5,12 50:2,9 67:4,9 138:6,10,11, 12,15,20 139:15 140:9 182:10,18

**portion** 55:18 70:15 73:1 95:15

**pose** 115:8

**posed** 116:12

**position** 65:10 96:1 104:22 149:18

**positioning** 81:9

**possibility** 65:18 85:2 93:6 156:2

**post** 78:15,25 79:1 92:23 125:25

**Postal** 14:17 87:22, 23 91:9 92:23 94:2 129:14

**posted** 74:6 91:1

**potential** 158:20

**pounds** 52:16 81:9, 10,12 83:16,18,19 98:20 104:20 105:12,18 106:5,10 107:3,4,17,25 108:6, 7,12,16,19 109:2 110:4 112:7,10,13, 14 113:5

**practice** 18:2 79:17

**practiced** 17:18

**predictable** 149:17

**predicted** 102:25 137:6 155:12

**preexisting** 141:16 142:1 166:13

**premed** 169:20

**preoccupied** 142:9

**prepared** 79:16

**presence** 158:2

**present** 8:15 17:4 34:17 35:6 49:20,21, 22 69:6,21 70:18 71:12 79:9,14,15 170:18 171:2

**presentation** 116:24 117:2

**presentations** 17:16 34:14

**presented** 12:21 15:16 17:4,16 29:17 51:2 52:23 68:9 70:22 72:22 103:4 119:18,21 158:16

**preserved** 68:8

**pretty** 164:6

**prevention** 63:7

**previously** 65:5 86:23 99:17 146:23 173:8

**principles** 80:14,19 106:8

**print** 155:23

**prior** 21:10 32:19 33:16,21 34:4 55:9 64:10 71:9,19 78:18 79:23 89:24,25 93:21 103:7 114:18, 21 136:13 151:17 152:6 157:19 174:9, 22

**privy** 66:16 176:2

**problem** 61:20 66:12 74:7 91:15,23 179:23 186:13

**problems** 90:16 91:10,12 183:7

**procedures** 179:7

**proceedings** 15:3 22:9 40:22 60:15 75:6 94:25 131:5 168:20

**produce** 38:22 71:2, 4 76:3,4 84:25 86:14 124:15 125:6,12,21 126:3 132:24 133:8 143:24 144:2,25

**produced** 54:11 76:2,7 84:24 85:4 97:8 126:2

**produces** 126:2

**product** 25:3 73:16 74:2 114:13,14,22 115:2,4,7 120:12 131:25

**products** 34:19 83:5,6,8 114:9 120:25 121:4,7 130:8 171:7,11,12, 16

**prof** 170:3

**profession** 17:17

**professional** 118:13

**prognosis** 16:8

**proper** 65:17 119:8, 16,18 158:15 180:8

**properly** 65:14 119:13 126:15

**proposed** 175:14

**protect** 145:24

**protecting** 149:9 171:8

**protection** 76:20 133:5

**protective** 34:16

**protocol** 77:24 83:6, 12 114:8 120:14 121:3,6 155:17 162:10

**prove** 78:9 79:4 83:6

**provide** 38:25 152:22

**provided** 30:6 62:2, 5 179:7,25

**provider** 34:19

**proving** 136:1

**proximity** 185:12

**psychiatrist** 9:23

**Psycho** 9:1

**psychologist** 9:21 13:13 94:2

**psychologists** 13:12

**publication** 43:20

**publications** 123:11

**published** 12:22 34:13 41:13 44:8 75:25 83:13

**pull** 55:10

**pulled** 48:2

**purchase** 67:17

**purchased** 149:1

**purpose** 21:3,4 134:1 151:21 152:17,22,24 154:9, 19

**purposes** 25:2,6 166:19 172:9 173:10 176:19 178:1

**pursuant** 25:2 83:24

**push** 95:24,25 96:4 135:3,4,20,22 136:2

**pushed** 83:18 133:11 136:4,18

**pushes** 135:12

**pushing** 82:17 96:12 130:3 131:11 134:21,22 135:14,25

**put** 43:16 46:20 50:10,17 52:9,21 62:11 65:1 68:22 69:1 77:11 82:15 84:5 85:18 100:8 109:10 124:2 126:14 145:23 147:9 157:22 159:23 160:22 165:21 169:9 178:18,19,20

**putting** 50:11 99:19 110:15 160:21 167:10 175:1

---

**Q**

**qualifications** 12:18

**qualified** 10:10,16 11:10,23 12:14 16:6, 7,10 17:13 183:16, 22 184:4

**qualify** 7:18

**qualitative** 82:13 95:11 114:5

**quality** 93:5 113:21, 24

**ques** 52:20

**Quest** 45:17,21

**question** 6:4,6,14,15 9:10,11,12 12:12,13 14:2,4,10 18:20 19:2,8,12 27:25 28:1 35:12 36:5,23 37:4, 15,20 38:2,25 39:2, 7,9,16 40:7 47:3 50:6 51:13,18 52:10 53:1,19,20 55:22 57:25 59:14 63:13, 14 64:11 73:22 82:1 87:1 90:11 108:3 126:15,19 127:20 133:22 138:14 148:19 150:7 151:8



Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 206 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                    Index: questions..report

154:11 156:23
157:4,12,14 161:2,4,
5 167:10 170:19
172:15 174:17
177:24 179:24
184:25 185:2,12,18
186:24

**questions** 6:8 9:9
13:25 14:8 35:20
36:1 37:2 38:16 39:1
54:13 99:10,13
103:17 128:5 136:9
141:14,25 168:11,24
169:12 180:21
183:19 186:14,17

---

**R**

**radiologist** 8:23

**rain** 183:25

**raise** 5:3 54:4 57:12
65:25 81:23 106:12

**raised** 65:21 67:6

**raising** 55:18

**ran** 69:3,14,15,17
84:13

**Raton** 4:13 6:19,21

**reach** 163:25

**read** 17:9 48:3,21
69:2 90:4 142:5
168:11 179:1 186:21

**readily** 144:9

**reading** 90:5 186:23

**reads** 17:11

**ready** 152:12 157:16

**real** 15:7 79:7 83:1
97:15 102:4 109:9

**realistically** 85:20

**realize** 48:21 77:16

**reason** 71:5 84:10
136:22 141:12
144:19 153:20

**reasons** 61:21
115:10 131:15
161:19

**recall** 11:11,13 18:7
20:4 21:1 25:23
29:17,20 30:8 31:2
33:24 49:9 50:13,16
59:13 60:5 62:19
73:5 90:4,16 98:5
99:19 101:9 104:17
111:3 117:1 136:15
137:25 138:22
139:16 141:10
176:11 177:3,5
178:9,10,15 185:16

**recalling** 90:16

**receive** 66:23 88:16
90:4 119:16 129:20,
21 145:7,8 156:6,14
157:8,18

**received** 63:12,15
66:16 82:21 90:2
127:5 129:22 133:18
136:5 141:6 145:8
156:14 157:8

**receptacle** 149:2,3

**recess** 15:2 22:8
40:21 60:14 75:5
94:24 131:4 168:19

**recognize** 66:12
86:24 142:12

**recognized** 176:10

**recollection** 121:6

**Recommendation**
43:20

**recommended**
47:19

**reconvened** 15:3
22:9 40:22 60:15
75:6 94:25 131:5
168:20

**record** 5:15 14:25
15:4 16:4 17:22
22:4,6,10 25:1 26:16
28:12 40:15,19,23
54:19 57:15,22 58:3
59:19,24 60:12,16
62:12 63:2 72:21
75:3,7 77:9 83:22
84:15 91:16 94:22
95:1 117:22,23,25
123:22,24 131:1,2,6
168:16,17,21 169:9

176:18 186:20 187:1

**recording** 186:5

**records** 31:22 32:10

**recreate** 132:11
133:24,25 134:3

**rectangle** 147:22

**rectify** 121:10

**REDIRECT** 180:23

**Redler** 4:5,6,24
18:10 19:1,10,14
29:19,25 47:10,17
52:2,8 53:6,9,15
65:6,16 67:6 68:11
71:1 74:9 76:11,13,
17,23 81:23 88:13
90:24 91:6,8,16 92:6
93:9,10 98:13,21
101:14 105:23
107:3,22,23 108:6,
18 109:2 110:11
116:12,17 119:18,
21,22 125:11,12
127:5 129:2,6 133:9
136:5,12 141:2
145:6 157:21 158:5,
16 163:6 172:6
173:18,24 175:4
180:3 181:1 182:10
183:6

**Redler's** 47:22 63:9
86:16 106:16 124:15
132:25 178:3

**Redlers** 18:9

**reduce** 121:11

**reduced** 64:18

**reducing** 42:9 171:9

**redundant** 157:14

**Reef** 180:16

**refer** 165:3

**reference** 11:25
12:3 36:3 63:21
65:20 86:13 89:20
93:7 109:7 123:10
142:10 148:23

**references** 33:12
89:15

**referring** 19:21
30:20 116:19 117:6
118:25 120:20

**reflected** 169:5

**reflective** 133:21

**refrained** 185:25

**refreshed** 29:21

**regard** 72:20 85:5

**region** 143:13

**regular** 100:10

**relate** 70:16 93:23
107:8 125:16 152:21

**related** 69:1 122:3
129:19 165:18,19
167:4

**relates** 7:12 15:6
17:2 91:23 146:24

**relating** 17:10 66:24
106:7 141:16 144:8
149:25 170:2 184:5

**relation** 47:11 50:24
108:10 138:19

**relationship** 82:12

**release** 163:14

**released** 96:8
163:10

**relevance** 178:6

**reliance** 175:25
176:1

**relied** 31:4 33:9,15,
19 34:1,9,15,18
38:20 39:3,4,6 41:2
48:8 142:15,16
162:25 163:1

**relies** 37:17

**rely** 33:4,11,16 34:12
37:17 39:12 48:3,15,
24 49:2 68:18 69:7
70:8 142:23 144:17

**relying** 35:25 36:19
38:21 39:20 89:6,9
114:24 140:25
143:17 149:13
172:17

**remain** 64:22
116:17

**remained** 81:15

**remedial** 174:11

**remember** 11:6
31:8 90:18 99:17
100:19 138:3,5
140:17 154:14

**remove** 116:17
163:13

**removed** 67:13
72:14 120:2 157:22

**render** 11:2 12:14,
19 16:6,7,21,24 17:8
31:5 33:4 60:21

**rendered** 19:24 34:7
48:24 88:14,16,25
89:11 167:5,20
168:5

**rendering** 13:11,14
33:17 48:4,8,16 84:7
109:1 144:18 149:13

**renders** 149:6,7

**reopen** 104:24
106:13 151:16
152:19 157:23 158:7

**reopening** 150:22
151:2,14

**reopens** 162:18

**repair** 174:11,23

**repeat** 132:11
164:12

**repeatable** 132:8

**repetitive** 164:6

**replies** 51:16

**reply** 11:2 13:19,20
79:12 157:19

**report** 14:23 19:22,
23,24 20:11 22:15,
19,21 23:2,13,19
24:6,16,19,24 25:1,
9,15 26:7,22 27:1,17
29:7 30:7,15,21,22
31:3,5 32:1,6,12,18
33:3,5,10,17 34:8
35:1 47:12 48:23



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                          Index: reported..significant

49:1 50:25 58:20
59:3,5,10,15 61:6,
12,20,22 62:2,5,25
63:1,4,18 64:7 70:16
73:21 77:20,22 78:1,
12,19 79:16 80:5,7
81:19 82:2 83:22,24
84:10 87:12 89:25
90:8 103:8 104:14,
18 108:15 113:18,19
124:11 132:18
142:22,24 145:15
158:10 159:2,24
163:4 164:11,16,25
166:8,9,14 167:20
168:6,7 172:10,20
173:9 175:20 176:3,
7,19 178:1

**reported** 80:13
86:18,21

**reporter** 4:16,20
5:3,10 6:8,10 31:16,
19

**reporting** 79:18

**reports** 23:17,18,20
24:15 80:2 127:12
143:19 167:5,14,15
175:4,19

**represent** 98:11,13

**representations**
172:18,21

**representative**
80:12

**representing** 123:1

**reproduce** 85:20

**requested** 27:10
114:21 141:7

**require** 39:1

**required** 86:14
110:1,3 143:24
158:19 175:19

**requirements** 65:11

**res** 161:12

**research** 44:25
45:13

**reserve** 165:2

**reside** 6:22

**residual** 141:4
142:20 143:15,18,21
183:7

**residuals** 129:24
130:1

**Resorts** 4:6 5:2

**respected** 12:10

**responsibilities**
118:16

**responsibility** 94:7

**responsible** 75:21
87:9

**rest** 70:24 113:25

**result** 68:9,14 74:11
144:13,22 156:1

**resultant** 158:21

**resulted** 76:23 92:17
143:9

**resulting** 16:14
144:5

**results** 86:18 125:10
126:22 127:3

**retained** 8:2,6,8
16:18,24 21:11
60:20

**retention** 21:12

**return** 110:14

**review** 12:22 15:15
32:11 45:14 60:20
130:11 166:12 171:6
179:6

**reviewed** 24:23
25:16 31:4,23 32:5,
18 48:11,12,13 49:3
75:25 78:1 86:13
109:14 142:5 144:3,
16 164:25 180:15

**reviewing** 165:18

**reviews** 82:2

**Richard** 77:22

**ridiculous** 80:10
93:22

**Rimkus** 30:22
134:25

**risk** 64:17 72:3,4
73:17 74:11 76:14,
15,25 101:19
115:12,20 116:12
120:21 121:7,8
122:1 149:9 155:2,9,
19 157:8

**risks** 74:11 76:21
115:8 120:11
121:11,24

**Road** 4:13 6:17

**roll** 127:21

**room** 40:9 142:14

**rotate** 82:18

**rotating** 82:17

**round** 66:2 75:18
145:18 146:15
147:4,20 148:3,5

**rounded** 147:4

**Rule** 25:3

**ruler** 124:2

**run** 111:23 116:15

**runs** 111:21

———————————

**S**

**safe** 67:22 121:18
160:24

**safer** 64:16 77:5
114:13

**safety** 7:13 8:3
65:14,23 67:19
73:16 74:2 76:22,24
115:13 118:13
123:13,14 155:9,20

**sale** 148:23

**sample** 137:8 140:5

**sand** 160:22 161:18,
20,22

**sand's** 161:20

**save** 89:14

**saved** 68:6

**scale** 176:14 184:10,
12 185:15

**scan** 69:4,14,15,21
86:16,22

**schedule** 61:24

**schematic** 54:17

**Schneider's** 86:17

**school** 13:1,3 75:1

**science** 134:7

**scientific** 7:5,13 8:8,
11 65:24 75:25
77:23 79:18 80:14
86:12 106:8 107:24
108:18,25 109:13,24
110:19,20 137:7
143:23 151:23 161:3

**scientifically** 77:23
78:17 106:6 126:16

**scientist** 119:9

**screw** 178:16

**seat** 128:14

**seated** 74:8 100:10

**secret** 160:15 186:2

**secure** 93:14,17

**securing** 64:16
93:12

**self-taught** 13:9,10

**Selim** 68:23

**semi-annual** 16:16

**seminars** 134:10

**send** 167:11

**sense** 109:18,22,23
143:5,6

**sensitive** 146:18

**sentence** 115:23

**separate** 9:11 58:11

**separately** 126:8

**September** 7:7

**Services** 7:5,14 8:9

**set** 96:22 173:18

**settlement** 25:2,7

**severe** 76:4,7 84:25
86:14 125:21 127:5

141:2 142:18 143:6,
25 156:1

**severely** 68:10 76:12
146:17

**severity** 68:13
144:9,14 146:23

**shade** 152:23

**shaft** 85:11

**shaped** 147:25

**share** 47:9,14,21
92:25 93:3 143:19
159:19 165:6 166:4

**shares** 159:21
160:10

**She'd** 163:24

**she'll** 93:4

**Sheraton** 122:12

**shine** 179:21

**ship** 128:7

**shoe** 145:24 146:7

**short** 111:22 143:10
163:24

**show** 22:16 122:13
123:2 129:12 166:19
173:7 177:24

**showed** 125:3

**showing** 138:5
173:10 178:9

**shown** 95:18 137:17
173:13

**shows** 119:11

**shut** 64:22 116:17

**sic** 33:3

**side** 49:6,12 50:9
68:15 71:4 77:11
92:1 124:19 158:5

**sides** 79:14,15

**sign** 155:23 158:1,2

**signal** 73:17

**significance** 76:8

**significant** 92:24
98:16 174:3



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM

**significantly** 42:8
98:19 99:14 113:21
126:5 137:2 146:6
160:21 171:8

**signing** 186:23

**signs** 157:22

**similar** 26:5 33:13
34:3 35:17 39:18,25
40:3 41:4 51:6 53:22
54:5 55:21 66:1
68:10 76:10 81:24,
25 99:22 184:8

**simple** 66:7 96:20

**Simply** 82:15

**sincerity** 129:11

**single** 94:13

**sir** 5:4

**Siri** 20:15,17

**sitting** 78:13,22
128:14 173:21

**situation** 132:1
142:8 180:2

**situations** 15:7
179:9 180:15

**size** 32:21 97:21,22
137:8,12 140:5

**sizes** 32:21 33:15

**skip** 63:19

**sky** 80:3 175:21

**sleep** 91:22

**slightly** 100:22
163:14,22

**slip** 66:8

**small** 95:15 97:15
137:7 140:5

**smaller** 97:12,13
109:6 137:8

**Smith** 4:17 78:2

**so-called** 65:15,25

**soccer** 34:20 35:9
41:22 42:18 46:1

**sold** 79:25 175:18

**solemnly** 5:5

**sounding** 104:10

**soup** 74:14,19

**Spangenberg**
87:16,18,19,25

**Spangenberg-
postal** 87:21

**speak** 6:9 12:3,9
90:25 170:24

**speaking** 171:4

**speaks** 70:25

**special** 64:24 113:16

**specialist** 4:17 76:25
92:21 170:3

**specialists** 15:13
47:19

**specialized** 13:1

**specialty** 94:3

**specific** 9:9 10:13,
21,23 12:18 37:21,
23 48:15,24 49:3
64:9 66:9 70:16
89:8,9 105:12 114:9
143:13 144:17 153:1
156:18 158:12
159:20

**specifically** 11:9
15:21 29:5 33:2,25
34:9 39:6 48:22
156:11,21 157:6
159:14

**speed** 102:24 127:7
129:17

**spell** 31:16

**spicking** 88:10

**spite** 52:8

**spoke** 65:6 89:24
165:6

**spoken** 18:6 166:1,4

**spoliation** 93:18
171:18,25

**sport** 34:20 35:10,15
45:16 92:15

**sport's** 39:18

**sports** 8:13 10:4
12:21 34:21 35:9,17
39:17,22 40:2 41:3
45:21 125:23
170:17,20 171:3,5,
10

**sportsconcussions.
org.** 42:14

**spread** 145:25

**square** 147:23 148:3
178:13

**St** 4:7,10 5:2 19:19
24:21 27:7 31:7 33:7
128:3 143:1 154:24
171:23

**staff** 7:10 170:6

**stamp** 30:2 59:20,24
81:3 173:11 178:9
181:8

**stanchion** 55:17
67:17 71:3,5 72:5
77:1 102:12,18
114:17 124:12,18,
23,24 126:17 147:9,
14 148:12,16,17
149:1,2,5,7 151:20
152:4 154:18 155:4
160:23 161:20,24
166:22 173:22
177:12,14,17,22
178:11,19

**stanchions** 64:6,14
67:14,22 72:13,15
74:7 159:4 162:13

**stand** 56:19 81:9,16,
21 113:3 178:2

**standard** 36:15 67:1
72:8,10 76:19 79:17,
22 80:4,9 87:4
120:15,19,22 121:20
122:2,15,18,19
123:3,6,9 130:10
149:14,24 162:5,8,9
175:7,8,24 176:8

**standards** 73:24,25
89:9 106:9 175:11

**standing** 105:7
135:14

**standpoint** 72:3
137:7 162:3

**stands** 81:1 137:18

**staple** 68:22

**start** 48:1 96:11
111:23 147:14
148:20

**started** 73:5 79:24

**state** 5:14 17:21
24:25 71:25 73:20
75:20,22,24 76:13,
18 77:19 78:7 83:21
89:3 94:3,6 105:24
106:18 158:5 175:4

**stated** 16:2 19:6
28:5 52:1 54:10
58:13 64:7 65:16,17
66:1 69:12 71:10
73:5 81:22 84:21
86:23 89:19 93:8,20
157:19

**statement** 35:25
36:11,13 41:3 52:20
79:12 89:19,21
106:7,20 115:18
152:25 181:23

**statements** 36:20
142:16

**states** 4:8 12:5
34:15,20 65:6 67:3
68:3 72:9 81:6 82:3
87:7 120:16 128:8
171:22

**stating** 65:23 73:4
75:16 133:23

**statutory** 73:15
83:14

**stay** 67:5 154:1,24
162:15,17,23
166:23,24 185:1

**stayed** 21:7 64:12
154:25

**staying** 96:21

**stays** 82:19 124:24
153:25

**steel** 63:9 66:2,3
74:12 76:3 82:20
84:24 95:16 98:17

**standpoint** continued

119:23 124:12,14,16
125:4 129:4 132:17
135:9 139:10 143:12
144:1 161:23 163:8,
9 183:5,10,11

**sticking** 88:9,10
148:2

**stop** 30:3

**stopped** 184:23,24

**stored** 67:14

**stores** 122:7,9

**story** 106:15

**straight** 82:18 145:9

**strain** 66:7

**strained** 66:7,8

**stream** 121:9,10

**street** 6:20

**strength** 109:7
111:10,12 163:7

**stressed** 141:11,24

**stresses** 141:15

**strike** 14:19,20 18:1

**strong** 64:8 67:3
106:25 126:7,9
127:20 159:6 162:7

**struck** 63:9

**structural** 69:22
86:23 145:7

**structure** 129:21
144:12

**students** 134:12

**studied** 12:25

**studies** 32:19 33:4,
16,17 34:10,16
130:16

**study** 42:18 169:20

**stuff** 40:9

**subconcussive**
35:23 42:7

**subdural** 76:5,6
84:25 86:15,20
129:22 143:25



**Orange Legal**
**800-275-7991**

Case: 3:14-cv-00017-CVG-RM   Document #: 166   Filed: 05/29/15   Page 209 of 211

REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                                            Index: subject..training

144:13,25 145:2,8 175:5

**subject** 12:25 15:16 16:19 51:4 64:20 77:24 81:24 82:25 93:23 151:20 154:18

**submitted** 77:20

**subsequent** 21:11, 13 90:7 103:8,9 166:7 174:10,23

**substitute** 134:16

**substituted** 99:21

**sudden** 80:3 167:12 175:21

**sufficient** 64:6 97:1 152:5 159:5

**sufficiently** 105:1 163:19

**suggest** 14:9

**suggested** 85:10

**suggestions** 83:14

**Suite** 4:13

**summarize** 164:9, 14

**sun** 58:14 77:5 101:6 153:2,6,13,18,19,23, 24 154:2,6,24,25 179:19,21 184:2

**support** 164:9,14 166:16 181:11,14

**supporting** 66:3

**supposed** 77:22 78:16 81:24 98:11 161:24 181:16

**supposedly** 111:7 184:22

**surface** 149:3

**surgeon** 11:15

**swear** 4:20 5:5

**swelling** 144:14

**sworn** 5:10

**symptoms** 43:18 91:18

**Synonymous** 145:12

---

**T**

**table** 96:23 157:20

**tablet** 103:14

**taint** 173:2

**takes** 97:14 98:15,16 105:25

**taking** 5:23 52:8 165:22

**talk** 17:15 52:3 61:1 63:22 117:9

**talked** 33:15 70:15

**talking** 13:13 29:1,2 39:17 50:1 53:19 57:17 58:8 63:3 69:11 80:20,22 90:24 102:15 107:14,15,16,18,19 116:25 120:8 125:13,15 127:24 128:11 131:9 156:18,20 159:23 160:6 184:1,3

**talks** 12:22 17:12

**tall** 111:4 183:14,15

**tan** 100:18 101:7 105:8 137:20 139:14 140:8

**tan-colored** 126:10

**Target** 122:8

**tasks** 167:1,3

**taught** 13:6 15:8 115:12

**technical** 17:6 79:18 120:10,11

**technically** 131:18

**teenager** 91:17

**teenagers** 91:14 92:16

**telescopic** 185:21

**telling** 63:17 122:22 139:16

**tells** 36:2 162:20

**temple** 75:18 82:21

**temporal** 82:21 135:10 143:13 146:18

**temporary** 114:1

**ten** 74:17 81:7,10 83:15,18 124:21 127:14

**terms** 82:17

**terrific** 28:23

**test** 82:4 91:6 93:19 99:16 114:8 126:14 130:17,20 131:19,24 154:23

**tested** 114:16 139:1 183:8

**testified** 5:11 11:1 151:4,13 156:21 165:25 166:3

**testify** 28:19,22 164:10,15,18 183:17 184:4

**testifying** 143:2

**testimony** 5:5 49:11,18 129:16 157:24 166:17 177:3,4 179:1

**testing** 34:16,18 75:22,24 76:1 78:8, 10,16 79:3,4,24 80:11,19 81:18 82:24 83:2,5,6,9 84:22 85:8,10,13 86:4 91:5 96:16 97:19 99:23 100:7 102:15,16 114:3,6 125:2,9,15 128:2 130:3 131:10,12 132:7,12,20 133:1,3 134:2 136:17 137:1 154:8 170:7 172:5

**tests** 71:3 83:2 87:17 91:3 128:12 131:14, 24 133:6 136:1 154:17

**that'd** 148:2

**that--** 62:7

**therapist** 9:19

**thing** 25:19,24 55:21 88:10 91:25 113:2 114:1 170:16 180:9

**things** 6:2 8:17 9:7 39:2 48:3,22 58:6 62:24 82:7 91:25 95:5 99:4 116:15 121:16,18 130:6 137:15 170:2

**thinking** 99:4 136:13

**Thomas** 4:7,10 5:2 19:19 24:21 27:7 31:7 33:7 128:3 143:1 154:24 171:23

**thought** 24:20 31:11 71:18 72:25 94:11 154:11 169:4 186:5

**thousand** 11:5

**thousands** 35:6 48:10 49:2 93:1

**threshold** 45:17,22 126:4

**threw** 125:17

**tie** 64:21

**tied** 120:2 157:23

**ties** 64:22,24 65:1

**tile** 85:14,19,21 86:8 95:13 96:18,19,20, 25 97:11,17,19 98:11,15,16,25 99:1, 21 100:2,8 129:3 130:4 132:13 133:8 136:19,20 139:20,25 140:6,11

**time** 4:14 6:12 8:15 17:4 22:1 29:18 34:17 35:7 40:5 41:8 49:13,17 53:24 64:19 66:13 67:12, 24 68:16 79:23,25 80:2 91:15,21 93:6 96:2 106:25 111:7, 16 123:18 126:25 127:7 128:17 132:3, 5 135:25 139:9

141:5,6,7,10,20 143:11 153:12 155:18 159:19,21 160:10 166:13,24 167:9 169:12 170:7, 11,18 173:18,20,24 175:14 185:13,19 186:4

**times** 89:21 101:23 105:20 114:8 153:4, 6,7 162:3,14

**tip** 124:18

**tipping** 85:13

**tips** 146:22

**tired** 94:10

**tissue** 99:3

**titled** 45:2

**today** 5:24 155:10 167:20 168:4,5,25 177:21

**Today's** 4:14

**toe** 145:24 146:3

**toes** 146:7

**told** 65:6 71:1,13,19 80:7 90:21 95:17 136:23,24 139:13 140:3 169:25 174:2 185:1

**tool** 64:24

**tools** 95:7

**top** 42:25 43:13 68:12 76:14 146:7

**total** 50:13,16 100:5 110:13

**totally** 13:15,17 16:12 56:7 81:21,22

**touch** 47:21

**train** 119:10 156:12

**trained** 15:19,20 65:14 66:10 115:12, 20 119:13 155:19, 20,21

**training** 13:4,18 15:6 16:1 65:12 67:18 116:14 118:9,



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM

Index: transcript..weighed

10 119:8,16 156:5,
12 157:6,19

**transcript** 43:11
58:4

**trauma** 69:13
143:22

**Traumatic** 43:21

**treat** 47:17

**treating** 48:19 94:4

**treatise** 36:14

**treatises** 48:25

**treatment** 47:20
48:20 142:6

**Treatments** 43:18

**trial** 164:15 172:12
184:8

**Tropicana** 55:8

**true** 52:20 136:18

**truth** 5:6,7 185:16

**tune** 131:22

**tunnel** 126:16,17
127:2 128:2 131:23,
24

**turn** 20:18

**turned** 103:22

**TV** 141:13

**type** 11:23 12:2 16:8,
10 34:5,16 35:2,8
45:5 46:17 49:22
79:3,4 101:17
113:22 120:12
130:2,10,11,19,20
134:2 141:25 144:9
147:21 173:18,21
178:11

**typed** 45:4

**types** 73:16 85:4
184:5

---

**U**

**Uh-huh** 14:15 32:2
39:13 48:14 61:2
63:16 72:1 75:13

78:24 84:20 100:21
114:10,19 124:20
132:14 135:17
144:23 145:19 146:1
147:24 150:13 153:3
155:6 162:2 163:16
183:24

**umbrella** 30:9 33:6
50:2 51:3,7,11 52:8,
12,16,17,21,24 53:2,
8,14,18,20 54:4,11
55:17,20,21,23 56:1,
19,22 57:23 63:9
64:8 65:22 66:3
67:6,10,16,17 68:10,
15 71:3,5 72:4 74:10
77:2,25 78:5,9,14,
15,23,25 79:1 81:7,
9,11,12,15,16,19,21,
24 82:5,7 85:9,11,14
93:14,20 95:12,25
96:1,2,9 100:3,18
101:5,8,11,19
104:20,21,24 105:3,
17,24 106:5,12,13,21
108:11,13 109:3,10
114:17,22 120:2
124:4,8,12,13,16
125:1,4 126:12,17
127:4,10,18,21,25
128:8 130:4,15
131:11 132:23
133:11 134:22
135:4,12,22 136:2,
18,24 138:1,2,19
139:1,2,3,14,15,19,
21,23 140:6,11,21
147:16 148:12,15,
17,20,21,24 149:7
150:24 151:20
152:22 153:16
154:18 158:8 159:6
160:19,22 161:9,25
162:19 163:2,8,9,10,
14,19,21 172:4,5,16,
19,24 173:5,14,21
176:12,16,23 177:7,
18 178:3 179:3
180:25 181:1,9,10,
11,12,17,25 182:13,
16,17 183:2,4,5,17
184:6,9,15,16,22
185:11,13

**umbrella's** 56:20

**umbrellas** 27:14
49:5,12,23 50:1,4,24
51:1,3,5,6,10 52:23
53:10,22,23 54:6,8,
14 55:15 56:11,14
57:18 58:8,12 59:5,
11,16 60:3 62:3,9,10
64:14,16,21 65:1
66:1 67:4,15,22 68:9
72:14 93:12 95:19
97:4,16 100:18
106:1 115:10 121:13
123:16 126:10
132:20,21,22 136:25
137:16,18 138:9,11,
15,16,20,24 139:1
149:16 150:4,23
151:1,3,5,14 155:4,
12,14,24 157:9,22
158:17 159:9
160:15,16 162:6,13
163:6 166:21 174:25
175:2 181:25 182:9,
12,24 183:23,25
184:2,3,13

**unable** 163:1

**unclear** 29:2

**unconscious** 63:12
88:15,16,25 89:11
92:4

**undersigned** 84:23

**understand** 12:7,8
34:7 38:1 39:7,8
49:25 56:15 72:12
83:1 91:25 111:10
139:22 145:22
150:12 168:24
175:10

**understanding**
16:17 36:22 92:22
173:17,23

**unfit** 152:24

**United** 4:8 12:5
34:15,20 67:2 68:3
72:9 120:16 128:8
171:22

**unlike** 92:23 118:1

**unnamed** 14:17

**upcoming** 167:3

---

**V**

**valid** 90:14

**valuate** 15:21

**valuating** 16:22

**valuation** 134:18

**varies** 66:21 133:19

**variety** 171:10

**vary** 92:5 126:4
146:21

**Vehicle** 46:23

**velocity** 127:11,19
132:3 135:18,19,21,
23 136:6 146:21,24
177:15

**verbal** 39:1

**verified** 26:12 70:10
92:10,20

**verify** 67:9

**versus** 4:6 107:1

**video** 4:15,17 14:25
103:18 125:7 166:15
184:11 186:8

**videotape** 59:6
123:19 176:23
185:11,14

**videotapes** 98:5

**viewed** 139:9

**violated** 87:2

**Virgin** 4:9

**visiting** 21:24

**visitors** 171:3

**volumes** 123:2,11

**voluminously** 17:9

**voluntary** 72:20
73:14 80:9 83:14
87:4 175:12

**volunteer** 85:18
99:18,20,24 136:3,4

**vomitatious** 58:24,
25 101:3 105:9

---

**W**

**W-e-i-s-h-e-r** 31:18

**wagers** 110:16

**wait** 72:24 118:3
120:6 130:21 170:16
186:16

**waiting** 186:24

**waive** 186:22

**walks** 92:3

**Walmart** 122:8

**wander** 99:11,13

**wanders** 99:8 104:5

**wanted** 21:8 76:9
97:22 116:17 176:22

**War** 44:7,8

**warned** 65:7

**warning** 65:15,17
67:11 155:23 156:1
158:1,2,19

**warnings** 65:14
72:19,20 73:12,13,
15,17,19 74:5 93:8
115:13 116:11
119:19 120:4,5,8,13,
14 121:11 155:9,21
157:9 158:11,12,16,
19,22

**watch** 153:14

**watched** 154:25
184:11

**watching** 184:20

**water** 154:3,5

**ways** 41:10 130:13
156:23

**wear** 146:2

**weather** 127:8

**week** 6:25 7:1

**weekly** 16:15 170:23

**weigh** 101:8 102:12
111:2 176:16

**weighed** 81:12



REDLER vs. MARRIOTT OWNERSHIP RESORTS (ST. THOMAS)
C.J. ABRAHAM                                    Index: weighing..younger

101:10,15 102:7,9,
18 176:17 184:12,
15,16

**weighing** 184:13,22
185:13

**weight** 81:11,14,21
92:2 101:11 112:25
146:5 176:23 185:11

**weights** 109:5 111:9,
19,23

**Weisher** 31:15,20
32:11

**welcomed** 185:6

**welfare** 67:19 76:22

**well-known** 45:18

**whatsoever** 116:15
141:12

**wherewithal** 134:15

**why'd** 168:14

**wide** 96:22 97:22
122:18,19 175:17

**wider** 139:11

**wife** 104:10 106:24
107:2

**Wikipedia** 43:25

**wind** 64:8 67:3 72:7
78:6 82:3,10,16
83:18 102:23 103:12
114:17 121:15
126:7,9,16,17 127:2,
7,10,11,19,21,25
128:2,17 129:7,10
131:23 132:3 134:21
135:4,12,21,22
151:22 152:5 153:9,
12,24 154:1,10,19,23
155:12,18,24 158:25
159:6 160:14,15
161:9 162:7 177:16
179:8

**winds** 127:12 149:16
160:19

**withstand** 72:6
114:18 146:9,10
149:18 152:5,14
177:15

**witnesses** 19:7

**woman** 92:7 111:21

**wood** 98:18 137:10,
12

**word** 19:3,6 73:17,
23 117:3 172:17

**words** 6:8 45:9
50:10,11,17 124:18
172:17,23 174:21

**work** 6:25 7:9 25:3
85:20 105:21 131:23
170:5,22 175:23

**worked** 26:2 92:25
109:5 114:12

**workers** 96:22

**working** 67:8 80:1
92:15 97:4 106:24
170:20 175:17

**works** 106:25

**world** 34:17 64:13
83:1 102:5 109:9
121:21 122:3,18,19
136:10 171:4 175:17

**worse** 93:6

**worth** 126:19,21
131:25

**wound** 101:14 102:5
183:6

**wrapped** 64:21

**wrist** 100:5,6

**write** 35:1 80:4,6
84:3 171:6 175:20
176:4,7,20 186:3

**writes** 130:14

**writing** 80:8 90:1
175:23 176:3

**written** 15:15 23:20
37:23 39:11 41:12
72:18 73:12 83:11
158:16 162:9 179:7

**wrong** 25:11 80:17
147:2,7,11,13,14,15

**wrote** 44:22 80:2
132:18 175:19

**X**

**Xiao** 77:21 87:9

**Xiao's** 87:14

**Y**

**year** 6:23 19:25
134:10 170:25

**years** 10:15 15:11
37:17 47:16 48:11,
21 84:13 91:11
129:25 133:7 134:17
141:4 142:20 143:14
159:8 170:6 175:18

**York** 6:17,18,24
7:10 33:1 79:25
118:1 170:14

**young** 76:5 85:1
86:15 91:14,17
144:1

**younger** 113:9

